WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200
Gregory M. Starner
Kimberly A. Haviv

Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida  33131
(305) 371-2700
John K. Cunningham
Richard S. Kebrdle (*pro hac vice* pending)

*Attorneys for Renato Fermiano Tavares*
*as Petitioner and Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| | )    Case No. 15-10937 (SMB) |
| OAS S.A., *et al.*,[1] | )    (Joint Administration Requested) |
| | ) |
|    Debtors in Foreign Proceedings | )    Chapter 15 |
| | ) |

**VERIFIED PETITION FOR RECOGNITION**
**OF BRAZILIAN BANKRUPTCY PROCEEDINGS AND MOTION**
**FOR ORDER GRANTING RELATED RELIEF PURSUANT TO**
**11 U.S.C. §§ 1515, 1517, 1520 AND 1521**

Petitioner Renato Fermiano Tavares (the "Petitioner"), the duly-authorized

foreign representative in respect of the judicial reorganization proceedings (the "Brazilian

Bankruptcy Proceedings") pending in the First Specialized Bankruptcy Court of São Paulo (the

"Brazilian Bankruptcy Court") pursuant to Federal Law No. 11.101 of February 9, 2005 (the

---

[1] The debtors in these chapter 15 cases, along with the last four digits of each debtor's tax identification or corporate registry number, are:  OAS S.A. (01-05); Construtora OAS S.A. (01-08); OAS Investments GmbH (4557); and OAS Finance Limited (6299).

"Brazilian Bankruptcy Law") of the laws of the Federative Republic of Brazil ("Brazil")

concerning OAS S.A. ("OAS"), Construtora OAS S.A. ("Construtora OAS"), OAS Investments

GmbH ("OAS Investments"), and OAS Finance Limited ("OAS Finance") (collectively, the

"Debtors," and together with their non-debtor affiliates, the "OAS Group"), by and through his

undersigned counsel, respectfully submits this verified petition (the "Verified Petition") in

furtherance of the forms of petition (collectively, the "Forms of Petition") [ECF No. 1] filed

concurrently herewith (this Verified Petition, together with the Forms of Petition, the "Petition")

and hereby requests that the Court enter an order substantially in the form annexed hereto as

Exhibit "A" (the "Proposed Order") pursuant to sections 1515, 1517, 1520 and 1521 of title 11 of

the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"):

(a) granting recognition of the Brazilian Bankruptcy Proceedings as foreign main

proceedings (as defined in section 1502(4)) pursuant to section 1517 of the Bankruptcy Code;[2]

(b) recognizing the Petitioner as the "foreign representative," as defined in section

101(24) of the Bankruptcy Code, in respect of the Brazilian Bankruptcy Proceedings;

(c) granting the Petitioner authority to examine witnesses, take evidence, and deliver

information concerning the Debtors and their businesses, and entrusting the administration,

realization and distribution of any and all of the Debtors' assets within the territorial jurisdiction

of the United States to the Petitioner; and

(d) granting such other and further relief as the Court deems just and proper.[3]

---

[2] To the extent that the Court declines to recognize the Brazilian Bankruptcy Proceedings in respect of any Debtor as a foreign main proceeding, the Petitioner requests in the alternative that the Court enter an order recognizing any such Brazilian Bankruptcy Proceeding as a foreign nonmain proceeding (as defined in section 1502(5)). In the event that the Court recognizes any Brazilian Bankruptcy Proceeding in respect of any Debtor as a foreign nonmain proceeding, the Petitioner further requests pursuant to sections 1521(a)(1)-(2) that the Court stay within the territorial jurisdiction of the United States the commencement or continuation of any individual action or proceeding concerning any such Debtor's assets, rights, obligations or liabilities and the execution against any such Debtor's assets to the same extent as provided for in section 1520(a).

[3] The Petitioner is also seeking provisional relief pursuant to section 1519 of the Bankruptcy Code pending

In support of this request, the Petitioner refers the Court to the statements contained in (A) the *Declaration of Renato Fermiano Tavares Pursuant to 28 U.S.C. § 1746 in Support of Petition for Recognition of Brazilian Bankruptcy Proceedings and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§ 1515, 1517, 1520 and 1521* (the "Petitioner Declaration") and (B) the *Declaration of Eduardo Secchi Munhoz Pursuant to 28 U.S.C. § 1746 in Support of Petition for Recognition of Brazilian Bankruptcy Proceedings and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§ 1515, 1517, 1520 and 1521* (the "Brazilian Counsel Declaration"), which are submitted concurrently herewith and incorporated herein by reference.  In further support of the relief requested herein, the Petitioner respectfully represents as follows:

## Preliminary Statement

On March 31, 2015, the Debtors duly commenced the Brazilian Bankruptcy Proceedings pursuant to the Brazilian Bankruptcy Law by filing voluntary bankruptcy petitions in the Brazilian Bankruptcy Court and, on April 1, 2015, the Brazilian Bankruptcy Court issued a decision and order approving the continuation of the joint reorganization proceedings of the Debtors and certain other members of the OAS Group.  The Debtors are part of an international engineering construction and infrastructure investment enterprise based in São Paulo, Brazil. Despite its fundamentally sound business model, the OAS Group's financial situation was seriously impacted by a severe downturn in Brazil's economy that began in 2013.  To make matters worse, the OAS Group recently was implicated in an alleged corruption case involving contracts with the oil company Petrobras, which is a state-controlled company the majority of

---

recognition of the Brazilian Bankruptcy Proceedings.  In addition the Foreign Representative has filed the *Petitioner's Motion for an Order Directing the Joint Administration of the Chapter 15 Cases of OAS S.A. and its Affiliates Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 1015(b)* [ECF No. 2] requesting that the Court order joint administration of these chapter 15 cases.

whose shares are owned by the Brazilian government.  In November 2014,  Petrobras included

OAS on a list of 23 firms blocked from obtaining further contracts with the oil company, leading

to successive and significant downgrades of its credit ratings from the major rating agencies.

Handicapped in its ability to access the credit markets to obtain the liquidity

needed to sustain its operations, the OAS Group announced, in January 2015, that it would cease

payments on its financial debt in order to maintain operations and avoid collapse while it began

negotiating with its creditors toward a global resolution of its financial distress.  Despite these

efforts, a total of seven lawsuits have been filed against the OAS Group in Brazil, which have

resulted in orders attaching strategic assets such as cash, certain unencumbered shares of

Investimentos e Participações em Infraestrutura S.A. ("Invepar") (which is one of the OAS

Group's most valuable assets) and 49.60% of shares held by OAS in Fonte Nova Negócios e

Participações S.A, a concessionaire responsible for the maintenance and operation of World Cup

stadium, Fonte Nova.  The threat of an uncontrolled scramble for assets with its detrimental

consequences to going-concern value (and thus to creditors as a whole) rendered an out-of-court

restructuring the OAS Group's liabilities impossible.  Accordingly, as the number of such suits

increased, OAS and certain of its subsidiaries were left with no alternative but to commence the

Brazilian Bankruptcy Proceedings.

Although the OAS Group's assets in the United States were limited to New York

bank accounts maintained to effect dollar-denominated international transactions, certain alleged

holders of notes issued by OAS Finance and OAS Investments and guaranteed by OAS and OAS

Construtora have also initiated litigation in the United States.  On February 4, 2014, Aurelius

Investment, LLC commenced an action against the Debtors in the Supreme Court of the State of

New York and a second New York lawsuit was launched by the Alden Global Adfero BPI Fund,

4

Limited and certain of it affiliates (described below) on February 18, 2014.  Then, on March 5, 2015, a third lawsuit was commenced by Huxley Capital Corporation, an affiliate of Aurelius Investment, LLC, in the United States District Court for the Southern District of New York alleging that the merger of OAS Investimentos S.A. with OAS and certain asset transfers constituted fraudulent conveyances.   In view of these actions, the fact that a major portion of the OAS Group's financial debt is comprised of New York law-governed, U.S. dollar-denominated notes along with the urgent need to centralize and coordinate the OAS Group's reorganization efforts in Brazil, the Debtors determined that the filing of these chapter 15 cases and the concurrent request for immediate provisional relief at this time was appropriate and necessary.

Accordingly, the Petitioner is commencing these cases to obtain recognition of the Brazilian Bankruptcy Proceedings as foreign main proceedings and certain related relief detailed below.

## Background

### A.  The OAS Group

1.     The OAS Group is among the largest and most experienced infrastructure companies in Brazil, focusing on heavy engineering and equity investments in infrastructure projects located in and outside Brazil and abroad for both public and private clients.  The OAS Group is engaged in a range of services such as public concessions, construction, engineering, planning, execution and works management for the transportation, power, sanitation, infrastructure and real estate industries, providing services in 22 countries in Latin America, the Caribbean and Africa.  Its principal operating activities are organized into two major divisions: *Engineering*, which engages in heavy civil engineering and construction projects, and *Investments*, which is focused on private investments in infrastructure and public and private services concessions.

5

2.      Most of the OAS Group's foreign construction contracts are with the national governments of countries in Latin America and Africa and to build, among other things, highways, hospitals, water and sewage systems and affordable housing.  The OAS Group's domestic construction contracts are with private companies holding concessions, other private companies and the federal and local Brazilian governments (such as the Brazilian states of São Paulo, Rio de Janeiro and Minas Gerais) and to build, for example, various roads and bridges. The OAS Group employs, directly or indirectly, approximately 110,000 people.

3.      Through its Investments division, OAS holds stakes in a number of valuable enterprises, including its 24.4 % stake in Invepar, which is one of the largest concession companies in Brazil, comprising 12 public-service concessionaires in the toll road, urban mobility and air transportation industries.   In addition, OAS directly or indirectly owns or partially owns: (i) a company that manages three sports arenas in Brazil, (ii) 41 residential, commercial and mixed-use properties in five Brazilian states, (iii) sanitation companies that service more than 1.4 million customers, (iv) a company holding a concession related to an aqueduct in Peru, (v) interests in two ultra-deep water drillships operating under long-term contracts with Petrobras, (vi) a shipyard that is under construction that will be used to build vessels for oil and gas exploration in the Brazilian pre-salt layer and (vii) a residential complex in the city of Rio de Janeiro being developed in connection with the upcoming 2016 summer Olympics.

**B.  The Debtors**

4.      OAS is the holding company at the apex of the OAS Group.  Its share capital is divided between CMP Participações Ltda. (99.9% owned by Mr. Cesar de Araújo Mata

6

Pires) with 450,000,000 common shares (90%) and LP Participações e Engenharia Ltda (99.9%

owned by Mr. José Adelmário Pinheiro Filho) with 50,000,000 common shares (10%).

5.    OAS directly owns 99.9999997% of the share capital of Construtora OAS,

the holding company at the top of Engineering Division, and indirectly owns the rest.

Construtora OAS, through its subsidiaries and branches, conducts business in Brazil, Peru,

Trinidad and Tobago, Ghana, Uruguay, Chile, Honduras, Argentina, Bolivia, Colombia,

Mozambique, Guinea, Ecuador, Equatorial Guinea, Haiti, Costa Rica, Panama, Angola, and

Guatemala.  Construtora OAS' operations in Brazil consist of more than 80 construction projects

that generate more revenue for Construtora OAS than its operations in any other country.

6.    As evidenced by certificates of registry (the "Certificates of Registry")

from the Office of the Presidency of the Commercial Board of the State of São Paulo (part of the

Office of Economic Development, Science, Technology and Innovation), each of OAS and

Construtora OAS maintains its registered office in the city of São Paulo.   Copies of each

Certificate of Registry are attached to the Petitioner Declaration as Exhibit "E," and certified

translations of each from Portuguese to English are attached to the Petitioner Declaration as

Exhibit "F."

7.    OAS Investments, a financing vehicle for the OAS Group, has its

registered office in Weiner Neustadt at the address Fischhof 3/6, 1010 Vienna, Austria.  OAS

Investments is directly and wholly owned by OAS.

8.    OAS Finance, another OAS Group financing vehicle, maintains its

registered office at Trident Trust Company (B.V.I.) Limited, Trident Chambers, P.O. Box 146,

Road Town, Tortola, British Virgin Islands.  It is wholly owned by OAS through OAS

Investments Limited, another BVI-registered company.

7

### C.  Center of Main Interests

9.      Each of the Debtors is operationally and functionally centered in São Paulo, Brazil.  For instance, each of the Debtors are governed, managed and directed from the OAS Group's headquarters in São Paulo, Brazil, the members of each of the Debtors' boards of directors reside and hold meetings in São Paulo, Brazil, all of the accounting, finance, marketing, research and development, legal services, human resource management, cash management and other operational and administrative activities and/or decision-making are conducted in São Paulo, Brazil.  Further, all key expenditures and policy decisions are made by staff located in São Paulo, Brazil and, aside from the Noteholders, substantially all of the OAS Group's creditors are located in Brazil.

10.      Each of the Debtors is incorporated under the laws of Brazil except for OAS Investments and OAS Finance, which are incorporated under the laws of Austria and the British Virgin Islands, respectively.  Although OAS Finance and OAS Investments maintain their registered offices in the British Virgin Islands and Austria (as required under local law), neither conducts its business, which in each case is limited to the issuance and management of the Notes (as defined below), owns assets or has employees in the British Virgin Islands or Austria.  No matter the law of their incorporation or location of their registered office, head office functions for each of OAS Finance and OAS Investments occur in Brazil.  Indeed, decisions about the most important functions of the Notes issuers and payments on the Notes are made exclusively in Brazil.  Moreover, all or substantially all negotiations regarding the Brazilian Bankruptcy Proceedings (including restructuring of the Notes) have occurred in Brazil.  Further, the Notes issuers do not appear to have obligations owing to BVI or Austrian creditors, except to the extent that any beneficial holders of the Notes happen to be from those countries.

Americas 9352028

In addition, they have no suppliers in the BVI or Austria.  The only contractor providing OAS

Finance with services in the BVI is its domicile agent, Trident Trust Company Ltd.   The only

contractors that provide or provided services to OAS Investments in Austria are TAXCOACH

Wirtschaftsprüfung und Steuerberatung GmbH, a local accounting and tax services provider,

Schindler Rechtsanwälte GmbH, a local legal advisor, Weinder Seitung GmbH, a local

newspaper and Bieber Brix & Partners, a notary.  The services provided by these Austrian

contractors consist of local services related primarily to the establishment and maintenance of

OAS Investments' registered office in Austria and, secondarily, to various ministerial services

related to the issuance of the 2019 Notes (as defined below).  The limited services provided by

these contractors and the total absence of suppliers in the BVI and Austria further demonstrate

the limited nature of the Notes issuers' presence in those countries (i.e., that they are mere

"letterbox" companies).

### D.  Summary of the OAS Group's Debt Structure

11.     The OAS Group has total debt of approximately R$ 9.2 billion, including

claims by surety, endorsements, or joint obligations.[4]  In addition, the OAS Group has a labor

claim pending judgment in the Brazilian courts in an undetermined amount (because it has not

yet been reduced to judgment).  The OAS Group does not intend to seek to restructure valid

labor claims in the Brazilian Bankruptcy Proceedings.

12.     Approximately R$ 400 million of the OAS Group's debt is secured.   The

OAS Group has only one secured creditor, FI-FGTS, which holds a security interest in 5.95% of

total shares in Invepar that were pledged in connection with a R$ 400 million local debenture.[5]

---

[4] The OAS Group's indebtedness is comprised of amounts in Brazilian Reais (R$) and US dollars.  As of April 7,
2015, R$ 100 is equal to approximately US$ 32.08.

[5] As noted above, OAS owns 24.4% of the total outstanding shares of Invepar.

Americas 9352028

In addition, FI-FGTS holds a fiduciary assignment under Brazilian law of certain receivables of the OAS Group.  Fiduciary assignments are not subject to the Brazilian Bankruptcy Law.  See Brazilian Counsel Decl. at ¶ 22.

13.    Approximately R$ 6.1 billion of the OAS Group's debt is unsecured, subject to the Brazilian Bankruptcy Law and may be restructured under a Brazilian reorganization plan approved by the requisite majorities of creditors in a creditors meeting and the Brazilian Bankruptcy Court.

14.    Approximately R$ 2.18 billion of the unsecured debt arises under various debt securities issued in both Brazil and in the United States.  The United States debt instruments consist of approximately US$ 1.78 billion in U.S.-dollar denominated notes governed by New York law indentures.  Specifically, OAS Finance issued (i) certain 8.875% perpetual notes (the "Perpetual Notes") in the aggregate principal amount of US$ 500,000,000 and (ii) certain 8.00% Senior Notes due in 2021 (the "2021 Notes," and together with the Perpetual Notes, the "OAS Finance Notes") in the aggregate principal amount of US$ 400,000,000.  OAS Investments issued (i) certain 8.25% Senior Notes due in 2019 (the "2019-I Notes") in the aggregate principal amount of US$ 500,000,000 and (ii) certain 8.25% Senior Notes due in 2019 (the "2019-II Notes," and together with the 2019-I Notes, the "OAS Investments Notes," and together with the OAS Finance Notes, the "Notes") in the aggregate principal amount of US$ 375,000,000.  OAS and Construtora OAS have guaranteed all of the Notes.[6]  The Notes are general, unsecured obligations of the issuers and each of the guarantors and are pari passu with each obligor's other

---

[6] The Notes were also originally also guaranteed by OAS Investimentos S.A.  In order to reduce costs and in an effort to streamline the OAS Group's corporate structure, OAS Investimentos S.A. was merged into OAS on December 26, 2014.  In addition, on December 1, 2014, the Construtora OAS transferred it 24.4% stake in Invepar to OAS Infraestrutura S.A, a subsidiary of OAS.

10

unsecured obligations.[7]

### E.  Events Precipitating Commencement of the Brazilian Bankruptcy Proceedings

15.    Despite the OAS Group's prominent position in Brazil's construction and engineering market, ripple effects from the Petrobras investigation and adverse economic conditions have impaired its financial position.

16.    Since March 2014, the Brazilian oil company Petrobras has been under official investigation as a consequence of an ongoing Brazilian federal government-led anti-corruption case involving most of Brazil's largest construction companies and at least 14 suppliers.    On November 21, 2014, Petrobras released a list of 23 firms – including OAS – that were temporarily blocked from competing for new contracts with Petrobras, leading Standard & Poor's to downgrade OAS to 'B+' from 'BB-', even though only approximately 3% of the OAS Group's revenues were derived from contracts with Petrobras.

17.    These events, together with the general slowdown in the Brazilian economy, have led to a decrease in cash generation, and the poorer credit ratings have made it extremely difficult and expensive for the OAS Group to obtain credit to finance its projects, the magnitude of which requires large amounts of capital to fund and operate.  Meanwhile, the decline in value of the Brazilian real relative to other currencies (including the U.S. dollar) has further decreased the OAS Group's ability to service its existing total debt.

18.    As a result, in January of 2015, the OAS Group announced that it would cease making payments to its financial creditors while it worked to propose a global restructuring plan to its creditors.

19.    Indeed, the OAS Group has been engaging with its major financial

---

[7] Deutsche Bank Trust Company Americas (the "Indenture Trustees") acts as the Indenture Trustee, Registrar, Transfer Agent and New York Paying Agent for the Notes, and Deutsche Bank Luxembourg S.A. acts as the Irish Paying Agent for the Notes.

Americas 9352028

creditors, seeking to find solutions mutually beneficial to the OAS Group, its employees,

creditors and other stakeholders.  Several institutions holding a significant portion of the Notes

have formed an ad hoc group (the "Ad Hoc Group").  The Ad Hoc Group retained separate

counsel and an independent financial advisor in January of 2015.  After weeks of frequent and

cooperative dialogue with the Ad Hoc Group's advisors, representatives from the OAS Group

and its financial and business operations advisors met with the Ad Hoc Group's financial advisor

on March 13, 2015 to further intensify fact gathering and to discuss the OAS Group's business

plan.  Since then, further information meetings between advisors have been ongoing.  The OAS

Group's advisors have gone to great lengths to facilitate the Ad Hoc Group's advisors' requested

due diligence on the OAS Group and to explore the avenues for a viable turnaround of their

operations.  Indeed, the OAS Group has been paying the Ad Hoc Group's advisors' fees and has

every intention to continue to do so while this constructive process continues.  In sum, the OAS

Group has engaged with the Ad Hoc Group and its other principal creditors with a view toward

coming to a financial and operational restructuring plan satisfactory to its principal creditor

constituency.

   20. Although most creditors have continued to work together with OAS to

find consensual solutions to preserve and distribute value, and the OAS Group believes

substantial progress has been made, a few creditors have begun to seek individual remedies.  Of

the seven lawsuits against the OAS Group pending in Brazil, prior to the commencement of the

Brazilian Bankruptcy Proceedings, there were six collection or attachment actions in various

stages of litigation.  As a result, key assets of the OAS Group were subjected to attachment,

including cash assets, 8.89% of the valuable unencumbered shares that OAS indirectly holds in

Invepar, and 49.60% of shares held by OAS S.A. in Fonte Nova Negócios e Participações S.A,

12

the concessionaire previously mentioned that is responsible for the maintenance and operation of World Cup stadium, Fonte Nova.  The continuation and growing number of these actions and resulting attachments made it increasingly difficult for the OAS Group to continue business operations, making the need for a global solution to its financial difficulties urgent.

### F.  The Actions Filed in the Supreme Court of the State of New York

21.     As already noted, litigation against the Debtors has also been commenced in the United States.  Under the indenture governing the 2021 Notes (the "Indenture"), OAS Finance (as issuer), and OAS, Construtora OAS, and OAS Investimentos S.A.[8] (as guarantors) consented to the non-exclusive jurisdiction of the New York courts.[9]

22.     On January 2, 2015, OAS Finance failed to make a scheduled interest payment on the 2021 Notes.  After the payment obligation remained unsatisfied for 30 days, on February 3, 2015, Aurelius Investment, LLC ("Aurelius"), a purported holder of 2021 Notes, delivered a "Notice of Acceleration" under the 2021 Notes to the OAS Finance and its guarantors thereunder.  Aurelius claimed to hold over 25% of the 2021 Notes and purported to declare the full outstanding balance of the Notes immediately due and payable.

23.     The next day, on February 4, 2015, unbeknownst to OAS or any other noteholder, Aurelius commenced litigation (the "Aurelius Litigation") by filing a verified complaint and an ex parte Application for Order of Attachment under Rule 62 of the New York State Civil Practice Law and Rules (the "CPLR") against OAS Finance, OAS, Construtora OAS, and OAS Investimentos S.A. (together, the "Existing State Litigation Defendants") in the

---

[8] As noted above, OAS Investimentos was merged into OAS.

[9] The Indenture provides that OAS, Construtora OAS, and OAS Investimentos consent to the non-exclusive jurisdiction of the New York Courts with respect to "any legal action, suit or proceeding against it with respect to its obligations, liabilities or any other matter arising out of or in connection with th[e] Indenture."  Indenture §§ 13.08, 13.12.

Americas 9352028

Supreme Court of the State of New York, County of New York (the "New York State Court").[10]

Aurelius also filed its materials under seal, thus preventing the Existing State Litigation

Defendants from learning of the lawsuit.

      24.    Aurelius sought, on an ex parte basis, prejudgment attachment in the

amount of $109,933,802.22, i.e., for its alleged principal and accrued interest under the 2021

Notes.  Notably, Aurelius argued that the New York State Court has jurisdiction to, and should,

attach not only the Existing State Litigation Defendants' property within the State of New York

but also all of the Existing State Litigation Defendants' intangible property, wherever located.

Aurelius asserted that its proposed attachment was "needed to secure plaintiff's potential

judgment . . . because (a) defendants are foreign corporations without domicile or residence in

New York, (b) many of the assets sought to be attached are liquid in nature (e.g., bank or

brokerage accounts), and (c) defendants are in acute financial distress that draws into question

whether any potential judgment would be paid unless secured by an attachment."  Memorandum

of Law in Support of Plaintiff's Ex Parte Application for Order of Attachment, Aurelius

Investment, LLC v. OAS Finance Limited, et al., No. 650312/2015 at 7 (Sup. Ct. Feb. 4, 2015).

      25.    On February 9, 2015, the New York State Court issued the requested ex

parte order of attachment.  The Sheriff of the City of New York was ordered to levy within his

jurisdiction any property of any Existing State Litigation Defendant to secure and satisfy the

sum.  The Existing State Litigation Defendants were also prohibited from "selling, assigning,

transferring or paying over to any person other than the Sheriff" any property or debt covered by

---

[10] In addition to this lawsuit, Aurelius is also fully participating in the Brazilian Bankruptcy Proceedings and has filed papers with the Brazilian Bankruptcy Court seeking various forms of relief.

the Order.

26.    On February 18, 2015, a nearly-identical lawsuit (the "Alden Litigation"

and, together with the Aurelius Litigation, the "Existing State Litigation") was filed against the

Existing State Litigation Defendants by Alden Global Adfero BPI Fund, Ltd., Alden Global

Opportunities Master Fund, L.P., Alden Global Value Recovery Master Fund, L.P., and Turnpike

Limited (together, "Alden"), which together claim to beneficially own $29,070,000 of the 2021

Notes.  Alden is represented by the same law firm representing Aurelius, relies on the same

alleged default and acceleration as Aurelius, and has moved for an order of attachment identical

to that sought by Aurelius (other than the sum sought to be attached).  Alden's motion for

attachment is proceeding on the same schedule as that of Aurelius.

27.    The Aurelius Litigation and the Alden Litigation have both been assigned

to Justice Lawrence K. Marks and are proceeding on the same schedule.  On March 13, 2015,

Defendants filed papers opposing the requested attachments on the basis that (i) the attachments

are barred by the Indenture's "equal and ratable" provision, which prohibits noteholders from

gaining priority or preference over other noteholders (which is exactly what Aurelius and Alden

are attempting to do), (ii) Aurelius and Alden have failed to demonstrate any need for an

attachment, and (iii) there is no basis for an order of attachment in respect of the Existing State

Litigation Defendants' global property.  The matters are scheduled to be heard on April 27, 2015.

**G.  Action in the U.S. District Court for the Southern District of New York**

28.    On March 5, 2015, Huxley Capital Corporation ("Huxley"), a company

affiliated with Aurelius,[11] filed a complaint (the "Huxley Litigation" and, together with the

Existing State Litigation, the "Existing Litigation") against OAS S.A., Construtora S.A., OAS

---

[11] Huxley's affiliation with Aurelius was not disclosed in Huxley's complaint. It only later came to light when
Aurelius issued a press release following the commencement of the Brazilian Bankruptcy Proceedings in which
Aurelius asserted unfounded negative statements about the OAS Group.

Americas 9352028

Investimentos S.A., OAS Infraestrutura S.A., and OAS Engenharia e Construção S.A. (together the "Huxley Defendants") in the United States District Court for the Southern District of New York.

29.    Huxley alleges that it is the beneficial owner of an undisclosed amount of 2021 Notes and the 2019 Notes issued by OAS Finance and OAS Investments, respectively.  As previously noted, both sets of Notes are guaranteed by OAS and Contrutora OAS.[12]

30.    In its complaint, Huxley seeks to set aside, allegedly as fraudulent conveyances, three separate corporate actions—all of which took place between Brazilian companies in Brazil.  These corporate actions consist of: (1) the transfer of assets from Construtora OAS to OAS Engenharia e Construção S.A. on December 1, 2014; (2) the transfer of Invepar shares from OAS Investimentos S.A. to OAS Infraestrutura S.A. on December 26, 2014; and (3) OAS' merger with OAS Investimentos S.A. on December 26, 2014.   Notably, these challenges overlap with relief that Aurelius is seeking in parallel proceedings in Brazil.

31.    The Huxley Litigation has been assigned to Judge Gregory H. Woods. The Huxley Defendants have until April 20, 2015 to move, answer or otherwise respond to Huxley's complaint.  An initial pre-trial conference is set for April 28, 2015.

## H.  The Brazilian Bankruptcy Proceedings

32.    As noted above, the OAS Group has suffered from its inability to generate cash as a result of the Brazilian economic downturn and the negative publicity resulting from the Petrobras investigation.  Consequently, the OAS Group's cash reserves have been negatively impacted.  These factors, combined with the growing number of lawsuits and attachments, particularly in Brazil, led the management of the OAS Group to the conclusion that the

---

[12] The Notes were also originally guaranteed by OAS Investimentos, however, as noted above, OAS Investimentos was merged into OAS.

Americas 9352028

reorganization process available through the Brazilian Bankruptcy Proceedings was the best option to preserve enterprise value for the benefit of all stakeholders.

33.     On March 31, 2015, the Debtors duly commenced the Brazilian Bankruptcy Proceedings pursuant to the Brazilian Bankruptcy Law by filing voluntary bankruptcy petitions in the Brazilian Bankruptcy Court.  On April 1, 2015, the Brazilian Bankruptcy Court issued a decision and order (the "Brazilian Bankruptcy Court Order") approving the continuation of the Brazilian Bankruptcy Proceedings.  A copy of the Brazilian Bankruptcy Court Order from the electronic judicial files of the Brazilian Bankruptcy Court is attached to the Petitioner Declaration as Exhibit "A" and a certified translation of the Brazilian Bankruptcy Court Order from Portuguese to English is attached to the Petitioner Declaration as Exhibit "B."

34.     Specifically, the Brazilian Bankruptcy Court determined that all of the members of the OAS Group included in the joint petition for relief under the Brazilian Bankruptcy Law.  Commencement Order at 3329.  The court expressly found that the OAS Finance and OAS Investments have their "principal center of activities (COMI – Center of Main Interest)" in Brazil, are "fully controlled by OAS," and "operate exclusively for acquiring resources abroad. . . ."  Id.

**I.   Connections to the United States**

35.     The Debtors do not have a domicile or any place of business in the United States.  Petitioner Decl. ¶ 43.  As of the date hereof, however, Construtora OAS held, in its own name or in the names of its branches,[13] approximately US$ 5,626,000 on deposit with BNP Paribas, New York Branch and approximately US$ 276,000 on deposit with Citibank N.A.  Id. Such funds have been levied by the Sheriff of New York City and have been turned over to the

---

[13] Construtora OAS' branches are not legal entities separate from Construtora OAS.

Sheriff pursuant to the ex parte order of attachment that Aurelius secured from the New York

State Court.  Id.  Construtora OAS also has two deposit accounts with Banco do Brasil (New

York Branch).  The funds in these accounts, approximately US$ 39,000 and US$ 1,200

respectively, have also been levied by the Sheriff of New York City pursuant to the ex parte

order of attachment.  Id.  OAS Investments maintains a bank account at the New York branch of

Itaú BBA Nassau, which as of the date hereof holds approximately US$ 12,000.  Id.  Finally, as

of the date hereof, OAS has US$ 9,950 and OAS Finance has US$ 10,000 in separate client trust

accounts with White & Case LLP in New York County, New York.  Id.  The presence of these

assets, the pendency of the lawsuits filed in New York and the fact that the Notes are governed

by New York law and denominated in U.S. dollars make ancillary chapter 15 relief in support of

the Brazilian Bankruptcy Proceedings necessary to achieve an equitable, global resolution of the

OAS Group's financial distress.

### Jurisdiction, Eligibility and Venue

36.    This Court has jurisdiction to consider this Petition pursuant to sections

157 and 1334 of title 28 of the United States Code, as well as the Amended Standing Order of

Reference dated January 31, 2012, Reference M-431, In re Standing Order of Reference Re:

Title 11, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.) (the "Amended Standing

Order").

37.    These cases have been properly commenced pursuant to section 1504 of

the Bankruptcy Code by the filing of this Petition for recognition of the Brazilian Bankruptcy

Proceedings pursuant to section 1515 of the Bankruptcy Code.  These are core proceedings

pursuant to section 157(b)(2)(P) of title 28 of the United States Code, and the Court may enter a

final order in respect of them under Article III of the United States Constitution.

38.     Venue is proper in this Court pursuant to section 1410(1) of title 28 of the United States Code (stating that venue is proper where debtor has principal U.S. assets or principal place of business) as the Debtors' only assets within the United States, deposit accounts, interests in funds in the custody of the Sheriff of New York City, and interests in client trust accounts with White & Case LLP, are all located in New York County and thus within this District.  The Debtors have no places of business within the United States.

39.     Similarly, the presence of such assets within the United States makes the Debtors eligible to be debtors under chapter 15 in accordance with section 109(a) of the Bankruptcy Code.  See Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet), 737 F.3d 238, 248-49 (2d Cir. 2013) (applying section 109(a)'s local property requirement to chapter 15 cases); In re Octaviar Admin. Pty Ltd., 511 B.R. 361, 372-73 (Bankr. S.D.N.Y. 2014) (holding cash in client trust account maintained by the foreign representatives' U.S. counsel satisfied the section 109(a) requirement); see also In re Global Ocean Carriers, Ltd., 251 B.R. 31, 38-39 (Bankr. D. Del. 2000) (retainers held by local attorneys of debtors suffice for eligibility under section 109(a)).

40.     The statutory predicates for the relief requested herein are sections 1515, 1517, 1520 and 1521 of the Bankruptcy Code.

## Relief Requested

41.     The Petitioner requests that this Court enter an order, substantially in the form of the Proposed Order attached hereto and pursuant to sections 1515, 1517, 1520, and 1521 of the Bankruptcy Code, that:

a)  recognizes the Brazilian Bankruptcy Proceedings as foreign main proceedings pursuant to section 1517 of the Bankruptcy Code;

b)  recognizes the Petitioner as the "foreign representative" of the Debtors as defined in section 101(24) of the Bankruptcy Code in respect of the Brazilian Bankruptcy

19

Proceedings;

c)  grants the Petitioner authority to examine witnesses, take evidence, and deliver information concerning the Debtors and their businesses, and entrusts the administration, realization and distribution of any and all of the Debtors' assets within the territorial jurisdiction of the United States to the Petitioner; and

d)  grants such other and further relief as the Court deems just and proper.

(the "Relief Requested").

## Bases for Relief

**A.    The Court Should Recognize the Brazilian Bankruptcy Proceedings as Foreign Main Proceedings and the Petitioner as their Foreign Representative**

42.    The Relief Requested is based on the provisions of chapter 15 and certain other provisions of the Bankruptcy Code discussed in detail below.  The purpose of chapter 15 is to "incorporate the Model Law on Cross-Border Insolvency (the "Model Law") so as to provide effective mechanisms for dealing with cases of cross-border insolvency."  11 U.S.C. § 1501(a). Thus, "[t]he language of chapter 15 tracks the Model Law, with adaptations designed to mesh with United States law.  Congress prescribed a rule of interpretation that expressly requires United States courts to take into account the statute's international origin and to promote applications of chapter 15 that are consistent with versions of the Model Law adopted in other jurisdictions."  In re Pro-Fit Int'l Ltd., 391 B.R. 850, 857 (Bankr. C.D. Cal. 2008); see also Krys v. Farnum Place, LLC (In re Fairfield Sentry Ltd.), 768 F.3d 239, 245 (2d Cir. 2014) (quoting statute); In re British Am. Ins. Co., 425 B.R. 884, 899 (Bankr. S.D. Fla. 2010).  Accordingly, in interpreting chapter 15, a court is to "consider its international origin, and the need to promote an application of [chapter 15] that is consistent with the application of similar statutes adopted by foreign jurisdictions."  11 U.S.C. § 1508.[14]

---

[14] The legislative history notes that "[i]nterpretation of [chapter 15] on a uniform basis will be aided by reference to the Guide [to Enactment of the UNCITRAL MODEL LAW on Cross-Border Insolvency, U.N. Gen. Ass., UNCITRAL 30th Sess. U.N. Doc. A/CN.9/442 (1997) (the "Guide")] and the Reports cited therein, which explain

Americas 9352028

43.     Section 1517(a) of the Bankruptcy Code provides that, after notice and a

hearing, the Court shall enter an order recognizing a foreign proceeding as a foreign main

proceeding if (1) such foreign proceeding is a foreign main proceeding within the meaning of

section 1502 of the Bankruptcy Code, (2) the foreign representative applying for recognition is a

person or body, and (3) the petition meets the requirements of section 1515 of the Bankruptcy

Code.  See In re Overnight & Control Comm'n of Avánzit, S.A., 385 B.R. 525, 532 (Bankr.

S.D.N.Y. 2008).  As explained below, the Brazilian Bankruptcy Proceedings, the Petitioner and

this Petition satisfy all of the foregoing requirements.

### 1.     The Brazilian Bankruptcy Proceedings Are Foreign Main Proceedings

44.     The Brazilian Bankruptcy Proceedings are each foreign main proceedings

and, as such, satisfy the first condition for the entry of an order recognizing such proceedings

under section 1517(a) of the Bankruptcy Code.

45.     First, the Brazilian Bankruptcy Proceedings meet the definition of "foreign

proceeding" set forth in section 101(23) of the Bankruptcy Code.[15]  Section 101(23) requires that

a "foreign proceeding" be (1) a collective judicial or administrative proceeding relating to

insolvency or adjustment of debt, (2) pending in a foreign country, (3) under the supervision of a

foreign court and (4) for the purpose of reorganizing or liquidating the assets and affairs of the

debtor.  See 11 U.S.C. § 101(23).  The Bankruptcy Code defines "foreign court" as "a judicial or

other authority competent to control or supervise a foreign proceeding."  See 11 U.S.C. §

1502(3).

---

the reasons for the terms used and often cite their origins as well."  H. Rep. No. 109-31, Pt. 1, 109th Cong., 1st Sess. 109-110 (2005).

[15] "'[F]oreign proceeding' means a collective judicial . . .  proceeding in a foreign country . . . under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization."  11 U.S.C. § 101(23).

Americas 9352028

46.     The Brazilian Bankruptcy Proceedings are "collective" in the sense that they involve the treatment of multiple creditors and claims together rather than a resolution of merely a two-party dispute.  Indeed they culminate in a restructuring plan that normally would require approval by impaired creditors representing at least half in number and claim amount (depending on the class of claims) in order to proceed, though a "cramdown" procedure with different voting requirements also exists.  See Brazilian Counsel Decl. ¶¶ 22-23.  The restructuring plan, as contemplated by the Brazilian Bankruptcy Law, is intended to directly or indirectly benefit all creditors collectively rather than to benefit any single creditor alone.  Id. ¶ 17.

47.     Proceedings under the Brazilian Bankruptcy Law are commenced upon filing of a petition for relief with the Brazilian Bankruptcy Court, at which time the claims against the debtor are fixed. See Brazilian Counsel Decl. ¶ 9.  As noted above, on March 31, 2015, the Debtors filed voluntary petitions for relief under the Brazilian Bankruptcy Law and, on April 1, 2015, the Brazilian Bankruptcy Court entered the Brazilian Bankruptcy Court Order.  Thus, the Brazilian Bankruptcy Proceedings have been properly commenced and are therefore pending in a foreign country.

48.     The Brazilian Bankruptcy Proceedings are judicial proceedings, as they are presided over, supervised by, and may not be dismissed without an order of the Brazilian Bankruptcy Court, a judicial body of Brazil, whose approval is also necessary for the restructuring plan to become effective.  Brazilian Counsel Decl. ¶¶ 8, 22.  The Brazilian Bankruptcy Court retains jurisdiction to enforce the restructuring plan, including by specific performance.  Id.  ¶ 24.  Moreover, immediately following the filing of a petition for relief under the Brazilian Bankruptcy Law, the Brazilian bankruptcy judge must approve any disposals of or

22

new encumbrances upon any of the debtor's permanent assets.  <u>See</u> Brazilian Counsel Decl. ¶ 9.

49.    The Brazilian Bankruptcy Proceedings are pending in a foreign country
(Brazil) under a law relating to insolvency, <u>see</u> Brazilian Counsel Decl. ¶ 6, pursuant to which
the assets and affairs of a debtor are subject to the control and supervision of the Brazilian
Bankruptcy Court.  <u>See</u> <u>id.</u> ¶ 8, 22.  Indeed, the Brazilian Bankruptcy Law has many features in
common with or similar to the Bankruptcy Code, such as the debtor remaining in possession, <u>Id.</u>
¶ 12, provisions to establish an official creditors' committee, <u>Id.</u> ¶¶ 14-15, a policy favoring
rehabilitation over liquidation, <u>Id.</u> ¶ 6, a robust cramdown regime, <u>Id.</u> ¶ 23, and the principle of
<i>par conditio creditorum</i>, or the general policy of equal treatment of creditors.  <u>Id.</u> ¶ 6. Moreover,
in order to protect debtors and their creditors from particular creditors foreclosing on the debtor's
assets to the detriment of the others, the Brazilian Bankruptcy Law also provides for a general
stay (similar to the Bankruptcy Code's automatic stay), by which the Brazilian Bankruptcy Court
orders the temporary suspension of enforcement proceedings against the debtor, putting an end to
the "race to the courthouse" in order to allow for the plan negotiation process to progress
constructively.  <u>See</u> <u>id.</u> ¶ 11.  DIP financing is also allowed in Brazil, and claims for amounts
advanced are given superpriority treatment in case of "bankruptcy" (<u>i.e.</u>, liquidation in the event
the judicial reorganization fails).  <u>See</u> <u>id.</u> ¶ 13.

50.    Although the mechanisms and concepts of the Brazilian Bankruptcy Law
established to pursue this goal differ to a certain extent from those under the Bankruptcy Code,
the law ensures that secured creditors' security interests (<u>i.e.</u>, "in rem guarantees") remain
protected. <u>See</u> Brazilian Counsel Decl. ¶ 6.

51.    Finally, like a chapter 11 case, the Brazilian Bankruptcy Law
contemplates that the proceeding will culminate in a restructuring plan approved by the requisite

number of creditors holding the required amount of claims in their respective classes and

approved by the Brazilian Bankruptcy Court.  Brazilian Counsel Decl. ¶¶ 17-24.  At its

eighteenth session, the UNCITRAL Working Group on Insolvency Law, which oversaw the

drafting of the Model Law, indicated that the term "foreign proceeding" was meant to include

composition proceedings such as the Brazilian Bankruptcy Proceedings:

> The proposal was made to add to [the definition of "foreign proceeding"] a reference to composition proceedings, namely, proceedings in which indebtedness was reduced while the debtor remained in control of its assets.  The Working Group hesitated to add such a specific reference to composition proceedings.  One view in that direction was that the broad category of "reorganization", which might be read more as an economic than as a legal term, would widely be understood as encompassing composition and other such proceedings.  It was felt that adding such a specific reference to any particular form of reorganization might actually create uncertainty.  Furthermore, it was observed that attempting a list of reorganization proceedings would run the risk of excluding some types of proceedings intended to be covered.  While it was generally agreed that composition proceedings should be covered, the Working Group was not ready to reach a definitive decision on how best to achieve that result and deferred consideration of the matter to a later stage of its work.

U.N. G.A., United Nations Comm'n on Int'l Trade L., 29th Sess., Rep. of Working Grp. on

Insolvency Law on the Work of the Eighteenth Sess. ¶ 108 (1 December 1995) ("A/CN.9/419")

(emphasis added).

52.    The Bankruptcy Code definition of "foreign proceeding" is arguably even

broader in that it adds the non-uniform phrase "or adjustment of debt" to the words "under a law

related to insolvency."  11 U.S.C. § 101(23).  The legislative history indicates that the change is

to emphasize "that the scope of the Model Law and chapter 15 is not limited to proceedings

involving only debtors which are technically insolvent but broadly includes all proceedings

involving debtors in severe financial distress, so long as those proceedings also meet the other

criteria of section 101(24) [sic]."  H. Rep. 109-31, Pt. 1, 109th Cong., 1st Sess. 118 (2005).

53.    Thus, it is unsurprising that U.S. bankruptcy courts, including this Court,

24

have specifically held that restructuring proceedings under the Brazilian Bankruptcy Law (and

other Brazilian insolvency laws) constitute "foreign proceedings."  See, e.g., In re SIFCO S.A.,

No. 11179 (REG) [Docket No. 38] (Bankr. S.D.N.Y. Oct. 23, 2014) (recognizing, as a foreign

main proceeding, a case filed pursuant to the in-court reorganization section of the Brazilian

Bankruptcy Law); In re Rede Energia S.A., No. 14-10078 (SCC) [Docket No. 18] (Bankr.

S.D.N.Y. March 6, 2014) (same); In re Centrais Elétricas Do Pará S.A., No. 12-14568 (SCC)

[Docket No. 19] (Bankr. S.D.N.Y. Dec. 12, 2012) (same); In re Independência S.A., No. 09-

10903 [Docket No. 23] (Bankr. S.D.N.Y. Mar. 26, 2009) (same); In re VarigLogística S.A., No.

09-15717 [Docket No. 77] (Bankr. S.D. Fla. May 11, 2009) (same); see also In re ITSA

Intercontinental Telecomunicações Ltda., No. 08-13927 [Docket No. 16] (Bankr. S.D.N.Y. Jan.

29, 2009) (recognizing a foreign Brazilian bankruptcy proceeding that confirmed a pre-

negotiated plan of reorganization); In re Enco Zolcsak Equipamentos Industriais Ltda., No. 11-

22924 [Docket No. 15] (Bankr. S.D. Fla. July 12, 2011) (recognizing, as a foreign main

proceeding, a case filed and pending pursuant to Brazilian Bankruptcy Law); In re Transbrasil

S.A. Linhas Aéreas, No. 11-19484 [Docket No. 9] (Bankr. S.D. Fla. May 11, 2011) (same); In re

Banco Santos, S.A., No. 10-47543 [Docket No. 9] (Bankr. S.D. Fla. Jan. 13, 2011) (same); In re

Fazendas Reunidas Boi Gordo, S.A., No. 09-37116 [Docket No. 7] (Bankr. S.D. Fla. Jan. 11,

2010) (same).  The Petitioner is aware of no chapter 15 cases where a U.S. bankruptcy court

failed to find that a proceeding commenced under the Brazilian Bankruptcy Law was a "foreign

proceeding" or denied recognition of any such proceeding under chapter 15.

   54. Second, in addition to qualifying as a "foreign proceeding" under section

101(23), each of the Brazilian Bankruptcy Proceedings qualifies as a "foreign main proceeding,"

which is defined in the Bankruptcy Code as "a foreign proceeding pending in the country where

the debtor has the center of its main interests." <u>See</u> 11 U.S.C. § 1502(4); <u>see also</u> 11 U.S.C. §

1517(b)(1) (providing that an order of recognition as a foreign main proceeding shall be entered

if the foreign proceeding that is subject to the petition "is pending in the country where the

debtor has the center of its main interests").

55.     The center of main interests ("COMI") of each of the Debtors and their

enterprise is Brazil.  Although the Bankruptcy Code neither defines nor provides a conclusive

test for determining the location of a debtor's COMI, it does establish a presumption that a

debtor's "registered office" is its COMI.[16]  See 11 U.S.C. § 1516(c).  "'Registered office' is the

term used in the Model Law to refer to the place of incorporation or the equivalent for an entity

that is not a natural person."  H. Rep. No. 109-31 pt. 1, at 113 (2005) (citing <u>Guide</u> at 36).

56.     The legislative history makes clear that the presumption is rebuttable and

that the rule of the "registered office," <u>i.e.</u> "place of incorporation," is "designed to make

recognition as simple and expedient as possible" in cases where the facts are not controversial

rather than to establish a conclusive presumption.  H. Rep. No. 109-31, Pt. 1, 109th Cong., 1st

Sess. 112-13 (2005).  Thus, the court in <u>In re Bear Stearns</u> observed that:

> This presumption permits and encourages fast action in cases where speed may be
> essential, while leaving the debtor's true "center" open to dispute in cases where
> the facts are more doubtful. . . . This presumption is <u>not a preferred alternative
> where there is a separation between a corporation's jurisdiction of incorporation
> and its real seat</u>.  Chapter 15 changed the Model Law standard that established the
> presumption in "the absence of proof to the contrary," to a presumption in "the
> absence of evidence to the contrary." The legislative history explains that the
> word "proof" was changed to "evidence" to make it clearer using United States
> terminology that the ultimate burden is on the foreign representative. . . .
> Whatever may be the proper interpretation of the EU Regulation, the Model Law
> and Chapter 15 give limited weight to the presumption of jurisdiction of
> incorporation as the COMI.

---

[16] The relevant time period to consider in determining the location of a debtor's COMI is the date on which the chapter 15 petition was filed, though "a court may consider the period between the commencement of the foreign insolvency proceeding and the filing of the Chapter 15 petition to ensure that a debtor has not manipulated its COMI in bad faith."  <u>Morning Mist Holdings Ltd.</u> v. <u>Krys (In re Fairfield Sentry Ltd.)</u>, 714 F.3d 127, 137 (2d Cir. 2013).

Americas 9352028

In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 374 B.R. 122, 128 (Bankr. S.D.N.Y. 2007) (internal citations omitted); see also In re Tri-Cont'l Exch. Ltd., 349 B.R. 627, 635 (Bankr. E.D. Cal. 2006) (similar view).  Accordingly, where any "evidence to the contrary" is presented, the presumption has no role to play.  Collins v. Oilsands Quest Inc., 484 B.R. 593, 595 (S.D.N.Y. 2012) ("Here however, there is evidence to the contrary, and so the Court must examine all of the evidence to determine where Oilsands's center of main interest lies.").

57.    The Court of Appeals for the Second Circuit has held that "[t]he relevant principle [to determine a debtor's COMI] is that the COMI lies where the debtor conducts its regular business, so that the place is ascertainable by third parties. . . .  Among other factors that may be considered are the location of headquarters, decision-makers, assets, creditors, and the law applicable to most disputes." Fairfield Sentry, 714 F.3d at 130 (deriving the principle by reference to foreign law cited below); see also Bondi v. Bank of Am., N.A. (In re Eurofood IFSC Ltd.), Case 341/04, 2006 WL 1142304 at [33] (E.C.J. May 2, 2006) (stating that the center of a debtor's main interests must be identified based on criteria that are:  (1) objective and (2) ascertainable by third parties, and that the statutory presumption that it be identified with the debtor's registered office could be rebutted if such criteria allowed for the establishment that the debtor's registered office was nothing more than a "letterbox" company not carrying out any business in the location in which its registered office is situated); In re Stanford Int'l Bank Ltd., [2010] EWCA (Civ) 137, [53]-[56] (Eng.) (following Eurofood and holding that the presumption that registered office is COMI can be rebutted only by factors that are objective and ascertainable by third parties, and noting that such factors must be in the public domain, that a third party would learn such facts in the course of dealing with the company and that any matters that

27

"would need to be obtained by enquiry were irrelevant to determining COMI").

58.    Some courts have held that an entity's "principal place of business" is that entity's COMI.  Tri-Cont'l Exch., 349 B.R. at 634.  The Court of Appeals for the Second Circuit has refused to adopt any dogmatic view absent a statutory definition, but, although it rejected the assertion that the "principal place of business" concept had any bearing in determining the relevant time to consider the location of a debtor's COMI, it noted that the concept might be useful in adducing factors that point to the location of a debtor's COMI.  Fairfield Sentry, 714 F.3d at 136.  Two tests are commonly employed to determine a corporation's principal place of business:

> The "nerve center" test defines the principal place of business as the nerve center from which a corporation radiates out to its constituent parts and from which its officers direct, control and coordinate all activities without regard to locale, in the furtherance of the corporate objective.   Under this test, courts focus on those factors that identify the place where the corporation's overall policy originates.  The other test has been labeled the "place of operations" or "locus of operations" test.   There, the effort is to identify the place in which a corporation conducts its principal operations.   Courts generally apply the "nerve center" test when a corporation's operations are geographically widespread, and the "locus of operations" test when a corporation is centralized.   Regardless of which is the more appropriate test, and they are much the same, the case law makes it clear that judges should not be straightjacketed by the formal requirements of each test, but rather should adapt the tests to the facts of each case.   A flexible approach is appropriate where the facts do not fall neatly within the parameters of either the "nerve center" or the "locus of operations" analysis.

Phoenix Four Inc. v. Strategic Res. Corp., 446 F. Supp. 2d 205, 214-15 (S.D.N.Y. 2006) (internal citations and quotations omitted); see also In re Tradex Swiss AG, 384 B.R. 34, 43 (Bankr. D. Mass. 2008).  Several courts have noted in considering location of those who actually manage the debtor that such location "conceivably could be the headquarters of a holding company."  See, e.g., In re Bear Stearns High Grade Structured Credit Strategies Master Fund. Ltd., 389 B.R. 325, 336 (Bankr. S.D.N.Y. 2008); In re Basis Yield, 381 B.R. 37, 47 (Bankr. S.D.N.Y. 2008); In

re SPhinX Ltd., 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006), aff'd., 371 B.R. 10 (S.D.N.Y. 2007).

59.     As noted above, the COMI of each of the Debtors and their enterprise is

Brazil.  Each of the Debtors is headquartered in the city of São Paulo.  Each of the Debtors is

operationally and functionally centered in São Paulo, Brazil.  For instance, each of the Debtors

are governed, managed and directed from the OAS Group's headquarters in São Paulo, Brazil,

the members of each of the Debtors' boards of directors reside and hold meetings in São Paulo,

Brazil, and all of the accounting, finance, marketing, research and development, legal services,

human resource management, cash management and other operational and administrative

activies are conducted in São Paulo, Brazil by staff located there.  Petitioner Decl. ¶ 47.  Further,

all key expenditures and policy decisions are made by staff located in São Paulo, Brazil and,

aside from the Noteholders, substantially all of the OAS Group's creditors are located in Brazil.

Id.

60.     Additionally, all the Debtors except for OAS Finance and GmbH are

organized under Brazilian law.  Indeed, as evidenced by the Certificates of Registry, each of

OAS and OAS Construtora maintain their registered offices in São Paulo.  The Court is therefore

entitled by statute to presume that the COMI of each of OAS and Construtora OAS is in Brazil.

11 U.S.C. § 1516(c).

61.     Although OAS Finance is incorporated in the BVI and OAS Investments

is incorporated in Austria, each of them has always been and continues to be managed from (and

thus to have its "nerve center" and "locus of operations" in Brazil) as demonstrated by the factors

set forth above and shared by the other Debtors.  In addition, the following factors must be taken

into account:

(a)     while these Notes issuers have their respective registered offices in the
BVI and Austria, which the Debtors understand is required in each case as

29

a technical matter of BVI law (in respect to OAS Finance) and Austrian
law (in respect to OAS Investments), each engages only in activities
related to the financing of the Brazilian-centered OAS Group through the
Notes;

(b)     each of the Guarantors of the Notes, which are jointly and severally liable
        with the Notes issuers, are incorporated in Brazil, and all of the members
        of their boards of directors and executive officers reside in Brazil;

(c)     all or substantially all negotiations regarding the Brazilian Bankruptcy
        Proceedings (including restructuring of the Notes) have occurred in Brazil;
        and

(e)     all of the members of each of the Notes issuers' boards of directors reside
        in Brazil and conduct all their business from Brazil.

Petitioner Decl. ¶ 49.

62.     Moreover, the Notes issuers do not appear to have obligations owing to

BVI or Austrian creditors, except to the extent that any beneficial holders of the Notes happen to

be from those countries.  Petitioner Decl. ¶ 50.  In addition, they have no suppliers in the BVI or

Austria.  Id. The only contractor providing OAS Finance with services in the BVI is its domicile

agent, Trident Trust Company Ltd.  Id.  The only contractors that provide or provided services to

OAS Investments in Austria are TAXCOACH Wirtschaftsprüfung und Steuerberatung GmbH, a

local accounting and tax services provider, Schindler Rechtsanwälte GmbH, a local legal

advisor, Weinder Seitung GmbH, a local newspaper and Bieber Brix & Partners, a notary.  The

services provided by these Austrian contractors consist of local services related primarily to the

establishment and maintenance of OAS Investments' registered office in Austria and,

secondarily, to various ministerial services related to issuance of the 2019 Notes.  Id.  In short,

both OAS Finance and OAS Investments are classical "letter box" companies, operationally and

functionally integrated into a larger enterprise, the OAS family of companies, whose

headquarters and head-office functions are located in Brazil. See Bondi, 2006 WL 1142304 at

[33] (E.C.J. May 2, 2006) (mere "letterbox" company did not have it COMI at the location of its

registered office). Therefore, the center of each of their main interests is in Brazil as well.

63.    Indeed, even in chapter 15 cases involving debtor entities organized under

U.S. law, including those with significant U.S. operations (not mere "letter box" companies, as

here), courts have found that such debtors' COMI is located where the head-office functions and

major decision-making occurs – i.e., at the place where senior management for the entire

corporate group is located, which may be outside the United States.  As one bankruptcy judge

remarked:

> Regarding the COMI issue, I've seen practically the same scenario at least on two other
> occasions in the last few years where the number and activity of the Canadian debtors
> outweighs the number and activity of the U.S. debtors, and where the shots that are called
> come out of Canada, not the United States. And I think it's a very conventional
> recognition that I'll approve.

In re Catalyst Paper Corp., Case No. 12-10221 (PJW) (Bankr. D. Del. Jan. 17, 2012), Hrg.

Transcript at 28 [Docket No. 92] (finding the U.S. debtor's COMI in Canada).  Other chapter 15

cases recognizing the insolvency proceedings outside the United States as foreign main

proceedings of U.S.-incorporated members of multinational corporate groups include In re

Oilsands Quest Inc., Case No. 12-10476 (MG) (Bankr. S.D.N.Y. Feb. 7, 2012)[17]; In re CPI

Plastics Grp Ltd., Case No. 09-20175 (JES) (Bankr. E.D. Wis. Feb. 10, 2009); In re ROL

Manufacturing (Canada) Ltd., Case No. 08-31022 (LSW), (Bankr. S.D. Ohio Apr. 17, 2008); In

re Madill Equipment Canada, Case No. 08-41426 (PBS) (Bankr. W.D. Wash. May 1, 2008); and

In re MAAX Corp., Case No. 08-11443 (CSS) (Bankr. D. Del. Aug. 6, 2008).

64.    It is also significant that the Brazilian Bankruptcy Court determined that

all of the members of the OAS Group included in the joint petition for relief under the Brazilian

---

[17] Collins v. Oilsands Quest Inc., 484 B.R. 593 (S.D.N.Y. 2012) (granting recognition as foreign main proceeding
notwithstanding Oilsands Quest Inc.'s incorporation in the US).

Americas 9352028

Bankruptcy Law, even those organized under non-Brazilian law, are proper debtors under the

Brazilian Bankruptcy Law.  Brazilian Bankruptcy Court Order at 3329.  The court expressly

found that the OAS Finance and OAS Investments have their "principal center of activities

(COMI – Center of Main Interest)" in Brazil, are "fully controlled by OAS," and "operate

exclusively for acquiring resources abroad," and held that because their COMI was in Brazil,

they were eligible for protection under the Brazilian Bankruptcy law.  Id.  In determining COMI,

as with all matters involving the interpretation of chapter 15, a court should "consider its

international origin, and the need to promote an application of this chapter that is consistent with

the application of similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508.  The

rationale of the Brazilian Bankruptcy Court for finding COMI in Brazil, that the objectives of

insolvency law could be better achieved by reorganizing a particular debtor, if sufficiently

integrated as a member of a single global economic group, under the same restructuring regime

as the rest of its group, Commencement Order at 3329, accords well with the goals of chapter 15

of "fair and efficient administration of cross-border insolvencies," protection of interests of "all

creditors and other interested entities, including the debtor," protection and maximization of

value, and "facilitation of the rescue of financially troubled businesses."  11 U.S.C. §

1501(a)(3),(5).  Where the "financially troubled business" is spread among multiple,

economically integrated legal entities, it makes sense to restructure them together, as is

commonly done in chapter 11 cases involving related entities.

> 65.    In summary, although incorporated outside of Brazil and maintaining

registered offices outside of Brazil as required under the laws of their respective places of

incorporation, both OAS Finance and OAS Investments have conducted their administration and

decision-making from Brazil, together with the rest of the Debtors, at all relevant times.  Their

Americas 9352028

limited purpose as financing vehicles for the OAS Group and the fact that all of the guarantors of

the Notes, in whom all the enterprise value available to satisfy the obligations under the Notes

resides, are located in and directed from Brazil additionally demonstrates that creditors,

including the holders of the Notes, are or should be aware that Brazil is their center of main

interests.  Accordingly, the center of main interests for each of the Debtors is in Brazil and, for

all of the reasons set forth above, the Brazilian Proceedings are, and should be recognized as, the

foreign main proceedings of the Debtors.[18]

### 2.    The Petitioner is a Proper "Foreign Representative"

66.    The second requirement for recognition of a foreign main proceeding

under section 1517(a) of the Bankruptcy Code is that a foreign representative applying for

recognition be a person or body.  See 11 U.S.C. § 1517(a)(2).  Section 101(24) of the Bankruptcy

Code provides that

> The term "foreign representative" means a person or body, including a person or
> body appointed on an interim basis, authorized in a foreign proceeding to
> administer the reorganization or the liquidation of the debtor's assets or affairs or
> to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

67.    Here, the Petitioner is an individual, which is included in the term

"person," 11 U.S.C. § 101(41), who has been duly appointed by each Debtor's board of directors

to act as foreign representative and is authorized to administer the reorganization of the Debtors'

---

[18] To the extent that the Court declines to recognize the Brazilian Bankruptcy Proceedings in respect of any Debtor
as a foreign main proceeding, the Petitioner requests in the alternative that the Court enter an order recognizing any
such Brazilian Bankruptcy Proceeding as a foreign nonmain proceeding (as defined in section 1502)(5)).  A court
may grant recognition of a foreign proceeding pending in a foreign country where the debtor has an establishment.
See 11 U.S.C. §§ 1517(b)(2).  An establishment is "any place of [the debtor's] operations where the debtor carries
out a nontransitory economic activity." 11 U.S.C. §1502(2).  Based on the above-stated facts, the Petitioner submits
that these Debtors each has at least an establishment in Brazil and, therefore, if the Court determines that the
Brazilian Bankruptcy Proceedings in respect of one or both of these Debtors is not a foreign main proceeding, that it
constitutes a foreign nonmain proceeding.  In the event that the Court recognizes any Brazilian Bankruptcy
Proceeding in respect of any Debtor as a foreign nonmain proceeding, the Petitioner further requests pursuant to
sections 1521(a)(1)-(2) that the Court impose the section 362 stay in respect of such Debtor and its assets to the
same extent as provided for in section 1520(a).

33

assets and the Debtors' affairs in the Brazilian Bankruptcy Proceedings in accordance with

section 101(24) of the Bankruptcy Code and to commence these chapter 15 cases. Petitioner

Decl. ¶¶ 3, 8. As explained in the Brazilian Counsel Declaration, the Brazilian Bankruptcy Law

authorizes the Debtors, through their boards of directors, to administer the reorganization of their

assets and affairs. Brazilian Counsel Decl. ¶ 12. As such, the Petitioner satisfies sections

101(24) and 1517(a)(2) of the Bankruptcy Code. See In re Vitro, S.A.B. de C.V., 470 B.R. 408,

411 (Bankr. N.D. Tex.) (holding that an individual appointed as foreign representative by the

debtor's board in anticipation of a Mexican *concurso* proceeding, which contemplates "self

management" during the proceeding similar to that of a debtor-in-possession, fits within the

scope of the Bankruptcy Code's definition of "foreign representative," and recognizing the

individual as the foreign representative); see also In re SIFCO S.A., No. 14-11179 (REG)

[Docket No. 38] (Bankr. S.D.N.Y. Oct. 23, 2014) (finding that foreign representative of

Brazilian debtor that was appointed by board of directors was a properly appointed foreign

representative); In re Rede Energia S.A., No. 14-10078 (SCC) [Docket No. 18] (Bankr. S.D.N.Y.

March 6, 2014) (same); In re Centrais Eletricas Do Para S.A., No. 12-14568 (SCC) [Docket No.

19] (Bankr. S.D.N.Y. Dec. 12, 2012) (same).

### 3.     The Petition was Properly Filed under Sections 1504 and 1509 and meets the Requirements of Section 1515

68.     The third and final requirement for recognition of a foreign proceeding

under section 1517(a) of the Bankruptcy Code is that the petition for recognition meets the

procedural requirements of section 1515 of the Bankruptcy Code. See 11 U.S.C. § 1517(a)(3).

Here, all of those procedural requirements are satisfied.

69.     First, the Petitioner duly and properly commenced these chapter 15 cases

in accordance with sections 1504 and 1509(a) of the Bankruptcy Code by filing the petitions

34

with all the documents and information required by sections 1515(b) and 1515(c) (i.e.,

documentary or other evidence of the existence of the Brazilian Bankruptcy Proceedings and a

statement by the Petitioner regarding any other foreign proceedings of the Debtors.  See In re

Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 374 B.R. 122, 127

(Bankr. S.D.N.Y. 2007) ("A case under chapter 15 is commenced by a foreign representative

filing a petition for recognition of a foreign proceeding under section 1515 of the Bankruptcy

Code."), aff'd, 389 B.R. 325 (S.D.N.Y. 2008).

70.     Second, in accordance with section 1515(b)(1)-(2) and (d) of the

Bankruptcy Code, the Petitioner has submitted evidence, translated into English, of the existence

of the Brazilian Bankruptcy Proceedings, the registered offices of OAS and OAS Construtora in

São Paulo, and the appointment of the Petitioner as foreign representative thereof.  See Exhibits

"A" through "E" to the Petitioner Declaration (together containing true and correct copies of the

Commencement Order, the Resolutions of Appointment, and the Certificates of Registry along

with certified translations of each from Portuguese to English).

71.     Finally, in accordance with section 1515(c) of the Bankruptcy Code,

paragraph 57 of the Petitioner's Declaration contains a statement identifying the proceeding of

Construtora OAS S.A. Surcursal Uruguay, a Uruguayan branch of Construtora OAS, before the

Juez Letrado de Primera Instancia de Concursos, which was commenced on April 6, 2015, as

the only foreign proceeding other than the Brazilian Bankruptcy Proceedings currently pending

with respect to the Debtors.

\*          \*          \*

72.     For all of the reasons set forth above, the Petitioner respectfully submits

that all of the requirements of section 1517(a) have been satisfied and that Debtors are entitled to

all of the relief provided by section 1520 of the Bankruptcy Code.[19]  Thus, the Court should enter

the Proposed Order attached here as Exhibit "A" recognizing the Brazilian Bankruptcy

Proceedings as foreign main proceedings.

## Notice

73.     Notice of this Petition has been provided to all parties listed on Exhibit

"B" annexed hereto (such parties, the "Chapter 15 Notice Parties").  In light of the relief

requested herein, the Petitioner respectfully submits that no further notice of this Petition is

necessary under the circumstances.

## No Prior Request

74.     No previous request for the relief requested herein has been made to this

or any other court.

## Conclusion

WHEREFORE, the Petitioner respectfully requests that the Court:  (a) enter the

Proposed Order, upon notice and a hearing, substantially in the form attached hereto as Exhibit

A, and (b) grant such other and further relief as may be just and proper.

---

[19]      Upon recognition of the Brazilian Bankruptcy Proceedings as foreign main proceedings, certain relief is automatically granted as a matter of right, including a stay that enjoins actions against the Debtors and otherwise protects the Debtors.  See 11 U.S.C. § 1520.  In particular, upon the Court's recognition of the Brazilian Bankruptcy Proceedings as foreign main proceedings, section 1520(a)(1) of the Bankruptcy Code triggers the automatic stay provisions of section 362 of the Bankruptcy Code with respect to the Debtors.

Dated: New York, New York
April 15, 2014

Respectfully submitted,

By: /s/John K. Cunningham
    John K. Cunningham
    Richard S. Kebrdle

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200
Gregory M. Starner
Kimberly A. Haviv

Southeast Financial Center, Suite 4900
200 South Biscayne Boulevard
Miami, Florida 33131-2352
(305) 371-2700
John K. Cunningham
Richard S. Kebrdle

*Attorneys for Renato Fermiano Tavares, as Petitioner and Foreign Representative*

37

## VERIFICATION OF CHAPTER 15 PETITION

Pursuant to 28 U.S.C. § 1746, I, Renato Tavares, declare as follows:

I am the authorized foreign representative of the Debtors. I have full authority to verify the foregoing chapter 15 Petitions for recognition of foreign main proceedings, including each of the attachments and appendices thereto, and I am informed and believe that the allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: April 15, 2015

Respectfully submitted,

Renato Tavares