**REDACTED PENDING ORDER ON MOTION TO SEAL**

DECHERT LLP
1095 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 698-3500
Facsimile:  (212) 698-3599
Allan S. Brilliant
Craig P. Druehl
Stephen M. Wolpert

*Attorneys for Aurelius Capital Management, LP*
*on behalf of entities it manages, including*
*Aurelius Investment, LLC and Huxley Capital*
*Corporation and Alden Global Capital LLC on*
*behalf of entities it manages, including Alden*
*Global Adfero BPI Fund, Ltd., Alden Global*
*Opportunities Master Fund, L.P., Alden Global*
*Value Recovery Master Fund, L.P., and*
*Turnpike Limited*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------- X
                                                          :
In re:                                                    :     Chapter 15
                                                          :
OAS S.A., *et al.*,[1]                                    :     Case No. 15-10937 (SMB)
                                                          :
        Alleged Debtors in Foreign Proceedings.   :     Joint Administration Requested
                                                          :
--------------------------------------------------------- X

**NOTEHOLDERS' OBJECTION TO MOTION**
**FOR PROVISIONAL RELIEF PURSUANT TO**
**SECTION 1519 OF THE BANKRUPTCY CODE**

        Aurelius Capital Management, LP on behalf of entities it manages, including Aurelius

Investment, LLC and Huxley Capital Corporation (collectively, "Aurelius") and Alden Global

Capital LLC on behalf of entities it manages, including Alden Global Adfero BPI Fund, Ltd.,

Alden Global Opportunities Master Fund, L.P., Alden Global Value Recovery Master Fund,

---

[1]     The Debtors in these chapter 15 cases, along with the last four digits of each debtor's tax
        identification or corporate registry number, are: OAS S.A. (01-05), Construtora OAS S.A. (01-08),
        OAS Investments GmbH (4557), and OAS Finance Limited (6299).

L.P., and Turnpike Limited (collectively, "Alden" and together with Aurelius, the

"Noteholders"), as holders or managers of entities that hold beneficial interests in certain 8.00%

Senior Notes due 2021 issued by OAS Finance Limited and guaranteed by OAS S.A., OAS

Investimentos S.A. and Construtora OAS S.A. (the "2021 Notes"), and/or certain 8.25% Senior

Notes due 2019 issued by OAS Investments GmbH and guaranteed by OAS S.A., OAS

Investimentos S.A. and Construtora OAS S.A. (the "2019 Notes"), and/or certain 8.875%

Perpetual Notes issued by OAS Finance Limited and guaranteed by OAS S.A., OAS

Investimentos S.A. and Construtora OAS S.A. (the "Perpetual Notes," and together with the

2019 Notes and the 2021 Notes, the "Notes"),[2] hereby file this objection (the "Objection") to the

motion [Docket No. 7] (the "Motion") of Renato Fermiano Tavares, as purported foreign

representative (the "Purported Foreign Representative") for the Brazilian bankruptcy

proceedings of OAS S.A. ("OAS"), Construtora OAS S.A. ("Construtora"), OAS Investments

GmbH ("Investments GmbH"), and OAS Finance Limited ("OAS Finance," and collectively

with OAS, Construtora, and Investments GmbH collectively, the "Debtors") for provisional

relief pursuant to Section 1519 of the Bankruptcy Code.  In support of the Objection, the

Noteholders respectfully state as follows:

## PRELIMINARY STATEMENT

The Debtors[3] request relief that is, in substance, a preliminary injunction that would

enjoin the exercise of creditor rights until the Court renders a decision on recognition of the

---

[2]    The Noteholders hold, in the aggregate, $266,168,000.00 in principal amount of Notes.  Other than
the holdings of Notes listed in the immediately preceding sentence, and certain asserted and
unasserted causes of action related thereto, the Noteholders hold no other claims or interests in OAS
S.A. or any of its subsidiaries, including subsidiaries that have not filed chapter 15 petitions with this
Court.

[3]    As the Purported Foreign Representative is an in house lawyer in the OAS enterprise, the Debtors are
the true parties requesting relief pursuant to the Motion.

Brazilian Bankruptcy Proceedings—a period that is likely to exceed 30 days.  Relying on a supposed emergency, the Debtors seek to obtain the sweeping injunction on *less than two days notice* to some parties in interest and *no notice* to numerous others.  The claimed emergency is an illusory one of the Debtors' own making.  They and their co-obligors have been in payment default on many of their debts since January 2015; and the New York attachments mentioned in the Motion occurred in February 2015.  Even so, the Debtors waited until March 31, 2015 to commence their Brazilian Bankruptcy Proceedings.  And while they adopted resolutions ostensibly appointing the Purported Foreign Representative on April 2, 2015, the Debtors waited another two weeks to commence these Chapter 15 cases and file their Motion.

In any event, the Debtors' request for a preliminary injunction on virtually no notice flies in the face of the vitally important procedures and safeguards mandated by section 1519(e) and the Federal Rules of Bankruptcy Procedure: to protect due process rights, a complaint and the commencement of an adversary proceeding are required to afford potential objectors the opportunity to take discovery and fully brief their objections.  The Debtors' Motion is both procedurally deficient and does not meet the standards for an injunction under section 1519(e) because, among other things, there would be no irreparable harm to the Debtors in the absence of an injunction.  Further, because Brazilian law only stays attachment of and foreclosure on assets, not actions and relief leading to that point, the Debtors are seeking from this Court a broader stay of actions than would be available to them under Brazilian insolvency law that is contrary to principles of comity under chapter 15.  Thus, the Motion must be denied.

Worse than the Debtors' attempt to rely on an "emergency" of their own making is that their substantive filings in these Chapter 15 cases demonstrate an extraordinary lack of candor

with the Court.  Those filings omit various essential facts regarding the Debtors' conduct over the last several months.

First, although the Purported Foreign Representative, in his declaration in support of the verified petition for recognition [Docket No. 4] (the "Tavares Declaration"), cites the "Petrobras investigation" as a factor leading to the OAS S.A. credit rating downgrade, he fails to mention that **the President of OAS S.A. and CEO of OAS Construtora and OAS Investimentos, as well as four other top-level executives were arrested in November 2014 on racketeering, corruption, money laundering, and other charges** in connection with purported inflated fees charged by the Debtors on construction contracts with Petrobras, the state-run oil company, and kickbacks the Debtors funneled to Petrobras executives and high-level Brazilian politicians.  Those executives remain incarcerated.

Second, and worse still, after the arrests of the senior officers and as soon as imminent payment defaults became apparent, OAS entities engaged in secret intercompany transactions that were designed to eliminate the Noteholders' structural seniority to the Debtors' most valuable assets and effectively extinguish the guaranties from the guarantor subsidiaries.  Those transactions, which are the subject of litigation that the Debtors seek to enjoin, include:

(i)     On December 1, 2014—a week before the Convertible Debentures were accelerated—Construtora OAS (a guarantor of the Notes) transferred assets valued at R$301 million to OAS Engenharia e Construção S.A ("Engenharia"), another subsidiary of OAS.  Construtora OAS did not receive any value in return. Significantly, unlike Construtora OAS, Engenharia is not an obligor or guarantor of the Notes. OAS did not reveal this transfer until it published board of director meeting minutes in the Brazil official gazette on January 20, 2015.

(ii)    On December 26, 2014—seven days before the default on the first interest payment due on the 2021 Notes—OAS Investimentos was merged into OAS.  OAS Investimentos' guaranty of the Notes was a critical element of credit support for the Notes and made them structurally senior to almost all other creditors of the OAS Group as respects the very substantial assets of OAS Investimentos.  Although Investimentos was itself insolvent, it had a vastly better ability to pay its creditors than did OAS, which had no assets of its own other than its interests in its

4

subsidiaries.  The merger of OAS Investimentos into OAS eliminated the Notes' structural seniority on the eve of their default.  If allowed to stand, the merger will dramatically reduce the recoveries on the Notes.

(iii)    Remarkably, although OAS had a statutory obligation in Brazil to disclose the merger, it did not do so for an entire month, even as it issued many other public statements in the interim.  When OAS finally did disclose the merger, on January 29, 2015, the minutes of OAS's extraordinary board meeting also revealed that OAS changed the newspaper in which it publishes notices.  This change was made on the same day that the illicit merger was also approved.  The Noteholders understand that this change—which itself was kept secret—violated Brazilian law, which permits such changes to be approved only at an annual general meeting.

(iv)    On December 26, 2014, OAS Investimentos transferred its ownership stake in Investimentos e Participações em Infraestrutura S.A. ("Invepar") to its subsidiary OAS Infraestrutura S.A. ("OAS Infraestrutura").  OAS Investimentos' 24.44% stake in Invepar had a book value of R$1.46 billion as of September 30, 2014 but is likely worth much more than that.  OAS Investimentos did not receive any value in return.  Significantly, unlike OAS Investimentos, OAS Infraestrutura is not an obligor or guarantor of the Notes.  This transfer was kept secret until Invepar (and not OAS Investimentos) published a notice on January 7, 2015.

(v)    These transfers were conducted in secret while the companies were plainly insolvent and on the verge of many payment defaults.

The chapter 15 filings merely mention the Noteholders' seeking to avoid these transactions, but provide no details or explanations and resort to vacuous phrases such as "reduction of costs" and "streamlining of corporate structure."  See, e.g. Verified Petition [Docket No. 3] at ¶ 14 n.6.  It does not pass the straight-face test to contend that the OAS entities picked the day after Christmas, one week before a tsunami of payment defaults was to begin, as the time to streamline the corporate structure.  The far more obvious motivation for these transactions is the one the Debtors fail to disclose: the removal of certain valuable assets from noteholders' reach by transferring Investimentos's remaining assets to OAS S.A., and the elimination of the Noteholders' structural seniority with respect to those assets over other creditors of OAS S.A.  These transactions deprived the Noteholders of access to over USD $1 billion in assets that would otherwise be available to satisfy their claims.  The Tavares

5

Declaration and Motion also fail to mention, let alone explain, the substantial delays in public disclosure of these highly suspect transactions.

Having failed both to disclose the arrests of key executives for exceptionally serious crimes and to provide any substantive explanation of the reasons behind their secret intercompany transactions, the Debtors have unclean hands.  Accordingly, the Court should exercise its discretion and deny the provisional relief sought by the Motion on that ground alone.

Moreover, the relief requested may be granted only if, pursuant to section 1522(a), the interests of creditors are sufficiently protected.  Thus, an order granting any injunctive provisional relief must be narrowly tailored to protect creditor interests.  Although the Noteholders maintain that the Debtors are not entitled to any injunctive relief, provided that the Court does not enjoin the continuation of the fraudulent transfer action pending in the United States District Court, they would be willing to consent to a temporary restraining order that solely prevents the further creditor attachment of assets of the Debtors (and not non-Debtor affiliates of the Debtors) within the United States for a period of not more than 14 days, if the order were to (i) specifically confirm that it neither affects the attachments obtained by the Noteholders prior to the commencement of the Chapter 15 proceedings nor prevents any creditor acts or litigation of any kind outside of the U.S. and (ii) prevent the Debtors from transferring assets currently held in the U.S. out of the U.S.

## FACTUAL BACKGROUND

1.      The relevant factual background is contained in the *Declaration of Eleanor Chan, Pursuant to 28 U.S.C. § 1746, in Support of Noteholders' Objection to Motion for Provisional Relief Pursuant to Section 1519 of the Bankruptcy Code* filed contemporaneously herewith and incorporated by reference herein.

6

## **ARGUMENT**

**I.**     **The Debtors Have Not Followed The Procedures Applicable to An Injunction As Required by Section 1519(e).**

2.      By its plain language, section 1519(e) of the Bankruptcy Code requires that the

Debtors follow the procedures applicable to injunctions to obtain the provisional relief it seeks

under section 1519(a).  *See* 11 U.S.C. § 1519(e) ("The standards, procedures, and limitations

applicable to an injunction shall apply to relief under this section.").  Rule 7001 of the Federal

Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") plainly requires that a party seeking an

injunction commence an adversary proceeding.  *See* Fed. R. Bank. P. 7001(7) (defining "a

proceeding to obtain an injunction or other equitable relief" as an adversary proceeding);[4] *see*

*also Feld v. Zale (In re Zale Corp.)*, 62 F.3d 746, 766 (5th Cir. 1995) (dissolving injunction

issued by bankruptcy court that was not commenced by adversary proceeding); *In re St.*

*Vincent's Catholic Med. Ctrs.*, 445 B.R. 264, 270 (Bankr. S.D.N.Y. 2011) (denying injunction

because no adversary proceeding had been commenced); *In re Garnett*, 47 B.R. 170, 171

(E.D.N.Y. 1985) (same); *In re Entz*, 44 B.R. 483, 485 (Bankr. D. Ariz. 1984) (same); *In*

*re Dahlquist*, 33 B.R. 101, 103 (Bankr. D.S.D. 1983) (same); *In re Brookfield Tennis, Inc.*, 29

B.R. 1, 2 (Bankr. E.D. Wis. 1982) (same).  Similarly, since extending the automatic stay is an

injunction, courts require an adversary proceeding in the context of requests for extensions of a

stay.  *See, e.g., In re All Seasons Resorts, Inc.*, 79 B.R. 901, 903 (Bankr. C.D. Cal. 1987) ("the

extension of § 362 does not occur automatically… but requires the filing of an

appropriate adversary proceeding").

---

[4]     Courts broadly recognize the equitable relief that must be sought by adversary proceeding.  *See* 10 COLLIER ON BANKRUPTCY ¶ 7001.08 (16th ed., 2014).

3.    An adversary proceeding comprises several steps.  To commence an adversary
proceeding, the party seeking the injunction must first file a complaint.  *See* Fed. R. Bank. P.
7003.  The complaint must be served in accordance with the applicable rules to provide adequate
notice to parties affected by the complaint.  *See* Fed. R. Bank. P. 7004.  The parties served with
the complaint then must have an opportunity to serve an answer, *see* Fed. R. Bank. P. 7012, and
are permitted to take discovery.  *See* Fed. R. Bank. P. 7026.   Further, Rule 7065 of Bankruptcy
Rules makes Rule 65 of the Federal Rule of Civil Procedure (the "Civil Rules") applicable in
adversary proceedings.  Rule 65, in turn, provides that a court "may issue a preliminary
injunction only on notice to the adverse party."  Accordingly, to preserve their due process
rights, Bankruptcy Rule 7065 emphasizes that parties against whom a preliminary injunction is
sought are entitled to each of the steps involved in an adversary proceeding.   The notice
requirements set out in Rule 65, as incorporated by Bankruptcy Rule 7065, are motivated by
basic requirements of due process.  Implicit in Rule 7065's notice requirement for injunctions is
that there should be a hearing at which the defendant has an opportunity to oppose the motion.
*See* 10 COLLIER ON BANKRUPTCY ¶ 7065.02 (16th ed., 2014).  Such notice considerations are a
matter of public policy, which courts are required to consider when determining whether an
injunction should be granted.  *See Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) ("A
preliminary injunction is an extraordinary remedy never awarded as of right. ... In exercising
their sound discretion, courts of equity should pay particular regard for the public consequences
in employing the extraordinary remedy of injunction.") (internal citations and quotation marks
omitted).

4.    At most, a party may obtain a temporary restraining order (a "TRO") under Civil
Rule 65(b) on limited or no notice.  But TROs are subject to crucial limitations, including the 14-

8

day time limitation, and can only be granted if "specified facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." *See* Fed. R. Civ. P. 65(b)(1)(A); Fed. R. Civ. P.65(b)(1)(B). The Debtors' attempt to skip over the TRO and obtain, by motion alone, an immediate preliminary injunction on an *ex parte* basis against the vast majority of the Debtors' creditors is manifestly impermissible. Thus, the Debtors cannot obtain the relief they seek pursuant to section 1519.

5.      In *Zale*, the Fifth Circuit held that an injunction was improper because the debtors "failed to follow the rules" and the "bankruptcy court compounded their failure by excusing their lapse." 62 F.3d at 765 ("Moreover, we feel this case demonstrates the difficulties that are apt to arise if the bankruptcy court too easily permits parties to circumvent the rules governing adversary proceedings.") (internal quotation marks omitted). There, the parties had not filed a complaint seeking an injunction but had "simply added the injunction to the settlement agreement." *Id*. at 763. In reversing the injunction issued by the bankruptcy court, the Fifth Circuit stated that "[i]ncluding a matter governed by Rule 7001 in another matter already before the court … does not satisfy the procedural rules required by Rule 7001." *Id.*

6.      In *In re St. Vincent's Catholic Med. Ctrs.,* the Debtors urged the court to enjoin its creditor, the New York State Department of Labor. 445 B.R. at 270. The court held that the request for an injunction was not properly before the court in light of the Debtors' failure to institute an adversary proceeding. Indeed, as the court observed, "[c]ourts have been near universal in reversing injunctions which have been issued without compliance with Rule 7001" (collecting cases)). *Id*. Here, the Petitioner's motion for section 1519 relief outside of an

adversary proceeding is contrary to both the language of section 1519 and the case law
recognizing that such actions are procedurally deficient.

7.      Although the plain requirements of section 1519(e) and Rule 7001 and the
holdings of *Zale, St. Vincent's Catholic Med. Ctrs.*, and similar cases are more than sufficient,
the legislative history of section 1519 also establishes that an adversary proceeding is required.
That is, "[s]ubsection (e) makes clear that this section contemplates injunctive relief *and that
such relief is subject to specific rules and a body of jurisprudence.*"  H.R. Rep. No. 109-31, Pt. 1,
109th Cong., 1st Sess. 114 (2005) (emphasis added).  Clearly, this requirement calls for
compliance with the Bankruptcy Rules applicable to adversary proceedings: Bankruptcy Rules
7001 and 7065, with all of the procedural protections provided therein.

8.      Moreover, the "procedures applicable to an injunction" require protection of the
due process rights normally afforded a party against which the drastic remedy of injunctive relief
is sought in an adversary proceeding.  At a minimum, that party should be provided notice of the
moving party's arguments, and the opportunity to take discovery, fully brief and be heard on the
relevant issues.  In requesting section 1519 relief without anything like adequate notice, the
Debtors deprive the Noteholders of their due process rights.

9.      Finally, the Debtors' request for injunctive relief on less than two days notice, and
without serving all of the known parties affected thereby, due to a purported "emergency" should
be denied because it offends fundamental fairness.  The requested relief would profoundly affect
creditors' ability to enforce their rights without having been afforded a meaningful amount of
time to respond.  That highly inequitable result would be all the more unfair, given that the
litigation that supposedly created an "emergency" was commenced in February and early March
2015, and the Brazilian Bankruptcy Proceedings were commenced on March 31, 2015.  If the

provisional relief requested were so necessitous, the Debtors would not have waited over two

weeks from the commencement of the Brazilian Bankruptcy Proceedings to file their Chapter 15

petitions and seek that relief.  In all fairness, the Court should, at the very least, delay its decision

on the Motion until creditors have an adequate opportunity to present the Court with

comprehensive objections.

10.    The Debtors have made no showing that there is immediate and irreparable harm

justifying  an "emergency" injunction.  In arguing that an injunction is warranted, the Debtors

state, "[t]he application of section 362 is urgently needed here to protect the Debtors' assets and

to protect the interests of creditors as a whole," "[t]he Pending New York Actions are also a

major distraction to the Debtors and the rest of the OAS Group," and "[t]he snowball effect of

the pressure to join in the 'race to the courthouse' further demonstrates the urgency of the

requested relief."  *See* Motion at ¶¶ 19, 21, 23.

11.    Courts, however, have recognized that pending litigation, without other factors,

does not create the urgency that calls for emergency relief.  For example, the liquidator in *In re*

*Worldwide Educ. Servs.*, 494 B.R. 494 (Bankr. C.D. Cal. 2013), used language similar to that of

the Debtors in arguing that the insolvent company was entitled to provisional relief under section

1519 for an emergency stay: "The pending lawsuits have and continue to drain the Debtors' few

remaining resources.  The pending lawsuits, if allowed to proceed, may result in certain creditors

(those with pending trial dates) being treated more favorably than other similarly situated

creditors.  This race to the courthouse, or in this case to a trial date, may lead to inequitable

results in how creditors are treated in the BVI Proceeding."  *Id*. at 499-500.  The court, however,

denied the motion, noting that among other considerations, the litigation had been pending for

two years, and that the liquidator had failed to show how facilitating the chapter 15 process with

a stay was in the public interest. *Id.* at 501. The same result should apply here, where the

Debtors only have three lawsuits pending against them in the United States and substantially all

of their assets in the United States have already been attached. It is incredible that the Debtors

contend that filing an answer to the fraudulent transfer complaints next Monday would exert so

much pressure on the Debtors' resources as to create an emergency.

**II.     Due to Unclean Hands, Equitable Relief Under Section 1519 of the Bankruptcy
          Code is Unavailable to the Debtors.**

12.     Section 1519 of the Bankruptcy Code provides that "[f]rom the time of filing a

petition for recognition until the court rules on the petition, the court may, at the request of the

foreign representative, where relief is urgently needed to protect the assets of the debtor or

interests of creditors, grant relief of a provisional nature…" 11 U.S.C. § 1519(a). To obtain

provisional relief, the Debtor must meet the standards applicable to an injunction. *See* 11 U.S.C.

§ 1519(e). Through the use of the word "may" in 1519(a), Congress made clear that the relief

authorized by section 1519 is committed to the Court's sound discretion. Moreover, 1519(a)'s

references to an "urgent" need to protect assets of the debtor make clear that 1519 relief is

equitable in nature. Finally, given the injunctive nature of the relief requested, the Debtor must

show, among other things, that the equities weigh in its favor.

13.     "It is a fundamental principle that he who comes into equity must come with clean

hands." *Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510, 532 (S.D.N.Y. 2009)

(quotations omitted). Accordingly, "[a] court may deny injunctive relief based on the defense of

unclean hands where the party applying for such relief is guilty of conduct involving fraud,

deceit, unconscionability, or bad faith related to the matter at issue [and] to the detriment of the

other party." *Estate of Lennon v. Screen Creations, Ltd.*, 939 F. Supp. 287, 293-94 (S.D.N.Y.

1996) (quotations omitted) (denying a preliminary injunction based on unclean hands where one

12

plaintiff made multiple misrepresentations to, and also deceived, defendant in course of dealing).

14.      Here, the Debtors have withheld from the Court highly important information and have failed to prove any explanation of the reasons for transfers of enormous value by the Debtors to the detriment of all noteholders.  This effort to obtain equitable relief without scrutiny should be rejected.  That effort is especially egregious here because the Debtors seek to enjoin litigation designed to bring to light the true reasons behind such transfers.  Due to the Debtors' concerted effort to sweep these facts under the rug, the Debtors have unclean hands. Accordingly, the Court, in its discretion, should deny the Debtors' request.

## III.    The Debtors Do Not Meet the Standards for Relief Under Section 1519.

15.      Aside from the Debtors' lack of candor with the Court, they fail to meet their burden of showing that the prerequisites for relief under section 1519 are satisfied.  Section 1519(e) of the Bankruptcy Code unambiguously provides that "[t]he standards, procedures, and limitations applicable to an injunction shall apply to relief under this section."  Thus, by the plain language of that section, to be granted *any* relief under section 1519, the Debtors must meet the standards for an injunction.[5]  A statute's plain meaning should be disregarded only in "'rare and exceptional circumstances, and … only upon 'the most extraordinary showing of contrary intentions.'"  *Fortis, Inc. v. United States*, 420 F. Supp. 2d 166, 174 (S.D.N.Y. 2004).  *See also*

---

[5]      Section 1519(a), in relevant part, allows the Court to (1) stay execution against the debtor's assets, (2) in certain circumstances, entrust the administration or realization of all or part of the debtor's assets located in the United States to the foreign representative or another person authorized by the court, and (3) grant certain relief under section 1521(a)(3), (4), or (7), including (a) suspending the right to transfer, encumber or otherwise dispose of any of the debtor's assets, and (b) any additional relief that may be available to a trustee, except for relief available under section 522, 544, 545, 547, 548, 550, and 724(a).  Here, the Debtors seek imposition of the automatic stay pending a decision on recognition of the Debtors' chapter 15 petitions, which is not specifically referenced in section 1519 or its cross reference to section 1521.  Thus, the Debtors are apparently requesting relief under the catchall of "any relief that may be available to a trustee" under section 1521(a)(7).

*United States v. Ron Pair Enters.*, 489 U.S. 235, 242 (1989) ("the plain meaning of legislation should be conclusive" except in rare cases where literal application would clearly contravene the intent of its drafters).

16.    The Debtors erroneously argue that the injunction standard is not applicable to a motion for the imposition of the automatic stay under section 1519, citing *In re Pro-Fit Int'l Ltd.*, 391 B.R. 850 (Bankr. C. D. Cal. 2008).  *See* Motion at ¶ 24.  The Debtors' reliance on *Pro-Fit* is misplaced.  First, the Bankruptcy Court for the Central District of California has itself recognized that the *Pro-Fit* analysis is unsound.  In a subsequent chapter 15 case, the court explicitly disagreed with the *Pro-Fit* standard for determining whether the stay is appropriate, as it "is flatly inconsistent with the plain and unambiguous language of Section 1519(e)," and found that "[t]he statutory language of Section 1519 is plain and does not admit of any exceptions for noninjunctive relief."  *In re Worldwide Educ. Servs.*, 494 B.R. 494, 498 (Bankr. C.D. Cal. 2013).  Thus, applying the requirements for injunctive relief to the petitioner's request for a preliminary stay, the court denied the request.  *Id.* at 499, 502.

17.    Second, in the recent cases from this Court cited by the Debtors in support of the availability of section 362 relief pursuant to section 1519(a), *see* Motion at ¶ 25, the respective petitioners argued that the requested relief was warranted under an injunction standard.  *See, e.g. In re Compania Mexicana de Aviacion, S.A. de C.V.*, No. 10-14182 (MG) (Bankr. S.D.N.Y. Aug. 2, 2010) [ECF No. 5] (requesting temporary restraining order); *In re Japan Airlines Corp.*, No. 10-10198 (JMP) (Bankr. S.D.N.Y. Jan. 19, 2010) [ECF No. 4] (seeking application of section 362 stay and injunction); *In re Alitalia Linee Aeree Italiane S.p.A.*, No. 08-14321 (BRL) (Bankr. S.D.N.Y. Nov. 5, 2008) [ECF No. 5] (moving for automatic stay and temporary injunction).  Thus, it is clear that the Debtors must satisfy the injunction standards to obtain 1519 relief.

14

18.    To obtain a preliminary injunction, the Debtors must show:  (1) a likelihood of a successful reorganization, (2) imminent and irreparable harm to the Debtors in the absence of an injunction, (3) the balance of harms tips in the Debtors' favor, and (4) the public interest weighs in favor of an injunction.  *See, e.g., In re Lyondell Chem. Co. v. Centerpoint Energy Gas Servs. (In re Lyondell Chem. Co.)*, 402 B.R 571, 588 (Bankr. S.D.N.Y. 2009).[6]  In the Second Circuit, "a showing of irreparable harm [is] the single most important prerequisite for the issuance of a preliminary injunction."  *Hyde v. KLS Prof'l Advisors Group, LLC*, Case No. 12-1484-cv, 2012 U.S. App. LEXIS 21111, at *2 (2d Cir. 2012).  The Debtors cannot satisfy any of these elements, and thus their request should be denied.

### A.    The Debtors Have Not Shown That They Are Likely to Succeed on the Merits.

19.    The Debtors argue that they should be granted an injunction under section 1519 because they are likely to succeed in obtaining recognition of the Brazilian Bankruptcy Proceedings as foreign main proceedings.  *See* Motion at ¶ 26.  The Debtors' likelihood of success, however, is highly questionable.  First, it is unclear if Mr. Tavares meets the definition of "foreign representative" under section 101(24) and therefore whether he is authorized to seek recognition of the Debtors' chapter 15 petitions.  Section 101(24) requires that a foreign representative be "authorized in a foreign proceeding to administer the reorganization or the

---

[6]    Although the *Lyondell* court "recognized a limited exception to the irreparable harm requirement for issuance of a preliminary injunction in the bankruptcy context where the action to be enjoined is one that threatens the reorganization process or which would impair the court's jurisdiction with respect to the case before it" (*see Lyondell*, 402 B.R. at 588, n.37 (collecting cases)), the issue before the *Lyondell* court (and each of the cases the *Lyondell* court cited in footnote 37) was the bankruptcy court's equitable powers under section 105(a) of the Bankruptcy Code, and not the proper standard for a preliminary injunction under section 1519(e) of the Bankruptcy Code.  Further, even if this narrow exception applied here, courts in this District have recognized that the exception does not apply unless the threat to the reorganization process is "imminent, substantial and irreparable."  *See Nevada Power Co. v. Calpine Corp. (In re Calpine Corp.)*, 365 B.R. 401, 410 (S.D.N.Y. 2007).  For the reasons stated below, continuing the pending fraudulent transfer litigation does not pose an irreparable threat of harm to the Debtors' reorganization process.

liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24). Mr. Tavares, however, merely states that, by certain resolutions of the Debtors' boards, the Debtors' authorized representatives appointed him as their foreign representative, *see* Tavares Declaration at ¶ 8. No showing has been made that such appointment constitutes the necessary authorization to administer the Brazilian Bankruptcy Proceedings or to act as a representative of those proceedings under Brazilian law.[7] To the contrary, the Brazilian Bankruptcy Court has appointed a judicial administrator (*administrador judicial*) for the Debtors, and it is the firm of Alvarez & Marsal Consultoria Empresarial do Brasil, not Mr. Tavares. *See* Tavares Decl. ¶ 59 n.15 & Ex. B at pg. 3329-3330. For this reason alone, it cannot be said that the Debtor is "likely" to succeed on its recognition petition.

 20.

**REDACTED**

---

[7]   *But see In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1047-49 (5th Cir. 2012) (individuals not disqualified from serving as foreign representatives merely because they were not officially appointed by a foreign court). *Vitro*, however, is distinguishable on its facts. In that case, the Fifth Circuit took pains to point out that a Mexican court had previously denied a motion requesting that the individuals in question be enjoined from acting as foreign representatives. The court thereby "gave the representatives its tacit approval." *Id*. at 1048. Mr. Tavares has not provided *any* evidence of approval or authorization in a foreign proceeding, whether tacit or overt. *See* Tavares Declaration at ¶¶ 7-8.

21.     Further, there are significant factual issues with respect to the center of main interests of at least two of the Debtors, the issuers and principal obligors on the Notes, OAS Finance and Investments GmbH, which is incorporated in Austria (collectively, the "Finance Companies"). Mr. Tavares's claim that the Finance Companies, despite their countries of incorporation, are functionally centered in Brazil, *see* Tavares Declaration at ¶ 17, has not been tested through discovery, and thus the Court should not conclude, on that basis, that the Debtors are likely to succeed on recognition of the Finance Companies' foreign proceedings.

22.     Accordingly, the Debtors cannot show that they are likely to succeed on their petitions for recognition, and thus cannot meet the first prong of the injunction test.

**B.     The Debtors Will Not Suffer Imminent, Irreparable Harm In the Absence of an Injunction.**

23.     The Debtors argue that a failure to obtain an injunction will result in irreparable harm due to (i) the alleged potential for further enforcement actions by the Noteholders in their pending actions, (ii) the alleged potential that creditors other than the Noteholders commence litigation in the U.S., (iii) and the alleged distraction of the Debtors' officers and directors from the Brazilian Bankruptcy Proceedings upon the occurrence of either (i) or (ii). *See* Motion at ¶¶ 27-30. The Debtors' arguments in this regard, however, are either unsupported or belied by their own submissions. They do not, in any event, rise to the level of irreparable harm.

24.     First, as Mr. Tavares admits, the Debtors have no domicile or place of business in the U.S., and their only connection to the U.S. is that they hold approximately USD $5,962,150 in cash in U.S. bank accounts or trust accounts with White & Case. *See* Tavares Declaration at ¶ 43. Of that amount, more than USD $5,600,000 has already been turned over to the Sherriff of

New York City pursuant to the *ex parte* order of attachment. *See* Tavares Declaration at ¶ 43. Thus, the risk that additional, significant assets will be attached through further enforcement in the pending litigation is nonexistent.

25.    Second, the Debtors point to no evidence that a race to the courthouse is imminent; their arguments in that regarding are mere speculation. In any event, given that most of the Debtors' assets in the U.S. have already been attached, a race to the courthouse could not result in irreparable harm.

26.    Thus, the only apparent purpose in requesting the relief is to stay the fraudulent transfer action brought against certain Debtors and their non-debtor affiliates in the S.D.N.Y. District Court, and thereby avoid scrutiny of such transaction and discovery into what actually transpired. The Debtors' desire to avoid the consequences of their own actions, however, cannot create a threat of imminent irreparable harm sufficient to justify the imposition of an injunction.

27.    Finally, the Second Circuit Court of Appeals has made it very clear that the fees and distraction from litigation does not rise to the level of imminent, irreparable harm necessary for injunctive relief. *See Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995) (defining "irreparable harm" as a certain and imminent harm "for which a monetary award cannot be adequate compensation[,]" and noting that expenditures of money, time and energy caused by the absence of an injunction are not enough to show irreparable harm) (quotations omitted). In fact, as the Supreme Court has held, "[t]he key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). Accordingly, the Debtors have not made the requisite showing to satisfy the second prong of the injunction standard.

18

**C.      The Balance of Harms Favors the Noteholders.**

28.      As noted above, the potential for actual harm to the Debtors of denial of an injunction is nonexistent.  On the other hand, an injunction delaying the Noteholders' ability to enforce their rights and challenge the Debtors' fraudulent transfers (even for a short time)—or, worse still, an injunction purporting to undo any rights already exercised or obtained by the Noteholders—could be highly prejudicial to the Noteholders' interests in light of the Debtors' recent clandestine and indefensible transfers of assets out of the reach of creditors.   Further, as noted above, the Debtors have approached this Court with unclean hands, and thus any balancing of the equities tips in favor of the Noteholders, which have merely pursued their rights and remedies under the relevant indentures and applicable law.

**D.      The Requested Relief Is Not In The Public Interest.**

29.      Finally, the requested injunction will further the Debtors' attempt to avoid scrutiny of the fraudulent transfers and enable non-debtor affiliates to continue to possess and use assets that were fraudulently transferred out of Noteholder reach or for the purpose of eliminating the Noteholders' structural seniority.  Under the circumstances, the requested injunction cannot be in the public interest.

30.      Further, under Brazilian insolvency law, the only actions stayed are the attachment of or foreclosure on assets, but not actions and relief up to that point. The unavailability of a stay under Brazilian law demonstrates that the injunctive relief sought would disserve the public interest because it would violate basic principles of comity. "[A] recognition order under chapter 15 should not be the indirect means for obtaining global relief that could not otherwise have been achieved by order of the court having jurisdiction of the main foreign proceeding."  *In re JSC BTA Bank*, 434 B.R. 334, 337 (Bankr. S.D.N.Y. 2010) (denying motion

for a global anti-suit injunction).  Since that relief is not available in Brazil, the bestowal of that relief by this Court would not serve the public interest.

**IV.**      **Any Order Granting Provisional Relief Must Contain Creditor Protections.**

31.      If, despite the above, the Court determines that relief under section 1519(a) is warranted (which it should not), the Court must ensure that the interests of creditor are sufficiently protected .  *See* 11 U.S.C. § 1522(a).  Thus, any order granting 1519 relief must be narrowly tailored to avoid unfair treatment of creditors.  Here, any order the Court may enter should include a specific provision providing that (i) the injunctive relief granted applies only in the United States and not to any actions or proceedings outside of the United States, and (ii) the injunctive relief does not, in any way, affect the rights of creditors obtained prior to the filing of the Chapter 15 cases including, but not limited to, any liens or attachments in Debtor assets obtained prior to that filing.  Further, in light of the Debtors' recent fraudulent transfers, any order should enjoin the Debtors from transferring assets currently held in the U.S. outside the U.S.

*[Remainder of Page Intentionally Left Blank]*

20

WHEREFORE, the Noteholders request that the Court deny the Motion.

Dated:    April 17, 2015
          New York, New York

                                    *_/s/ Allan S. Brilliant_*

                                  Allan S. Brilliant
                                  Craig P. Druehl
                                  Stephen M. Wolpert
                                  DECHERT LLP
                                  1095 Avenue of the Americas
                                  New York, New York  10036
                                  Telephone: (212) 698-3500
                                  Facsimile: (212) 698-3599

*Attorneys for Aurelius Capital Management, LP on behalf of entities it manages, including Aurelius Investment, LLC and Huxley Capital Corporation and Alden Global Capital LLC on behalf of entities it manages, including Alden Global Adfero BPI Fund, Ltd., Alden Global Opportunities Master Fund, L.P., Alden Global Value Recovery Master Fund, L.P., and Turnpike Limited*