**REDACTED PURSUANT TO COURT ORDER**

DECHERT LLP
1095 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 698-3500
Facsimile:  (212) 698-3599
Allan S. Brilliant
Robert J. Jossen
Gary J. Mennitt
Craig P. Druehl
Stephen M. Wolpert

*Attorneys for Aurelius Capital Management, LP*
*on behalf of entities it manages, including*
*Aurelius Investment, LLC and Huxley Capital*
*Corporation and Alden Global Capital LLC on*
*behalf of entities it manages, including Alden*
*Global Adfero BPI Fund, Ltd., Alden Global*
*Opportunities Master Fund, L.P., Alden Global*
*Value Recovery Master Fund, L.P., and*
*Turnpike Limited*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- X
                                                         :
In re:                                                   :    Chapter 15
                                                         :
OAS S.A., *et al.*,[1]                                   :    Case No. 15-10937 (SMB)
                                                         :
     Alleged Debtors in Foreign Proceedings.            :    Jointly Administered
                                                         :
-------------------------------------------------------- X

**OBJECTION OF ALDEN AND AURELIUS**
**TO PETITION FOR RECOGNITION**

---

[1]      The Debtors in these chapter 15 cases, along with the last four digits of each debtor's tax identification or corporate registry number, are: OAS S.A. (01-05), Construtora OAS S.A. (01-08), OAS Investments GmbH (4557), and OAS Finance Limited (6299).

21012508

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................. 8

I.      THE OAS GROUP ................................................................................................. 8

II.     THE 2021 NOTES, 2019 NOTES AND PERPETUAL NOTES ..................................... 11

III.    PETROBRAS CORRUPTION SCANDAL ................................................................ 13

IV.     SECRET TRANSFERS AND MERGER IN AFTERMATH OF CORRUPTION
        SCANDAL ........................................................................................................... 15

V.      BRAZILIAN BANKRUPTCY PROCEEDINGS ........................................................ 17

VI.     ROLE OF DEBTORS AND JUDICIAL ADMINISTRATORS UNDER
        BRAZILIAN BANKRUPTCY LAW ....................................................................... 18

VII.    COMMENCEMENT OF CHAPTER 15 CASES ....................................................... 21

VIII.   APPOINTMENT OF JOINT PROVISIONAL LIQUIDATORS FOR OAS
        FINANCE BVI AND OAS INVESTMENTS BVI ..................................................... 22

IX.     CHAPTER 15 PROCEDURAL HISTORY ............................................................... 25

ARGUMENT ..................................................................................................................... 26

I.      THE PETITIONER IS NOT THE FOREIGN REPRESENTATIVE OF THE
        DEBTORS ........................................................................................................... 26

II.     RECOGNIZING THE BRAZILIAN BANKRUPTCY PROCEEDINGS WOULD
        BE MANIFESTLY CONTRARY TO PUBLIC POLICY UNDER SECTION
        1506 OF THE BANKRUPTCY CODE ..................................................................... 38

        A.      Recognition is Manifestly Contrary to the Fundamental U.S. Policy of
                Refusing to Shelter Bad Faith Schemes ................................................... 39

        B.      The Brazilian System Lacks Certain Fundamental Due Process Protections ...... 42

III.    OAS INVESTMENTS AND OAS FINANCE BVI HAVE NO COMI OR
        ESTABLISHMENT IN BRAZIL ............................................................................ 45

IV.     THE COURT SHOULD DENY DISCRETIONARY RELIEF AND
        CONDITION ANY RECOGNITION ORDER ON CREDITOR PROTECTIONS ....... 50

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*1633 Broadway Mars Rest. Corp. v. Paramount Grp., Inc. (In re 1633 Broadway Mars Rest. Corp.)*,
    388 B.R. 490 (Bankr. S.D.N.Y. 2008) ................................................................40

*Awal Bank, BSC v. HSBC Bank USA (In re Awal Bank, BSC)*,
    455 B.R. 73 (Bankr. S.D.N.Y. 2011) .................................................................30

*Bd. of Managers of Soho Int'l Arts Condo. v. City of New York*,
    Case No. 01 Civ. 1226 (DAB), 2003 U.S. Dist. LEXIS 10221 (S.D.N.Y. June 17, 2003) ...................................................................................................................37

*Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*,
    737 F.3d 238 (2d Cir. 2013)................................................................................34

*Fogerty v. Petroquest Res. Inc. (In re Condor Ins. Ltd.)*,
    601 F.3d 319 (5th Cir. 2010) .............................................................................30

*Goldberg v. Kelly*,
    397 U.S. 254 (1970)...........................................................................................43

*Huxley Capital Corp. v. OAS S.A.*,
    Case No. 15 CV 1637 (GHW) .........................................................................1, 7

*In re Basis Yield Alpha Fund (Master)*,
    381 B.R. 37 (Bankr. S.D.N.Y. 2008)............................................................26, 45

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*,
    374 B.R. 122 (Bankr. S.D.N.Y. 2007) ..............................................................45

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*,
    389 B.R. 325 (S.D.N.Y. 2008)......................................................................30, 48

*In re Board of Directors of Telecom Argentina, S.A.*,
    528 F.3d 162 (2d Cir. 2008)...............................................................................43

*In re Centrais Eletricas Do Para S.A.*,
    No. 12-14568 (SCC) (Bankr. S.D.N.Y. Dec. 12, 2012) ...................................37

*In re Coastal Cable T.V., Inc.*,
    709 F.2d 762 (1st Cir. 1983)..............................................................................41

*In re Gold & Honey, Ltd.*,
    410 B.R. 357 (Bankr. E.D.N.Y. 2009) ..............................................................39

*In re Gold & Honey, Ltd.*,
   410 B.R. 357 (Bankr. E.D.N.Y. 2009)................................................................39

*In re Hourani*,
   180 B.R. 58 (Bankr. S.D.N.Y. 1995).............................................................43, 44

*In re Kemsley*,
   489 B.R. 346 (Bankr. S.D.N.Y. 2013)................................................................50

*In re Millennium Global Emerging Credit Master Fund Ltd.*,
   458 B.R. 63 (Bankr. S.D.N.Y. 2011)..................................................................50

*In re Natural Land Corp.*,
   825 F.2d 296 (11th Cir. 1987) ...........................................................................41

*In re Oversight and Control Comm'n of Avnzit, S.A.*,
   385 B.R. 525 (Bankr. S.D.N.Y. 2008)................................................................30

*In re Qimonda AG*,
   462 B.R. 165 (Bankr. E.D. Va. 2011).................................................................39

*In re Rede Energia S.A.*,
   No. 14-10078 (SCC) (Bankr. S.D.N.Y. Feb. 25, 2014)......................................37

*In re Rede Energia S.A.*,
   No. 14-10078 (SCC) (Bankr. S.D.N.Y. Mar. 6, 2014)........................................37

*In re Remington Rand Corp. v. Bus. Sys. Inc.*,
   830 F.2d 1260 (3d Cir. 1987), *aff'd, sub nom., Kilbarr Corp. v. Bus. Sys. Inc., B.V.*,
   869 F.2d 589 (3d Cir. 1989).........................................................................43, 44

*In re Sealed Case*,
   573 F.3d 844 (D.C. Cir. 2009)...........................................................................35

*In re SIFCO S.A.*,
   No. 14-11179 (REG) (Bankr. S.D.N.Y. Oct. 15, 2014).......................................37

*In re SIFCO S.A.*,
   No. 14-11179 (REG) (Bankr. S.D.N.Y. Oct. 23, 2014).......................................37

*In re Starbrite Props. Corp.*,
   Case No. 11-40758 (CEC), 2012 Bankr. LEXIS 2599 (Bankr. E.D.N.Y. June 5, 2012) ........40

*In re Suntech Power Holdings Co.*,
   520 B.R. 399 (Bankr. S.D.N.Y. 2014).................................................................49

*In re Toft*,
   453 B.R. 186 (Bankr. S.D.N.Y. 2011).................................................................39

-ii-

*In re Treco*,
  240 F.3d 148 (2d Cir. 2001)...................................................................................39

*In re Tri-Continental Exch., Ltd.*,
  349 B.R. 627 (Bankr. E.D. Cal. 2006)....................................................................45

*In re Vitro, S.A.B. de C.V.*,
  470 B.R. 408 (N.D. Tex. 2012)........................................................................34, 37

*In re Vitro S.A.B. de CV*,
  701 F.3d 1031 (5th Cir. 2012) ...............................................................34, 35, 36

*International Transactions, Ltd. v. Embotelladora Agral Regiomontana, SA de CV*,
  347 F.3d 589 (5th Cir. 2003) ............................................................................43, 44

*Keene Corp. v. United States*,
  508 U.S. 200 (1993).................................................................................................36

*Laime v. U.S. Trustee*,
  540 U.S. 526 (2004).................................................................................................34

*Lavie v. Ran (In re Ran)*,
  607 F.3d 1017 (5th Cir. 2010) .........................................................................26, 50

*Little Creek Dev. Co. v. Commonwealth Mort. Co. (In re Little Creek Dev. Co.)*,
  779 F.2d 1068 (5th Cir. 1986) ...............................................................................40

*Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*,
  714 F.3d 127 (2d Cir. 2013).............................................................................45, 46

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
  339 U.S. 306 (1950).................................................................................................43

*NLRB v. Steinerfilm, Inc.*,
  702 F.2d 14 (1st Cir. 1983).....................................................................................37

*Pepper v. Litton*,
  308 U.S. 295 (1939).................................................................................................40

*Richardson v. Sunset Science Park Credit Union*,
  268 F.3d 654 (9th Cir. 2001) ..................................................................................36

*Schwyzer v. Fiduciary Trust Co. Int'l*,
  Case No. 04 Civ. 7975 (RCC), 2005 U.S. Dist. LEXIS 46633 (S.D.N.Y. Aug. 4,
  2005) ........................................................................................................................36

*United States v. Knote*,
  818 F. Supp. 1280 (E.D. Mo. 1993), *aff'd*, 29 F.3d 1297 (8th Cir. 1994)..............37

*United States v. Ron Pair Enters., Inc.*,
   489 U.S. 235 (1989) ..................................................................................................34

*Waller v. Pidgeon*,
   Case No. 306506, 2008 WL 2338217 (N.D. Tex. June 5, 2008), *aff'd, Waller v.*
   *Pidgeon*, 324 F. App'x 431 (5th Cir. 2009) ..........................................................36

**STATUTES**

11 U.S.C. § 101(1) .....................................................................................................35

11 U.S.C. § 101(4) .....................................................................................................35

11 U.S.C. § 101(23) ...................................................................................................27

11 U.S.C. § 101(24) .............................................................................................27, 28

11 U.S.C. § 109(a) .....................................................................................................34

11 U.S.C. § 109(c)(2) .................................................................................................35

11 U.S.C. § 321(a)(2) .................................................................................................35

11 U.S.C. § 330 .........................................................................................................34

11 U.S.C. § 363 .........................................................................................................51

11 U.S.C. § 541(b)(3) .................................................................................................35

11 U.S.C. § 552 .........................................................................................................51

11 U.S.C. § 553 .........................................................................................................30

11 U.S.C. § 1107(a) ...................................................................................................32

11 U.S.C. § 1502 ................................................................................................4, 5, 49

11 U.S.C. § 1509 .......................................................................................................30

11 U.S.C. § 1515(a) ..............................................................................................27, 28

11 U.S.C. § 1515(b) ..............................................................................................28, 31

11 U.S.C. § 1517(a) ...................................................................................................39

11 U.S.C. § 1517(b)(1) ...............................................................................................45

11 U.S.C. § 1517(b)(2) ...............................................................................................49

11 U.S.C. § 1520(a)(3)................................................................................................5, 8, 51

11 U.S.C § 1521(a) ....................................................................................................31, 50, 51

11 U.S.C. § 1523(a) ........................................................................................................30, 31

18 U.S.C. § 2441(c)(3)...........................................................................................................35

21 U.S.C. § 387k(h)(1) ..........................................................................................................35

28 U.S.C. § 1746.....................................................................................................................32

41 U.S.C. § 1704(g)(3)(F)......................................................................................................35

Aurelius Capital Management, LP on behalf of entities it manages (collectively, "Aurelius") and Alden Global Capital LLC on behalf of entities it manages (collectively, "Alden"), as holders or managers of entities that hold beneficial interests in certain 8.00% Senior Notes due 2021 issued by OAS Finance Limited and guaranteed by OAS S.A., OAS Investimentos S.A. and Construtora OAS S.A. (the "2021 Notes"), and/or certain 8.25% Senior Notes due 2019 issued by OAS Investments GmbH and guaranteed by OAS S.A., OAS Investimentos S.A. and Construtora OAS S.A. (the "2019 Notes"), and/or certain 8.875% Perpetual Notes issued by OAS Finance Limited and guaranteed by OAS S.A., OAS Investimentos S.A. and Construtora OAS S.A. (the "Perpetual Notes," and together with the 2019 Notes and the 2021 Notes, the "Notes," and the holders of Notes, the "Noteholders"),[2] hereby file this objection (the "Objection") to the relief requested pursuant to the Forms of Petition [Docket No. 1] (the "Forms of Petition") and the Verified Petition [Docket No. 3] (the "Verified Petition," and together with the Forms of Petition, the "Recognition Petitions") filed by Renato Fermiano Tavares (the "Purported Foreign Representative") as purported foreign representative for the above-captioned debtors in a foreign proceeding (the "Debtors"). In support of the Objection, Alden and Aurelius respectfully state as follows:

## PRELIMINARY STATEMENT

The Court should deny the Debtors' request for recognition of the Brazilian Bankruptcy Proceedings because the Debtors have not met the threshold requirements for recognition. First, the Debtors have not shown that the Purported Foreign Representative is authorized in the

---

[2]    Alden and Aurelius hold, in the aggregate, $319,266,000.00 in principal amount of Notes. Other than the holdings of Notes listed in the immediately preceding sentence, and certain asserted and unasserted causes of action related thereto, Alden and Aurelius hold no other claims or interests in OAS S.A. ("OAS," and together with all of its direct and indirect subsidiaries, the "OAS Group") or any of its subsidiaries, including subsidiaries that have not filed chapter 15 petitions with this Court.

foreign proceeding to administer the reorganization or liquidation of the Debtors' assets or

affairs. Accordingly, the Purported Foreign Representative does not meet the Bankruptcy

Code's definition of "foreign representative" and had no authority to apply to this Court for

recognition of the Brazilian Bankruptcy Proceedings. Second, with respect to OAS Finance

Limited, a British Virgin Islands ("BVI") company ("OAS Finance BVI") and OAS Investments

GmbH, an Austrian company ("OAS Investments," and together with OAS Finance BVI, the

"Non-Brazilian Debtors"), the Debtors have not shown that those entities have their "centers of

main interest" ("COMI") or an "establishment" in Brazil within the meaning of the Bankruptcy

Code. Thus, the Brazilian Bankruptcy Proceedings for the Non-Brazilian Debtors cannot be

recognized as either foreign main or foreign nonmain proceedings. Finally, due to the Debtors'

bad faith and the lack of due process protections in Brazil, recognition of the Brazilian

Bankruptcy Proceedings would be manifestly contrary to U.S. public policy. Thus, the Court

should apply the public policy exception of section 1506 of the Bankruptcy Code to deny

recognition.

       The Debtors' request for recognition of the Purported Foreign Representative as the

"foreign representative" within the meaning of sections 101(24) of the Bankruptcy Code is

defective. It is undisputed that the Purported Foreign Representative was not appointed by the

foreign court to act as a representative of the foreign proceeding in the U.S. Further, he is not

authorized in a foreign proceeding by Brazilian law to administer the reorganization of the

debtors. Accordingly, pursuant to the plain language of sections 101(24), 1509, and 1515 of the

Bankruptcy Code, he was not qualified to (1) act as the "foreign representative" of the foreign

proceeding, (2) commence the Debtors' Chapter 15 cases, or (3) perform the responsibilities of a

foreign representative under the provisions of Chapter 15. Embedded in the requirements under

those sections is the critical idea that the foreign representative will be accountable to the foreign court. This is important because the foreign representative has numerous discretionary responsibilities under Chapter 15 that should be performed in the best interests of all parties, not simply the debtor or its shareholders. A person simply designated by the board of directors of a foreign debtor rather than the foreign court obviously does not satisfy this requirement. Further, the Purported Foreign Representative cannot even *purport* to represent the Brazilian Bankruptcy Proceedings of OAS Finance BVI, as the Eastern Caribbean Supreme Court has divested the Purported Foreign Representative's alleged authority to act on its behalf by its order appointing joint provisional liquidators ("JPLs").[3]

Moreover, the Debtors request that the Court recognize the Brazilian Bankruptcy Proceedings as foreign main proceedings for two entities, OAS Finance BVI and OAS Investments, that do not have their centers of main interests ("COMI") in Brazil. Section 1516(c) of the Bankruptcy Code provides for a presumption that a debtor's registered office is the center of the debtor's main interests, and the Debtors have offered insufficient evidence to rebut this presumption. The Debtors assertion that the Non-Brazilian Debtors' COMI is in Brazil is based solely on the location of those entities' directors. Every other factor that the Second Circuit considers relevant, however, weighs against a finding of COMI in Brazil.

Both OAS Finance BVI and OAS Investments are special purpose entities formed to issue the Notes. Through their offering memoranda, they specifically held themselves out to the investing public as BVI and Austrian entities, respectively. OAS Finance BVI has its registered office in BVI, and has never had an address in Brazil. It is a wholly-owned subsidiary of OAS

---

[3]       Upon information and belief, the JPLs intend to withdraw OAS Finance BVI's current Chapter 15 petition and file another petition seeking recognition of the proceedings before the Eastern Caribbean Supreme Court as foreign main proceedings.

Investments Limited ("OAS Investments BVI"), also a BVI company.  Thus, its equity interests are controlled by a BVI entity.  ████████████████████  It has no assets, employees or ordinary course creditors in Brazil.  Its only material asset is a U.S. dollar-denominated loan to OAS Investments BVI, another BVI entity.  Its main creditors are the Noteholders, which are located around the world.  Its corporate obligations are governed by the laws of the BVI, and its obligations to the Noteholders are governed by New York law.

Similarly, OAS Investments is incorporated in Austria, and its registered office is located there.  Although he resigned in February 2015, Austrian public records show (and thus third parties would ascertain) that a director of OAS Investments resides in Austria in accordance with Austrian law.  Moreover, Austrian law contemplates that at least one director must reside in Austria, and if that ceases to be the case, parties in interest are entitled to demand the appointment of a temporary director from an Austrian court.  ████████████████████ ████████████████  It has no assets, employees or ordinary course creditors in Brazil, but it has such creditors in Austria.  Its only material asset is a U.S. dollar-denominated loan to OAS Investments.  Its principal creditors are Noteholders, which are located around the world.  Its corporate obligations are governed by the laws of Austria, and its obligations to the Noteholders are governed by New York law.

Thus, as the ascertainable COMI of the Non-Brazilian Debtors is outside Brazil, the Brazilian Bankruptcy Proceedings of the Non-Brazilian Debtors cannot be recognized by the Court as "foreign main proceedings" as defined under section 1502(4).  Further, there is no evidence that the Non-Brazilian Debtors conduct any local business activity in Brazil, such that they can be said to have an "establishment" in Brazil as that term is defined in section 1502(2) of the Bankruptcy Code.  Accordingly, the Debtors cannot even show that the Brazilian Bankruptcy

Proceedings for the Non-Brazilian Debtors can be recognized as "foreign nonmain proceedings" as defined under section 1502(5).

Finally, recognition of the Brazilian Bankruptcy Proceedings is manifestly contrary to public policy within the meaning of section 1506, and it would be inappropriate to allow the Purported Foreign Representative to operate the Debtors' U.S. business or exercise any rights and powers of a trustee as provided in section 1520(a)(3). The principal cause for the OAS Group's financial maelstrom is the aftereffects of widespread criminal corruption occurring at the highest levels of management. Moreover—even after five of the company's top executives were arrested and charged with corruption, money laundering, and the formation of a criminal organization—certain OAS Group entities engaged in secret transactions that had the effect of extinguishing guarantees of the obligations under the Notes and eliminating Noteholders' structural seniority to the company's most valuable assets. Even in petitioning this Court of equity for recognition of their Brazilian Bankruptcy Proceedings (defined below), the Debtors' Verified Petition and declarations in support thereof contain half-truths regarding the aftermath of the relevant criminal activities, with no disclosure of the executives' incarceration. Further, the Debtors' submissions contain no explanation, other than vague generalities, of the reasons it was necessary to merge one Guarantor (as defined below) out of existence and strip another Guarantor of assets worth over $1 billion on the day after Christmas (the "Christmas Transactions"), or why those transactions were kept secret for weeks after they occurred.

According to their filings, the Debtors have approximately $6 million in assets in the U.S. which is fairly insignificant for a company with several billions of dollars in debt. Most of those funds are currently in the possession of the Sheriff of New York City, and the Court has already held that the Debtors' will not be irreparably harmed from defending against the pending U.S.

5

actions.  This, combined with the Debtors' vehement opposition to any discovery into the

criminal activities and the Christmas Transactions in this and other U.S. proceedings,

demonstrates that the Debtors' true purpose in filing these Chapter 15 Cases is to stay discovery

and avoid highly damaging information from coming to light.  The U.S. courts, however, are part

of a system that is fundamentally based on principles of transparency and due process.  The

Debtors' requesting relief from this U.S. Court while actively attempting to avoid any inquiry or

insight into their clearly nefarious activities is antithetical to those principles.  Further, if the

Debtors have their way, no court will ever review or redress the Debtors' fraudulent transfers.

Accordingly, the Debtors seek, in bad faith, to utilize the U.S. courts to absolve them from the

consequences of a fraudulent scheme, which is manifestly contrary to U.S. public policy.  As

recognition of a foreign proceeding is subject to the public policy exception of section 1506 of

the Bankruptcy Code, the Brazilian Bankruptcy Proceeding cannot be recognized.

      Deference to the Brazilian courts in this case would also violate U.S. public policy, as

their laws and procedures do not provide a meaningful ability to avoid the fraudulent transfers

that occurred prior to the commencement of the Brazilian Bankruptcy Proceedings, and lack

fundamental due process protections.  The Brazilian bankruptcy system affords no access to

discovery or ability to cross-examine witnesses and present evidence at evidentiary hearings.  In

fact, no public hearings are conducted in the Brazilian Bankruptcy Proceedings, and all

interaction with the judge is done through undocumented, *ex parte* meetings.  Those *ex parte*

procedures are especially concerning here, as the particular facts of this case cast significant

further doubt on the ability of Noteholders to receive a fair hearing in Brazil.  In a misguided

attempt to comfort the S.D.N.Y. District Court regarding the connection between the Debtors'

criminal activities and the Christmas Transactions, the Debtors' counsel informed the District

Court that the corruption scandal "does not involve just my client's companies.  It involves, effectively, the entire construction industry.  It involves Petrobras, the state-controlled oil company, and the allegations rises to the level of the federal government.  Some people are even questioning whether the current president has been implicated."[4]  In fact, the current President of Brazil was chairwoman of Petrobras from 2003 to 2010, when much of the criminal activity took place.  Far from providing any comfort, highlighting the widespread nature of the corruption only undermines any confidence that may be had in Noteholders' ability to obtain a fair hearing in Brazil, where high-ranking government officials may have personal interests in the exoneration of the OAS Group from their wrongdoing.

The widespread corruption calls into doubt the effectiveness of Brazilian corporate governance, and the motivations of the Purported Foreign Representative through which the Debtors petition this Court for relief.  The Purported Foreign Representative, who is currently an in-house attorney in the OAS Group and has been for the past 6 years, ████████████

██████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

---

[4]        *Huxley Capital Corp. v. OAS S.A.*, Case No. 15 CV 1637 (GHW), Hr'g Tr., at 13:1-14 (S.D.N.Y. May 7, 2015) (the "Huxley Transcript") (attached to *Declaration of Benjamin M. Rose in Support of Objection of Alden and Aurelius to Petition for Recognition* (the "Rose Decl.") as **Exhibit 1**).

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████  An individual so hopelessly conflicted cannot possibly be an effective

representative of the interests of creditors.  ██████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████

Thus, the Court should deny recognition as manifestly contrary to public policy or, at the

very least, exercise its discretion to deny relief under section 1520(a)(3).  Further, in the event

the Court grants recognition of the Brazilian Bankruptcy Proceedings for some or all of the

Debtors (which it should not), any order granting recognition should contain provisions tolling

deadlines pursuant to section 108(c) of the Bankruptcy Code and protecting creditors against

transfers of U.S. assets to other jurisdictions, as well as the destruction of books, records, or

other relevant documents and the removal of such documents from the U.S.

## FACTUAL BACKGROUND

### I.    The OAS Group

1.    The OAS Group consists of OAS and all of its direct and indirect subsidiaries,

whether wholly-owned or otherwise.  The Debtors in this chapter 15 case, OAS, Construtora

OAS S.A. ("Construtora OAS"), OAS Investments, and OAS Finance BVI are members of the

OAS Group.

2.    OAS is the ultimate parent of the OAS Group.  OAS is privately held by (i) CMP

Participações Ltda., which owns 90% of OAS and is controlled by Cesar de Araújo Mata Pires,

and (ii) LP Participações e Engenharia Ltda., which owns 10% of OAS and is controlled by José

Adelmário Pinheiro Filho ("Pinheiro").  *See* Verified Petition at ¶ 12.

8

3.      OAS is a holding company and operates through its two principal subsidiaries: Construtora OAS and Investimentos (collectively with OAS and Construtora OAS, the "Guarantors").  *See* Verified Petition at ¶ 9.

4.      Construtora OAS operates the heavy engineering division, and Investimentos is a holding company that owns investments in various real estate and infrastructure assets including arenas, toll roads, ports, airports and sanitation assets.  *See id.*

5.      The Non-Brazilian Debtors are special purpose vehicles, the purposes of which are/were to raise financing in the international capital markets.  After raising that financing, they loaned the proceeds to OAS Investments BVI, another special purpose vehicle which, in turn, loaned the proceeds to Construtora OAS and other members of the OAS Group.

6.      The Non-Brazilian Debtors have no other function or business other than to raise financing for the OAS Group.  Having raised financing and loaned the proceeds to OAS Investments BVI to be loaned to Construtora OAS and other OAS Group members, the Non-Brazilian Debtors have only one business, which is to collect payments on their respective intercompany receivables from OAS Investments BVI, and to use those funds to remit payments on their respective debts.  Thus, they are not part of an integrated business with the other members of the OAS Group, but rather are among the largest creditors of the other members of the OAS Group.

7.      OAS Finance BVI is incorporated in the British Virgin Islands, and is wholly-owned by OAS Investments BVI, which is also incorporated in the British Virgin Islands.  The registered address of OAS Finance BVI is at Trident Trust Company (B.V.I.) Limited, Trident Chambers, P.O. Box 146, Road Town, Tortola, British Virgin Islands. OAS Finance BVI is registered with the Registrar of Corporate Affairs under BVI Company Number 1766299.

9

Directors of OAS Finance BVI are appointed by its sole shareholder, OAS Investments BVI. Pursuant to Section 5.1 of its articles of association, OAS Finance BVI may carry on or undertake any business or activity, do any act or enter into any transaction, subject to applicable British Virgin Islands legislation. *See 8.00% Senior Notes Offering Memorandum* (attached to Rose Decl. as **Exhibit 2**) at 111; *8.875% Perpetual Notes Offering Memorandum* (attached to Rose Decl. as **Exhibit 3**) at 109. OAS Finance BVI has no employees, and thus no employees in Brazil. Its only known asset is a US$909,448,958.33 intercompany receivable from OAS Investments BVI, a BVI company, and has no assets in Brazil. *See* Creditor List Filed on April 11, 2015 in Brazilian Bankruptcy Proceeding (the "RJ Creditor List") (attached to Rose Decl. as **Exhibit 4**) at last page. Its only vendors are located in BVI, not Brazil. Its principal liability is its obligation to pay the Notes, which are held by Noteholders all over the world.

    8.    OAS Investments is incorporated in Austria as a limited liability company (*Gesellschaft mit beshränker Haftung*). The registered address of OAS Investments is at Fischhof 3/6, 1010 Vienna, Austria. OAS Investments is registered with the Austrian companies register under FN 386381h. Pursuant to section three of its articles of association, the "principle [sic] corporate purpose" of OAS Investments is the financing of the operations of the OAS Group. *See 8.25% Senior Notes Offering Memorandum* (attached to Rose Decl. as **Exhibit 5**) at 114. At the time of its incorporation, one of OAS Investments' directors, Dr. Klaus Hafner, maintained a business address at Schubertring 6, 1010 Vienna, Austria. ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ the most up-to-date Austrian public records show that Dr. Hafner is a director of OAS Finance BVI. *See* OAS

Investments GmbH Austrian Companies Register Record (attached to Rose Decl. as **Exhibit 6**).[5]

OAS Investments has no employees, and thus no employees in Brazil.  Its only known asset is a

US$943,089,583.33 intercompany receivable from OAS Investments BVI, and thus it has no

assets in Brazil.  *See* RJ Creditor List at last page.  Its only vendors are located in Austria, not

Brazil.  Its principal liability is its obligation to pay the Notes, which are held by Noteholders all

over the world.

9.   ████████████████████████

████████████████████████

████████████████████████

███████████████

## II.    The 2021 Notes, 2019 Notes and Perpetual Notes

10.    The 2021 and Perpetual Notes were issued under and are governed by indentures

among OAS Finance Limited, as issuer, OAS S.A., OAS Investimentos S.A. and Construtora

OAS S.A., as guarantors, Deutsche Bank Trust Company Americas, as trustee, registrar, transfer

agent and paying agent, and Deutsche Bank Luxembourg S.A., as the Irish paying agent, Irish

listing agent and Irish transfer agent.  *See 8.00% Senior Notes Offering Memorandum* at 120;

*8.875% Perpetual Notes Offering Memorandum* at 118.

11.    The 2019 Notes were issued under and are governed by indentures among OAS

Investments, as issuer, OAS S.A., OAS Investimentos S.A. and Construtora OAS S.A., as

guarantors, Deutsche Bank Trust Company Americas, as trustee, registrar, transfer agent and

---

[5]    To the extent that original documents cited herein are in a language other than English, the exhibit attached
to the Rose Decl. shall include both the original document and a certified English translation, to the extent
available.

paying agent, and Deutsche Bank Luxembourg S.A., as the Irish paying agent, Irish listing agent

and Irish transfer agent.  *See 8.25% Senior Notes Offering Memorandum at 123.*

12.     Principal is to be payable, and the Notes are transferable and exchangeable, at the

office or agency maintained for such purposes in New York, New York at the Corporate Trust

Office of the Trustee.  *See 8.00% Senior Notes Offering Memorandum at 120; 8.875% Perpetual*

*Notes Offering Memorandum at 118; 8.25% Senior Notes Offering Memorandum at 123.*

13.     The Notes and their indentures provide that they will be governed by, and

construed in accordance with, the laws of the State of New York.  The issuers have each

consented to the non-exclusive jurisdiction of the courts of the State of New York and the United

States courts located in the Borough of Manhattan, New York City, New York with respect to

any action that may be brought in connection with the Notes or their indentures.  *See 8.00%*

*Senior Notes Offering Memorandum at 148; 8.875% Perpetual Notes Offering Memorandum at*

*137; 8.25% Senior Notes Offering Memorandum at 151.*

14.     The Notes were issued using U.S. underwriters.  The underwriters of the 2021

Notes include HSBC Securities (USA) Inc., and Santander Investment Securities Inc.  *8.00%*

*Senior Notes Offering Memorandum at 174.*  The underwriters of the 2019 Notes include

Deutsche Bank Securities Inc., HSBC Securities (USA) Inc., and Itau BBA USA Securities, Inc.

*8.25% Senior Notes Offering Memorandum at 179.* The underwriters of the Perpetual Notes

include Deutsche Bank Securities Inc., HSBC Securities (USA) Inc., Itau BBA USA Securities,

Inc., and Santander Investment Securities Inc.  *8.875% Perpetual Notes Offering Memorandum*

at 160.  The Notes were heavily marketed to investors in the U.S.

**III.     Petrobras Corruption Scandal**

15.     In November 2014, Brazilian federal prosecutors accused the OAS Group of

charging inflated fees on construction contracts with Brazil's state-owned oil company,

12

Petrobras, and of funneling kickbacks to Petrobras executives and high-level Brazilian

politicians.  Petrobras was chaired by Dilma Rousseff, the current President of Brazil, from 2003

to 2010, when much of the relevant activities took place, but who has denied any knowledge or

wrongdoing.  *See Another Former Petrobras Executive Arrested in Brazil Scandal*, REUTERS,

Jan. 14, 2015, *available at* http://www.reuters.com/article/2015/01/14/brazil-petrobras-arrest-

idUSL1N0UT0FF20150114.  The scandal is widespread across the Brazilian construction

industry, and 34 members of the Brazilian congress are under investigation, including the

president of the Senate, Renan Calheiros, and the Speaker of the Chamber of Deputies, Eduardo

Cunha.  *See* Anthony Boadle, *Top Brazilian Politicians Investigated in Petrobras Scandal*,

REUTERS, Mar. 7, 2015, *available at* http://www.reuters.com/article/2015/03/07/us-brazil-

petrobras-politicians-idUSKBN0M22GV20150307.

16.    On November 14, 2014, Pinheiro, president and 10% shareholder of OAS and

chief executive of Construtora OAS and Investimentos, was arrested in connection with the

corruption scheme.  *See* Criminal Indictment (attached to Rose Decl. as **Exhibit 7**).  Numerous

other OAS executives were arrested as well, including Agenor Franklin Magalhães Medeiros,

José Ricardo Nogueira Breghirolli, Mateus Coutinho de Sá Oliveira, and Alexandre Portela

Barbosa.  *Id*.  Prosecutors have formally charged these executives with corruption, money

laundering, and the formation of a criminal organization.  *Id.*  Brazilian police searching OAS

offices in November found lists of gifts, including luxury watches and fine wines, given to

leading politicians.  Dan Horch, *OAS, Brazilian Engineering Company, Seeks Bankruptcy*

*Protection*, N.Y. TIMES DEALBOOK, Mar. 31, 2015, *available at*

http://www.nytimes.com/2015/04/01/business/dealbook/oas-brazilian-engineering-company-

seeks-bankruptcy-protection.html.  Media reports called OAS, among other things, "the Brazilian

construction company at the center of the country's biggest-ever corruption scandal," and

emphasized that 22 of the 36 suspects charged by Brazilian prosecutors are current or former

employees at contractors including OAS.  *See* Filipe Pacheco, *OAS Bonds Drop to Record as

Payment Missed Amid Petrobras Probe*, BLOOMBERG BUSINESS, Jan. 5, 2015, *available at*

http://www.bloomberg.com/news/articles/2015-01-05/oas-bonds-drop-to-record-as-payment-

missed-amid-petrobras-probe.

   17. On February 20, 2015, the Ministério Público Federal (the Brazil Federal

Prosecutors office) filed a complaint against OAS and Construtora OAS (among other related

parties and executives) alleging improper conduct in connection with the scandal and seeking

fines and penalties of approximately R$1 billion Brazilian *reais* ("R$")[6] and a ban on

government contracting.

   18. Apparently, the Debtors' did not cut ties with the employees arrested for corrupt

activities.  According to the employee list filed with the Brazilian Bankruptcy Court, Agenor

Franklin Magalhães Medeiros, José Ricardo Nogueira Breghirolli, Mateus Coutinho de Sá

Oliveira, and Alexandre Portela Barbosa, are still employees of the OAS Group.  *See* Rose Decl.

at **Exhibit 8** at p. 2, 9, 50, 61.  Further, according to news reports, after Pinheiro's incarceration,

the OAS Group advanced him a year's worth of salary in the amount of R$7.2 million, or

approximately $2.4 million.  *See* Rose Decl. at **Exhibit 9**.

   19. In addition, in December 2010, OAS made loans in the aggregate amount of

R$268.9 million to its shareholder entities CMP Participações Ltda. (which is owned by Cesar de

Araújo Mata Pires) and LP Participações Ltda. (which is owned by Pinheiro).  According to

OAS's most recent audited financial statements, December 31, 2014, CMP Participações Ltda.

---

[6] The exchange rate as of May 15, 2015 was US$1 to R$2.98.

and LP Participações Ltda. still owe, in the aggregate R$100.049 million to OAS and certain of

its subsidiaries. *See* Individual and Consolidated Financial Statements For the Year Ended

December 31, 2014 and Independent Auditor's Report on the Financial Statements ("2014

Financial Statements") (attached to Rose Decl. as **Exhibit 10**) at 42. In the 2014 Financial

Statements, OAS's auditor, Deloitte, gave a qualified audit opinion stating that there is no

evidence that shows that these and other related party receivables in a total amount of R$280mm

will be repaid, and OAS S.A. should have taken a provision for eventual loss for these

receivables. *See* 2014 Financial Statements at 2.

**IV.     Secret Transfers and Merger in Aftermath of Corruption Scandal**

20.     The corruption scandal dramatically impaired the financial position of the OAS

Group. On November 19, 2014, Standard & Poor's downgraded the credit ratings of OAS and

OAS Finance BVI. The moment that downgrade occurred, the holders of the 9th Series

Convertible Debentures (the "Convertible Debentures"), issued by OAS and guaranteed by

Construtora OAS, were entitled to accelerate those Debentures. They did so on December 8,

2014.

21.     On December 29, 2014, Petrobras issued a press release stating that, in light of the

charges made against OAS in the scandal, OAS has been temporarily banned from contracting

with Petrobras and from participating in bids for such contracts.

22.     As of January 2, 2015, OAS Finance BVI and the Guarantors began to default on

the bonds issued by OAS Finance BVI.

23.     As noted in ¶ 21 above, the ratings downgrade on November 19 allowed some of

the OAS Group's debts to be accelerated. In the short period of time between then and

January 2, 2015, when OAS Finance BVI's bonds went into payment default, the OAS Group

engaged in a methodical, brazen series of secret transfers, all of which were designed to be

severely prejudicial to the holders of the Notes.

(i)     On December 1, 2014—a week before the Convertible Debentures were
        accelerated—Construtora OAS (a guarantor of the Notes) transferred
        assets valued at R$301 million to OAS Engenharia e Construção S.A
        ("Engenharia"), another subsidiary of OAS.  Construtora OAS did not
        receive any value in return.  Significantly, unlike Construtora
        OAS, Engenharia is not an obligor or guarantor of the Notes. OAS did not reveal
        this transfer until it published board of director meeting minutes in the
        Brazil official gazette on January 20, 2015.  ███████████████████
        ██████████████████████

(ii)    On December 26, 2014—seven days before the default on the first interest
        payment due on the 2021 Notes—Investimentos was merged into OAS.
        Investimentos' guaranty of the Notes was a critical element of credit
        support for the Notes and made them structurally senior to almost all other
        creditors of the OAS Group as respects the very substantial assets of
        Investimentos. Although Investimentos was itself insolvent, it had a vastly
        better ability to pay its creditors than did OAS, which had no assets of its
        own other than its interests in its subsidiaries. The merger of
        Investimentos into OAS eliminated the Notes' structural seniority on the
        eve of their default.  If allowed to stand, the merger will dramatically
        reduce the recoveries on the Notes.  ███████████████████
        ██████████████████████

(iii)   Remarkably, although OAS had a statutory obligation in Brazil to disclose
        the merger, it did not do so for an entire month, even as it issued many
        other public statements in the interim.  When OAS finally did disclose the
        merger, on January 29, 2015, the minutes of OAS's extraordinary board
        meeting also revealed that OAS changed the newspaper in which it
        publishes notices.  This change was made on the same day that the illicit
        merger was also approved.  Alden and Aurelius understand that this
        change—which itself was kept secret—violated Brazilian law, which
        permits such changes to be approved only at an annual general meeting.
        ██████████████████████

(iv)    On December 26, 2014, Investimentos transferred its ownership stake in
        Investimentos e Participações em Infraestrutura S.A. − INVEPAR
        ("Invepar") to its subsidiary OAS Infraestrutura.  Investimentos' 24.44%
        stake in Invepar had a book value of R$1.46 billion as of September 30,
        2014 but is likely worth much more than that.  Investimentos did not
        receive any value in return. Significantly, unlike Investimentos, OAS
        Infraestrutura is not an obligor or guarantor of the Notes.  This transfer
        was kept secret until Invepar (and not Investimentos) published a notice
        on January 7, 2015.  ██████████████████████

16



(v)

(vi)   These transfers were conducted in secret while the companies were plainly insolvent and on the verge of many payment defaults.

## V.   **Brazilian Bankruptcy Proceedings**

24.   On March 31, 2015, the Debtors commenced judicial reorganization proceedings (the "Brazilian Bankruptcy Proceedings") pursuant to Federal Law No. 11.101 of February 9, 2005 of the laws of the Federative Republic of Brazil (the "Brazilian Bankruptcy Law") by filing voluntary bankruptcy petitions in the First Specialized Bankruptcy Court of São Paulo (the "Brazilian Bankruptcy Court").  On April 1, 2015, the Brazilian Bankruptcy Court issued a decision and order (the "Brazilian Bankruptcy Court Order") approving the continuation of the Brazilian Bankruptcy Proceedings.  *See* Verified Petition at ¶¶ 33-34.  Without providing any party in interest an opportunity to be heard on the issue prior to its ruling, the Brazilian Bankruptcy Court indicated that it would treat the ten OAS entities in the Brazilian Bankruptcy Proceedings as substantively consolidated.  *See* Brazilian Bankruptcy Court Order (attached to Tavares Declaration as Exhibit B) at 3329.

25.   In the Brazilian Bankruptcy Court Order, the Brazilian Bankruptcy Court also appointed Alvarez & Marsal Consultoria Empresarial do Brasil as judicial administrator, *see id.*, and outlined a series of responsibilities for the judicial administrator: it "must report the company's situation within 10 days;" "[t]he judicial receiver shall be responsible for supervising the legality of the process and for seeing that the reorganizing companies meet all the deadlines."

*See id.* at 3330.  The judicial administrator must also submit fee proposals and monthly reports, *see id.*, and present a list of creditors.  *See id.* at 3332.  In addition, the Brazilian Bankruptcy Court provided that changes to debts listed by the Debtors in the bankruptcy filing must be sent to the judicial administrator.  *See id.* at 3331.

26.     The Debtors did not provide notice to Noteholders of the commencement of the Brazilian Bankruptcy Proceedings.

27.     On April 27, 2015, a group of Brazilian bondholders filed a motion with the Brazilian Bankruptcy Court asking the court to appoint a special monitor to supervise the management of the OAS Group and have veto power over management decisions, citing the company's various corrupt activities and fraudulent transfers.  *See* Rose Decl. at **Exhibit 15**.

## VI.     Role of Debtors and Judicial Administrators Under Brazilian Bankruptcy Law

28.     Under the Brazilian Bankruptcy Law, debtors may continue to operate in their ordinary course of business after filing a bankruptcy petition, subject to oversight by the creditors' committee and the judicial administrator.  Brazilian Bankruptcy Law Art. 64.  No provision of the Brazilian Bankruptcy Law, however, creates a bankruptcy estate, appoints the debtor as a trustee, or provides the debtor with trustee-like powers.

29.      The judicial administrator performs the administrative functions in "in-court restructurings," including, among others:

- Controlling information flow by providing information requested by creditors, *see* Brazilian Bankruptcy Law Art. 22 I (b), demanding information from creditors, the debtor or their officers, *see* Brazilian

Bankruptcy Law Art. 22 I (d), publishing notice of the creditor list, *see* Brazilian Bankruptcy Law Art. 7 § 2, Art. 18, and sending notices to creditors. *See* Brazilian Bankruptcy Law Art. 22 I (a).

- Applying to the judge to convene creditors' meetings (where the plan is discussed, modified, and either approved or rejected), *see* Brazilian Bankruptcy Law Art. 22 I (g), and chairing those meetings. *See* Brazilian Bankruptcy Law Art. 37.

- Performing the claims reconciliation, or "credit verification," process, including requesting "exclusion, classification otherwise, or rectification of any credit, in the event any falsehood, willful misconduct, sham, fraud, or essential error is uncovered or, further, any documents were overlooked at the time the credit was judged or included in the creditors' [list]." *see* Brazilian Bankruptcy Law Art. 7-20.

- Overseeing the debtor's activities. *See* Brazilian Bankruptcy Law Art. 22 II (a).

- Overseeing the debtor's compliance with restructuring plan. *See* Brazilian Bankruptcy Law Art. 22 II (a).

- Hiring professionals. *See* Brazilian Bankruptcy Law Art. 22 I (h).

- Filing for "bankruptcy" (i.e. liquidation) if the debtor breaches the obligations under the plan. *See* Brazilian Bankruptcy Law Art. 22 II (b).

- Submission of monthly reports on the debtor's activities. *See* Brazilian Bankruptcy Law Art. 22 II (c).

In a liquidation, the judicial administrator has additional duties and powers, including:

- Undertaking the judicial representation of the bankruptcy case. *See* Brazilian Bankruptcy Law Art. 22 III (c).

- Seizing the debtor's property and documents. *See* Brazilian Bankruptcy Law Art. 22 III (f).

- Performing any acts necessary for asset realization and payment of creditors. *See* Brazilian Bankruptcy Law Art. 22 III (i).

- Performing all acts for the preservation of rights and actions, to arrange for the collection of debts, and to grant release therefor. *See* Brazilian Bankruptcy Law Art. 22 III (l).

- Redeeming, on behalf of the estate and pursuant to judicial authorization, any mortgaged, attached, or legally retained assets.  *See* Brazilian Bankruptcy Law Art. 22 III (m).

- Represent the bankruptcy estate in court and retain lawyers.  *See* Brazilian Bankruptcy Law Art. 22 III (n).

30.    The Brazilian Bankruptcy Law provides no authority to the debtor to bring fraudulent transfer actions in reorganization proceedings.[7]  Parties seeking to avoid transactions related to unlawful acts of debtors prior to bankruptcy may only resort to civil measures, with the most typical procedure being the revocation suit (*ação revocatória*).  With respect to avoidance actions, Brazilian law does not provide for evidentiary hearings or formal discovery.  Because debtors are required to file a plan of reorganization within 60 days of the publication of notice that the Brazilian court has accepted the bankruptcy petition, Brazilian Bankruptcy Law Art. 53, actions to avoid transfers between debtors are rarely prosecuted in Brazil prior to plan confirmation and are often disposed of under a plan.  Thus, parties have no meaningful recourse in the Brazilian Bankruptcy Court for the avoidance of fraudulent transactions.

31.    Further, many important notices, such as the commencement of the bankruptcy proceeding, are done by publication, rather than by notice sent to each creditor.  *See e.g.*, Brazilian Bankruptcy Law at Art. 7 § 2 (requiring publication of notice of creditor's list and time and place where parties can have access to information); Art. 36 (Creditors' Committee convened by the judge pursuant to notice published in official press); Art. 52 V § 1. I-III (requiring notice published in official press containing summary of decision granting processing of in-court restructuring, nominal list of creditors, warning about claims reconciliation process);

---

[7]    Although certain types of avoidance actions can be brought in the Brazilian Bankruptcy Court in parallel proceedings where the debtor is in liquidation, *see* Brazilian Bankruptcy Law Art. 129, there is no similar provision that applies to the in-court reorganizations like the Brazilian Bankruptcy Proceedings.

Art. 53 III § 1 (judge shall order notice published advising creditors that the restructuring plan

has been received and setting a deadline for any objections).

**VII.**    **Commencement of Chapter 15 Cases**

32.    On April 15, 2015, the Purported Foreign Representative filed the Recognition

Petition in the United States Bankruptcy Court for the Southern District of New York, seeking

relief under chapter 15 of the Bankruptcy Code and recognition of OAS's Brazilian Bankruptcy

Proceedings as a foreign main proceeding.  The Purported Foreign Representative also filed his

declaration [Docket No. 4] (the "Tavares Declaration") and a declaration of a purported expert

on Brazilian insolvency law, Eduardo Secchi Munhoz [Docket No. 5] (the "Munhoz

Declaration"), in support of the Recognition Petition.

33.    The Petitioner's chapter 15 filings do not substantively describe the Christmas

Transactions outlined in ¶ 26 *supra*, providing little detail or explanation and only referring

generally to "reduction of costs" and "streamlining of corporate structure."  *See, e.g.,* Verified

Petition at ¶ 14 n.6.  The Recognition Petition and the Tavares Declaration also do not even

mention, let alone explain, the substantial delays in public disclosure of these highly suspect

transactions.  In addition, the Recognition Petition and the Tavares Declaration fail both to

disclose the arrests of key executives for exceptionally serious crimes and to provide any

explanation of the reasons behind their secret intercompany transactions.

34.    The Recognition Petition does not claim that the Purported Foreign

Representative was appointed by the Brazilian Bankruptcy Court or other appropriate judicial

body.  Given that the Purported Foreign Representative was not appointed by the Brazilian

Bankruptcy Court, the Recognition Petition does not contain a copy of any Brazilian court

decision appointing the Purported Foreign Representative or a certificate from a Brazilian court

affirming the appointment of the Petitioner as foreign representative.  Rather, the Petitioner only

21

asserts that the board of OAS appointed him a foreign representative pursuant to resolutions and powers of attorney. *See* Tavares Declaration at ¶ 3. Nor does the Recognition Petition reference a specific statute providing for the appointment of the Purported Foreign Representative.

## VIII. Appointment of Joint Provisional Liquidators for OAS Finance BVI and OAS Investments BVI

35.     On April 16, 2015, the Eastern Caribbean Supreme Court, High Court of Justice – Commercial Division in the British Virgin Islands entered an order appointing JPLs for OAS Finance BVI, as well as a non-debtor affiliate, OAS Investments BVI. *See* Orders of the Eastern Caribbean Supreme Court, High Court of Justice – Commercial Division in the British Virgin Islands, dated April 16, 2015 (the "BVI Order") (attached to Rose Decl. as **Exhibit 17**). The JPLs are independent professionals and members of a respected international accounting firm.

36.     The Eastern Caribbean Supreme Court order automatically divested the Debtors' directors and the Purported Foreign Representative's authority to act, or authorize actions, on behalf of OAS Finance BVI in connection with this chapter 15 case and the Brazilian Bankruptcy Proceedings, and vested that authority entirely in the JPLs. BVI Order at ¶ 4.

37.     The JPLs filed the Report of the Joint Provisional Liquidators (the "JPL Report") (attached to Rose Decl. as **Exhibit 18**) with the Eastern Caribbean Supreme Court on April 30, 2015.

38.     In connection with preparation of the Report, the JPLs retained a specialist insolvency and asset recovery firm of lawyers in São Paulo, Brazil, to review the Brazilian Bankruptcy Court record. JPL Report at 3. Counsel advised the JPLs that OAS S.A. had not complied with the Brazilian Bankruptcy Court's Order calling for financial reporting for each of the Debtors, and "[t]hus there is no separate reporting in the restructuring filing that allows us to assess the true picture of the companies over which we are appointed as Joint Provisional

Liquidators." JPL Report at 4. In addition to OAS S.A.'s noncompliance with the order,

directors and former directors of OAS Finance BVI and OAS Investments BVI have also

declined to respond to the JPLs' requests for information. JPL Report at 4-5.

39.    Counsel to the JPLs further recommended that "given the urgent need to protect

the position of [OAS Finance BVI] and [OAS Investments BVI] as independent parties to the

restructuring, an application be made to advise the Brazilian Court that the Court of the domestic

jurisdiction of the two companies had appointed Provisional Liquidators, and requesting that the

Brazilian Court respect this appointment understanding that neither company has employees to

be protected and need not be restructured themselves, and allow the Joint Provisional Liquidators

to represent Finance and Investments in the restructuring as arms-length creditors, given that

neither company requires to be restructured." JPL Report at 4. Counsel also advised that

"Article 47 of the Brazilian Bankruptcy code which provides the criteria under which entities can

be restructured, cannot apply to the BVI entities, and they are improperly included." JPL Report

at 4. Accordingly, the JPLs made the aforementioned application to the Brazilian Bankruptcy

Court on April 28, 2015. *Id.*

40.    The JPL Report also set forth insolvency counsel's review of publicly available

information on OAS Finance BVI and OAS Investments, and concluded that illicit transfers had

likely taken place. The Report stated, "there may be investments in other parts of the [OAS]

[G]roup that we should be aware of and taking steps to protect, or there are undisclosed losses or

other leakage that will dilute returns to creditors, including [OAS Finance BVI] and [OAS

Investments BVI]." JPL Report at 10. "In the alternative as demonstrated by OAS's own

[filings in the chapter 15 proceedings], Finance and Investments are massively insolvent… In

this case there has been a massive dissipation in value of the underlying assets and operating

entities to at least the extent of the Investments lending of funds raised in Finance and Investments GmbH." *Id*.

41.     The JPL Report noted that these losses had not been disclosed by OAS: "Based on the review of the little historical information available, this has not been previously reported via the annual statements of OAS Group," and, "Put another way OAS SA predicts virtually no recovery for Finance and Investments while offering no explanation for why value to the tune of approximately US$2 billion has been dissipated."  JPL Report at 10.

42.     The JPL Report concluded that the representation of OAS Finance BVI by the JPLs in the Brazilian Bankruptcy Court is "paramount" for the protection of its interests.  JPL Report at 11.

43.     The JPLs filed the Second Report of the Joint Provisional Liquidators (the "Second JPL Report") with the Eastern Caribbean Supreme Court on May 12, 2015.  *See* Second JPL Report (attached to the Rose Decl. as **Exhibit 19**).

44.     The JPLs informed the Eastern Caribbean Supreme Court that "primarily due to a failure by the management of the companies to provide us with the books and records" requested, Second JPL Report at 2, the JPLs had continued to be obstructed in their efforts to determine the assets and rights of OAS Finance BVI and OAS Investments BVI.  *See id.* at 2, 4. As a result, the JPLs' Brazilian counsel has recommended bringing an action in Brazil to obtain a judicial order for the production of books and records in order to overcome OAS executives' lack of cooperation.  *Id.* at 3.

45.     The JPLs also reemphasized the importance of excluding OAS Finance BVI and OAS Investments BVI from the Brazilian Bankruptcy Proceedings as debtors, stating that the companies "do not fit within the definition of a company eligible for restructuring since they are

essentially funding entities without active business, employees or hard assets.  It is hard to see

how an entity which is set up principally to be a creditor for the advance of funds to operating

companies can be properly restructured by directors who have a common interest in both

borrower and lender." *Id*. at 3-4.

46.     The Second JPL Report also stressed that in light of potential claims against OAS

directors and other third parties, it is especially vital that OAS Finance BVI and OAS

Investments BVI be treated as creditors in the Brazilian Bankruptcy Proceedings, allowing them

to investigate these issues and pursue recovery for Noteholders where appropriate.  *Id*. at 3, 7.

## IX.    Chapter 15 Procedural History

47.     On April 24, 2015, the Alden and Aurelius served their First Set of Document

Requests Directed to the Foreign Representative in Connection with the (I) Verified Petition for

Recognition of Brazilian Bankruptcy Proceedings and (II) Motion for Provisional Relief

Pursuant to Section 1519 of the Bankruptcy Code.  See Letter to Judge Bernstein Re: Discovery

Conference [Docket No. 39], Exh. A.  The Debtors subsequently made general objections, as

well as specific objections and responses, to the discovery requests.  See Letter to Judge

Bernstein Re: May 7, 2015 Discovery Conference [Docket No. 43], Exh. B.  At a discovery

conference held on May 7, 2015, the Court quashed the First Set of Document Requests, and

overruled the Debtors' general and specific objections thereto, directing the Debtors to produce

non-privileged documents on certain topics related to the Recognition Petition.  See Letter to

Judge Bernstein Re: May 7, 2015 Discovery Conference [Docket No. 44] at 1.

48.     At the May 7, 2015 discovery conference, the Debtors also indicated that the

temporary restraining order then in place would expire on May 19, 2015, and that they would not

seek a preliminary injunction at the recognition hearing.  *Id*. at 5.  In addition, the Debtors stated

that at the May 19, 2015 hearing, they will proceed solely on recognition and will not seek any

other relief, including the discretionary post-recognition relief under section 1521 of the

Bankruptcy Code sought in the Recognition Petition.  *Id.*

## ARGUMENT

### I.    The Petitioner is Not the Foreign Representative of the Debtors.

49.    "[R]ecognition under Section 1517 of the Bankruptcy Code is not a 'rubber stamp

exercise' . . . . The ultimate burden of proof on the requirements of recognition is on the foreign

representative."  *Lavie v. Ran (In re Ran)*, 607 F.3d 1017, 1021 (5th Cir. 2010).  "[I]n contrast to

the jurisprudence that developed under section 304 that emphasized discretion and flexibility . . .

the new recognition regime under chapter 15 is procedurally quite rigid."  *In re Basis Yield*

*Alpha Fund (Master)*, 381 B.R. 37, 46 (Bankr. S.D.N.Y. 2008).  The plain terms of the

Bankruptcy Code establish that the foreign representative must be authorized in the foreign

proceeding by the foreign court to act either as the administrator of the reorganization or as the

representative of such foreign proceeding.  11 U.S.C. §§ 101(24), 1515.  The Purported Foreign

Representative, however, has not been authorized to act in either role in this case.  Nothing in the

decision commencing the Brazilian Bankruptcy Proceedings appoints the Purported Foreign

Representative as a representative of those proceedings.  Rather, the only evidence shows that

Debtors' board unilaterally "appointed" the Purported Foreign Representative to serve their

interests in these proceedings.  Nor have the Debtors shown that Brazilian law authorizes the

Purported Foreign Representative to administer the reorganization of the Debtors' assets or

affairs.  Thus, the Debtors have not satisfied their burden of compliance with the Bankruptcy

Code's rigid recognition requirements, and recognition must be denied.

50.    Section 101(24) of the Bankruptcy Code defines the term "foreign representative"

as "a person or body, including a person or body appointed on an interim basis, authorized in a

foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or

affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24). Under

section 101(23), the term "foreign proceeding" means "a collective judicial or administrative

proceeding in a foreign country … under a law relating to insolvency or adjustment of debt in

which proceeding the assets and affairs of the debtor are subject to control or supervision by a

foreign court, for the purpose of reorganization or liquidation." 11 U.S.C. § 101(23). Read

together, these sections require that a foreign representative be "authorized *in*" a "judicial or

administrative proceeding" in the foreign country.

51.     Further, pursuant to section 1517 of the Bankruptcy Code, an order recognizing a

foreign proceeding may only be entered if the petition meets the requirements of section 1515.

Section 1515(a) provides that a "foreign representative applies to the court for recognition of *a*

*foreign proceeding in which the foreign representative has been appointed* by filing a petition for

recognition." 11 U.S.C. § 1515(a) (emphasis added). Again, the reference to appointment *in* the

foreign proceeding clearly contemplates appointment by the foreign tribunal.

52.     For a petition to meet the requirements of section 1515(b), it must be

accompanied by:

> (1) a certified copy of the decision commencing such foreign proceeding
> and appointing the foreign representative;
>
> (2) a certificate from the foreign court affirming the existence of such
> foreign proceeding and of the appointment of the foreign representative; or
>
> (3) in the absence of evidence referred to in paragraphs (1) and (2), any
> other evidence acceptable to the court of the existence of such foreign
> proceeding and of the appointment of the foreign representative.

11 U.S.C. § 1515(b).

53.     Thus, section 1515(b)(1) anticipates that the petition for recognition would be

accompanied by a *decision* appointing the foreign representative. Courts or other tribunals issue

decisions, not boards of directors. Further, section 1515(b)(2) specifically requires action by a

27

foreign tribunal.  Section 1515(b)(3) does not refer to decisions or certifications of a foreign

tribunal, but requires other sufficient evidence of appointment of the foreign representative.

Thus, the Bankruptcy Code clearly requires either (i) an express written authorization from a

foreign tribunal or (ii) evidence of foreign statutory authorization of the purported foreign

representative "to administer the reorganization or the liquidation of the debtor's assets or affairs

or to act as a representative of [the] foreign proceeding," within the meaning of Section

101(24)'s definition of "foreign representative."

        54.    Judicial authorization serves an important function that is not served where the

foreign representative is appointed by the debtor.  The foreign judicial or administrative tribunal

is presumed to be neutral with respect to the many competing interests at stake in a bankruptcy

and is subject to appellate review.  In contrast, the Debtors' board is not neutral; there is no

evidence that its decision was reasoned in any way; and it was not subject to review.  In addition,

where a foreign representative is appointed by a foreign tribunal, that person is answerable to the

appointing tribunal.  This important safeguard was ignored in this case.  The Purported Foreign

Representative is not answerable to anyone but the Debtors.

        55.    Requiring evidence of the foreign court's authorization of the foreign

representative for recognition of a foreign proceeding is consistent with the requirement in

section 1505 of the Bankruptcy Code that the United States bankruptcy court authorize the

trustee or another entity (including an examiner) to act in a foreign country on behalf of the U.S.

bankruptcy estate.  *See* 11 U.S.C. § 1505.  The legislative history of section 1505 provides that

"[t]hat requirement is a change from the language of the Model Law, but one that is purely

internal to United States law.  Its main purpose is to ensure that the court has knowledge and

control of possibly expensive activities, but it will have the *collateral benefit of providing further*

*assurance to foreign courts that the United States debtor or representative is under judicial*

*authority and supervision.*"  House Report No. 109-31, Pt. 1, 109th Cong., 1st Sess. 108-109

(2005) (emphasis added).  The assurance that Congress contemplates under section 1505 where a

foreign court is asked to recognize a United States bankruptcy case is the same type of assurance

section 1515 requires where a United States court is asked to recognize a foreign proceeding, but

which is lacking here.  Given the plain language of section 1515, there is no basis to distinguish

between the two contexts.  And, this assurance is particularly important where, as here, under the

foreign law the debtor does not have all the duties, powers and responsibilities of a debtor in

possession under the Bankruptcy Code (as discussed below).

56.    The accountability of the foreign representative to the foreign tribunal that

appoints him is critical because recognition of a foreign proceeding in Chapter 15 is a threshold

requirement that must be satisfied before any efforts to enforce a foreign bankruptcy proceeding

may be pursued,[8] and, once recognition is granted, Chapter 15 vests the foreign representative

with considerable powers and discretionary responsibilities.  In addition to having the authority

to seek various forms of bankruptcy relief such as extension of the automatic stay, injunctive

relief, and the commencement of a case under Chapter 11 or Chapter 7, the foreign

representative also is authorized to initiate fraudulent transfer actions under foreign law, in a

Chapter 15, or under U.S. law in a case under Chapter 7 or 11 (if one is commenced), for the

benefit of creditors.  *See In re Oversight and Control Comm'n of Avnzit, S.A.*, 385 B.R. 525, 540

(Bankr. S.D.N.Y. 2008) (recognizing oversight committee as foreign representative because it

---

[8]    *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 333
(S.D.N.Y. 2008) ("Requiring recognition as a condition to nearly all court access and consequently as a
condition to granting comity distinguishes Chapter 15 from its predecessor section 304."); H.R. 109-31(I)
at 110 ("Subsections (b)(2), (b)(3), and (c) [of section 1509] make it clear that chapter 15 is intended to be
the exclusive door to ancillary assistance to foreign proceedings.").

was "created under the Convenio approved by the Spanish Insolvency Court for the stated

purpose of protecting the interests of creditors" and was authorized to pursue causes of action for

the benefit of creditors); *see also Fogerty v. Petroquest Res. Inc., (In re Condor Ins. Ltd.)*, 601

F.3d 319, 323-24 (5th Cir. 2010) (holding that foreign representative was authorized to bring

avoidance actions under foreign law in context of Chapter 15 proceeding); *Awal Bank, BSC v.*

*HSBC Bank USA (In re Awal Bank, BSC)*, 455 B.R. 73, 90-91 (Bankr. S.D.N.Y. 2011) ("By

affording standing to the foreign representative [in the event a Chapter 11 or Chapter 7 case is

commenced], § 1523(a) gives the foreign representative the power and authority of

a trustee under § 553 as well as the other avoidance provisions of the Bankruptcy Code. … one

of the limited but important purposes of § 1523(a) is to place the foreign representative in the

shoes of a chapter 7 or chapter 11 trustee for the purpose of pursuing the enumerated avoidance

claims."); 11 U.S.C § 1521(a)(7); 11 U.S.C. § 1523(a).  Fraudulent transfer actions seek to undo

transactions the debtor has consummated.  To say the least, an individual aligned with and

answerable only to the debtor – and not the foreign tribunal – is not likely to seek this relief on

behalf of the debtor's creditors, especially here where the Purported Foreign Representative was

counsel for both Investimentos and Infraestrutura in connection the transfer of Invepar stock out

of Noteholder reach.

57.    The Debtors fail to meet the requirements of sections 1515 (b)(1) and (b)(2), on

which they purport to rely, *see* Verified Petition at ¶ 70, because they have not provided the

requisite decision or certificate of the foreign court appointing a foreign representative.  Given

that the Purported Foreign Representative was not appointed by the Brazilian Bankruptcy Court,

his accountability to that court must come from a Brazilian statute authorizing him to "administer

the reorganization or the liquidation of the debtor's assets or affairs or to act as representative of

the foreign proceeding." 11 U.S.C. § 101(24).  The Debtors do not argue that the Brazilian law specifically authorizes the appointment of any person or body to represent the foreign proceeding extraterritorially.  Rather, the Debtors assert that they themselves are authorized to administer the reorganization under Brazilian law and thus may appoint their own foreign representative.  Verified Petition at ¶ 67.  Other than unsupported conclusory and inaccurate statements from the Debtors' purported Brazilian law expert that a Brazilian debtor is akin to the debtor in possession under U.S. law,[9] however, there is no evidence of any such authority and, in fact, no such authority exists under Brazilian law.

58.     Although the Debtors and their officers and directors maintain the ability to operate their business in the ordinary course, Brazilian Bankruptcy Law contains no authorization for the Debtors to act as a "debtor in possession" in the Brazilian Bankruptcy Proceeding.  Brazilian law does not provide the Debtors with any of the rights, duties, or functions of a trustee, *cf.* 11 U.S.C. § 1107(a) ("a debtor in possession shall have all the rights… and powers, and shall perform all the functions and duties… of a trustee serving in a case under this chapter."), or authorize to the debtor to perform any other act that might otherwise affect the reorganization (other than filing a plan).  Moreover, the Brazilian bankruptcy does not create an estate to which the Debtors owe fiduciary duties, nor does Brazilian law bestow any special powers on the Debtors, such as avoidance powers, to exercise for the benefit of creditors.

---

[9]     Mr. Munhoz attempts to shoehorn the Purported Foreign Representative into the "administration" portion of the foreign representative definition simply by stating that under Brazilian law, "[a]s a general rule, the debtor, through its board of directors or agents, retains the right to administer its assets and affairs and to operate its business during the reorganization proceeding."  *Declaration of Eduardo Secchi Munhoz Pursuant to 28 U.S.C. § 1746 in Support of Petition for Recognition of Brazilian Bankruptcy Proceedings and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§ 1515, 1517, 1520, and 1521* (the "Munhoz Declaration") at ¶ 12, and comparing the Debtors to U.S. debtors in possession. ███████
██████████████   Moreover, these statements do not comport with reality.

Further, under Brazilian Bankruptcy Law, the Debtor has no bankruptcy-specific administrative

duties, such as reconciling and objecting to claims, providing notice and information to creditors,

or soliciting acceptance of a plan.  Thus, under the Brazilian Bankruptcy Law, the Debtors do not

have the duties or powers to administer reorganization or liquidation proceedings within the

meaning of section 101(24).  As such, the Debtors cannot bestow those duties and powers on the

Purported Foreign Representative, and the Debtors' powers and attorney and board resolutions

purporting to do so are ineffective.

59.     Moreover, while exaggerating their own power to manage restructuring efforts in

the Brazilian Bankruptcy Proceedings, the Debtors crucially omit any mention of the substantial

statutory duties and powers of the judicial administrator and the oversight of the creditors'

committee.  The Brazilian court appointed Alvarez & Marsal Consultoria Empresarial do Brasil

as judicial administrator, *see* Brazilian Bankruptcy Court Order at 3329, and outlined its rights

and responsibilities, including to report the company's situation within 10 days, to submit fee

proposals and monthly reports, and to "supervis[e] the legality of the [reorganization] process

and for seeing that the reorganizing companies meet all deadlines."  Brazilian Bankruptcy Court

Order at 3329.  The Brazilian Court Order contained no mention of any administrative duties or

powers of the Debtor.  Further, among other things, the Brazilian Bankruptcy Law requires the

judicial administrator to perform all claims reconciliation functions, compile the creditor list,

publish notices, preside over the creditors' meetings (where the plan is discussed, modified, and

either approved or rejected), provide financial and other information to creditors, issue monthly

reports, and oversee the debtors to ensure compliance with law and a confirmed plan, *see* ¶ 32,

all of which are duties and powers bestowed on the trustee or debtor in possession under U.S.

law, and none of which are provided to the Debtors under Brazilian law.  As stated by Mr.

Munhoz at his deposition, the judicial administrator 's role is "control and overseeing the judicial restructuring process." *See* Munhoz Transcript at 50:7-12.

60.    The Brazilian Bankruptcy Court Order and Brazilian Bankruptcy Law are clear: the judicial administrator, not the Debtors, is empowered to administer the reorganization of the Debtors' assets and affairs in the Brazilian Bankruptcy Proceedings.  Accordingly, the Debtors' purported appointment of Mr. Tavares as a foreign representative with such powers can have no legal effect.

61.    The Debtors' failure to comply with the express and unambiguous terms of the Bankruptcy Code means the Purported Foreign Representative may not be the "foreign representative," as that term is defined under section 101(24), in this case.  *See, e.g., United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (where the "statute's language is plain, 'the sole function of the courts is to enforce it according to its terms'") (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)); *Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 249-51 (2d Cir. 2013) (vacating recognition order and holding that section 109(a) applies in chapter 15 cases under a "plain meaning" analysis, under which statutes are interpreted such that "no part will be inoperative or superfluous"); *Laime v. U.S. Trustee*, 540 U.S. 526, 534-35 (2004) (applying the plain meaning rule when interpreting 11 U.S.C. § 330).

62.    The Debtor's citation to the district court decision in *In re Vitro, S.A.B. de C.V.*, 470 B.R. 408, 411 (N.D. Tex. 2012), *see* Verified Petition at ¶ 67, does not change that result.  In both the *Vitro* district court opinion, and the Fifth Circuit opinion affirming it, the courts relied on the fact that the noteholders sought a determination from the Mexican court that the board appointees were not the proper foreign representatives, but the Mexican court declined to do so,

which the Fifth Circuit interpreted as "tacit approval."  *In re Vitro S.A.B. de CV*, 701 F.3d 1031,

1048 (5th Cir. 2012).  Here, there was no tacit approval from the Brazilian Bankruptcy Court.

63.     In considering whether the foreign representatives had administrative power, the

Fifth Circuit, in *Vitro*, found that exclusive reliance on the Chapter 11 definition of "debtor in

possession" was inappropriate, and looked to the UNCITRAL Practice Guide on Cross-Border

Insolvency (the "Guide") for guidance on the question of whether the Mexican debtors were

considered debtors in possession under the Model Law.  There, the court found the definition of

debtor in possession to be a debtor that "remain[s] in control of its assets and could technically

be regarded as exercising administrative type of functions, although under the supervision of a

judicial or administrative authority" and "a debtor in reorganization proceedings, which retains

full control over the business, with the consequence that the court does not appoint an insolvency

representative." *Id.* at 1050.  Here, although the Debtors maintain control of the operation of

their businesses, they cannot be regarded as "exercising administrative type of functions" and the

Brazilian court has appointed an "insolvency representative," *i.e.* the judicial administrator, who

oversees the Debtors' day-to-day operations and is accountable to the Brazilian court.

64.     Moreover, in reaching its conclusion the Fifth Circuit interpreted the phrase

"authorized in a foreign proceeding" to mean "authorized *in the context of* a foreign bankruptcy

proceeding," effectively changing the terms "authorized in a foreign proceeding" to "authorized

under the laws of the jurisdiction in which the foreign proceeding is pending."  While Congress

has used the phrases "in the context of"[10] and "authorized under applicable law"[11] in other

---

[10]     *See e.g.*, 18 U.S.C. § 2441(c)(3) (defining "war crime" as, among other things, certain acts "when
committed *in the context of* and in association with an armed conflict . . .") (emphasis added); 21 U.S.C. §
387k(h)(1) (calling for marketing to enable the public to understand risk "*in the context of* total health")
(emphasis added); 41 U.S.C. § 1704(g)(3)(F) (requiring an examination of certain factors "*in the context of*
a 5-year plan . . . ") (emphasis added).

statutes, neither of such phrases appears in section 101(24), and the Court should not add words

to a statute. *See In re Sealed Case*, 573 F.3d 844, 849 (D.C. Cir. 2009) (declining to add words

to straightforward statutory language prohibiting courts from using imprisonment as

rehabilitation in determining prison sentence, and thereby obviate plain meaning); *Richardson v.*

*Sunset Science Park Credit Union*, 268 F.3d 654, 660 (9th Cir. 2001) (refusing interpretation of

clear statutory language that would require court to add word to statute); *Waller v. Pidgeon*, Case

No. 306506, 2008 WL 2338217, at *5 (N.D. Tex. June 5, 2008) (where statute was plain, court

could not insert additional term into statute), *aff'd, Waller v. Pidgeon*, 324 F. App'x 431 (5th Cir.

2009); *Schwyzer v. Fiduciary Trust Co. Int'l*, Case No. 04 Civ. 7975 (RCC), 2005 U.S. Dist.

LEXIS 46633, at *12 (S.D.N.Y. Aug. 4, 2005) ("The Court finds it unnecessary to… add words

that Congress either chose not to or failed to include [in the statute]").  Congress's decision not

to use such phrases in section 101(24), must be given effect.  *See, e.g., Keene Corp. v. United*

*States*, 508 U.S. 200, 208 (1993) ("Where Congress includes particular language in one section

of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally

and purposely in the disparate inclusion or exclusion.") (quoting *Russello v. United States*, 464

U.S. 16, 23 (1983)).

65.    Further, the Fifth Circuit relied on reports of the UNCITRAL Working Group on

Insolvency Law in finding that the foreign representative did not require foreign court approval,

citing one such report in which the Working Group declined to include a requirement that the

foreign representative be "[specifically] authorized by statute or other order of court

---

[11]    *See, e.g.*, 11 U.S.C. § 101(1) ("The term 'accountant' means accountant *authorized under applicable law*
. . . ."); 11 U.S.C. § 101(4) ("The term 'attorney' means attorney, professional law association, corporation,
or partnership *authorized under applicable law* to practice law."); 11 U.S.C. § 109(c)(2) ("is specifically
*authorized*, in its capacity as a municipality or by name, to be a debtor *under such chapter by State law*,
. . ."); § 11 U.S.C. 541(b)(3) ("any eligibility of the debtor to participate in programs *authorized under the*
*Higher Education Act of 1965* . . ."); 11 U.S.C. § 321(a)(2) ("a corporation *authorized by such*
*corporation's charter or bylaws* to act as trustee . . . .") (all emphases added).

(administrative body) to act in connection with a foreign proceeding." *Vitro*, 701 F.3d at 1048. In doing so, the Working Group expressed concerns with that inclusion of such a definition would be unduly restrictive. *See id.* The Working Group's desire to provide flexibility to foreign courts regarding the formalities of their appointment of foreign representatives, however, does not change the words of the Bankruptcy Code, which specifically require authorization and appointment of the foreign representative in a foreign proceeding. Thus, the *Vitro* decisions are inapposite to this Court's analysis.

66.    The Debtors' reliance on *In re SIFCO S.A.*, No. 14-11179 (REG) [Docket No. 38] (Bankr. S.D.N.Y. Oct. 23, 2014); *In re Rede Energia S.A.*, No. 14-10078 (SCC) [Docket No. 18] (Bankr. S.D.N.Y. Mar. 6, 2014); *In re Centrais Eletricas Do Para S.A.*, No. 12-14568 (SCC) [Docket No. 19] (Bankr. S.D.N.Y. Dec. 12, 2012) is also misplaced. *See* Verified Petition at ¶ 67. In *SIFCO* and *Rede Energia*, creditors who objected to the petition for recognition did not raise the issue of whether the foreign representative had been duly appointed in a foreign proceeding, and the question was not litigated before the court. *See In re SIFCO S.A.*, No. 14-11179 (REG) [Docket No. 32] (Bankr. S.D.N.Y. Oct. 15, 2014); *In re Rede Energia S.A.*, No. 14-10078 (SCC) [Docket No. 16] (Bankr. S.D.N.Y. Feb. 25, 2014). In *Centrais Eletricas Do Para*, no objection to the recognition petition was filed by any party at all. Thus, these orders, entered in uncontested circumstances and without an opinion, are not binding on and should not be considered precedential by this Court. *See NLRB v. Steinerfilm, Inc.,* 702 F.2d 14, 17 (1st Cir. 1983) (unpublished orders without opinion may lack precedential value); *United States v. Knote,* 818 F. Supp. 1280, 1283 (E.D. Mo. 1993), *aff'd*, 29 F.3d 1297 (8th Cir. 1994) (noting that an unpublished order issued by consent has "little precedential value."); *Bd. of Managers of Soho Int'l Arts Condo. v. City of New York*, Case No. 01 Civ. 1226 (DAB), 2003 U.S. Dist. LEXIS

10221, at *51 n. 20 (S.D.N.Y. June 17, 2003) ("Unreported or unpublished decisions … have 'little (or no) precedential value.'") (quoting *Dubai Islamic Bank v. Citibank, N.A.*, 126 F. Supp. 2d 659, 669 (S.D.N.Y. 2000)).

67.     There can be no doubt that the Debtors' appointment of the Purported Foreign Representative lacks force and effect with respect to OAS Finance BVI, which is incorporated in the British Virgin Islands.  The Eastern Caribbean Supreme Court's order appointing JPLs for OAS Finance BVI makes the JPLs the parties with the right to administer the reorganization or liquidation of the OAS Finance BVI's assets and affairs.   That order automatically divested the Debtors' directors and the Purported Foreign Representative's authority to act, or authorize actions, on behalf of OAS Finance BVI in connection with these chapter 15 cases as well as the Brazilian Bankruptcy Proceedings, and vested that authority entirely in the JPLs.  The JPL Report concluded that the representation of OAS Finance BVI by the JPLs in the Brazilian Bankruptcy Court is "paramount" for the protection of its interests.  JPL Report at 11.  The Report also noted that "Article 47 of the Brazilian Bankruptcy code which provides the criteria under which entities can be restructured, cannot apply to the BVI entities, and they are improperly included."  JPL Report at 4.  Accordingly, Brazilian insolvency counsel for the JPLs made an application to the Brazilian Bankruptcy Court on April 28, 2015 to represent OAS Finance BVI in the Brazilian Bankruptcy Proceedings.  *Id.*  As a result of the commencement of the British Virgin Islands liquidation proceedings, only the JPLs may act as foreign representative for OAS Finance BVI.  Accordingly, the OAS Finance BVI petition for recognition must be denied.

68.     Finally, given that the sole business of the Non-Brazilian Debtors is the issuance and repayment of the Notes, and that their only significant assets are intercompany receivables,

37

the Non-Brazilian Debtors' interests are as creditors, and thus adverse to the other Debtors. It is

inappropriate to have the same foreign representative to represent adverse parties, as it represents

an irreconcilable conflict of interest.

## II.    Recognizing the Brazilian Bankruptcy Proceedings Would Be Manifestly Contrary to Public Policy Under Section 1506 of the Bankruptcy Code.

69.    "Consistent with the traditional limits of comity, all relief under chapter 15

is subject to the caveat in § 1506." *In re Toft*, 453 B.R. 186, 191 (Bankr. S.D.N.Y. 2011); *see

also*, 11 U.S.C. § 1517(a) (subjecting the entry of an order granting recognition to section 1506).

Section 1506 of the Bankruptcy Code provides, "[n]othing in this chapter prevents the court from

refusing to take an action governed by this chapter if the action would be manifestly contrary to

the public policy of the United States." 11 U.S.C. § 1506. As the Second Circuit has recognized,

"[t]he principle of comity has never meant categorical deference to foreign proceedings. It is

implicit in the concept that deference should be withheld where appropriate to avoid the violation

of the laws, public policies, or rights of the citizens of the United States." *In re Treco*, 240 F.3d

148, 157 (2d Cir. 2001).

70.    Bankruptcy courts have applied section 1506 where deferring to foreign

proceedings would result in serious violations of the rights of U.S. parties. *See, e.g.*, *In re

Toft*, 453 B.R. at 201 (refusing to recognize and enforce foreign orders which would have

permitted the foreign representative to access the debtor's email accounts stored on servers

within the United States; recognition would violate "fundamental principles"); *In re Qimonda

AG*, 462 B.R. 165, 185 (Bankr. E.D. Va. 2011) (deferring to German law, to the extent that it

would allow for the cancellation of U.S. patent licenses, would be manifestly contrary to U.S.

public policy); *In re Gold & Honey, Ltd.*, 410 B.R. 357, 372-73 (Bankr. E.D.N.Y. 2009)

(denying recognition of Israeli proceeding where recognition would "severely impinge the value

and import of the automatic stay," and doing so would "ensue in derogation of fundamental

United States policies.").

A.    Recognition is Manifestly Contrary to the Fundamental U.S. Policy of Refusing to
Shelter Bad Faith Schemes.

71.    The requirement of good faith is a necessary condition for any relief that a

bankruptcy court, as a court of equity, may grant under the Bankruptcy Code.  This seminal

principle was central to the Supreme Court's decision in *Pepper v. Litton*, 308 U.S. 295 (1939),

in which the Supreme Court struck down a scheme in which an insider sought to use his strategic

position with the debtor "so that the rights of another creditor were impaired."  If the scheme was

upheld, as the Court explained, "exploitation would become a substitute for justice; and equity

would be perverted as an instrument for approving what it was designed to thwart."  *Id*. at 311-

13.

72.    As this Court has held, the good faith standard reflects the general principle that

"a litigant seeking relief must have 'acted fairly and without fraud or deceit as to the controversy

in issue.'"  *1633 Broadway Mars Rest. Corp. v. Paramount Grp., Inc. (In re 1633 Broadway

Mars Rest. Corp.)*, 388 B.R. 490, 500 (Bankr. S.D.N.Y. 2008).  Similarly, in *Little Creek Dev.

Co. v. Commonwealth Mort. Co. (In re Little Creek Dev. Co.)*, 779 F.2d 1068 (5th Cir. 1986), the

Fifth Circuit held that every bankruptcy statute "has incorporated, literally or by judicial

interpretation, a standard of good faith for the commencement, prosecution, and confirmation of

bankruptcy proceedings."  *Id.* at 1071.  The court continued, "[the] [r]equirement of good faith

prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay

creditors without benefitting them in any way or to achieve reprehensible purposes.  Moreover, a

good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering

their powerful equitable weapons (i.e., avoidance of liens, discharge of debts, marshalling and turnover of assets) available only to those debtors and creditors with 'clean hands.'" *Id.* at 1072.

73.    The Court is "entitled to demand utmost good faith and honesty" from all participants in the bankruptcy process. *In re Starbrite Props. Corp.*, Case No. 11-40758 (CEC), 2012 Bankr. LEXIS 2599, at *23 (Bankr. E.D.N.Y. June 5, 2012) (quoting *In re Condon*, 358 B.R. 317, 328 (6th Cir. BAP 2007)). *See also In re Coastal Cable T.V., Inc.*, 709 F.2d 762, 764 (1st Cir. 1983) ("[a basic bankruptcy] principle prohibits the use of the bankruptcy court, a court of equity, to further a fraudulent purpose."); *In re Natural Land Corp.*, 825 F.2d 296, 298 (11th Cir. 1987) (affirming dismissal of reorganization petition and noting that in finding lack of good faith, "courts have emphasized an intent to abuse the judicial process and the purposes of the reorganization provisions."). Thus, prevention of abuse of the court system reflects a fundamental U.S. public policy.

74.    Less than six months ago, the Debtors' top executives were arrested for serious financial crimes. Apparently, however, the OAS Group has not severed ties with some or all of those executives, as it advanced Pinheiro a year's salary in the amount of R$7.2 million after he was incarcerated. A month and a half after the arrests, the Debtors brazenly engaged in unilateral transactions designed to eliminate guarantees and destroy the Noteholders' bargained-for structural seniority to the Debtors' most valuable assets. The Debtors covertly performed these transactions on the day after Christmas, and kept them secret for several weeks. The Purported Foreign Representative, through whom the Debtors come to this Court, was the general counsel for the Guarantor entity that was fraudulently merged out of existence. His appointment as Purported Foreign Representative was approved by the same board that approved

the Christmas Transactions.  All of these details suggest that the Debtors have actively

perpetrated a fraudulent scheme to damage Noteholder interests.

        75.    The Debtors' filings in these Chapter 15 Cases omit important details in an

attempt to gloss over the seriousness of the conduct of the Debtors' management, and contain no

credible explanation for the Christmas Transactions beyond "streamlining corporate structure."

*See* Verified Petition at ¶ 14 n. 6.  This lack of transparency has carried through to the BVI

liquidation proceedings, where the JPLs have been unable, despite repeated requests, and a clear

legal entitlement, to obtain relevant information.   *See* JPL Report at 4-5; Second JPL Report at

2-4.  The centerpiece of their argument against producing discovery in the fraudulent transfer

action before the S.D.N.Y. District Court has been that recognition of the Brazilian Bankruptcy

Proceedings is forthcoming from this Court, and therefore discovery should not proceed because

the action will be stayed.[12]  Thus, the Debtors are clearly intent on ensuring that the details of

their fraudulent scheme, and potentially continuing criminal corruption on the part of their

management, never come to light in the U.S., and their request for recognition is an attempt to

use this Court as a means to do so.  The Court should reject this attempt, and deny recognition as

manifestly contrary to U.S. public policy.

        B.    The Brazilian System Lacks Certain Fundamental Due Process Protections.

        76.    The Debtors are likely to argue that the Court need not consider whether

recognition will shelter a bad faith scheme, because the Brazilian court system will provide

creditors with a forum to seek redress.  This is no answer, however, because the Brazilian system

severely departs from several U.S. notions of due process, which is a fundamental U.S. policy.

---

[12]        The S.D.N.Y. District Court declined to stay discovery in the Huxley action, finding that anticipated
        motions to dismiss were not a basis for a finding of good cause.  *See* Huxley Transcript at 28:11-22.

Thus, the Brazilian Bankruptcy Proceedings run afoul of the section 1506 public policy

exception and should not be recognized.

77.    Due process is a fundamental constitutional norm and a centerpiece of the rule of

law in the United States.  Where a foreign proceeding offends fundamental United States notions

of due process, enforcing an order that is the product of such a proceeding violates public policy.

*See International Transactions, Ltd. v. Embotelladora Agral Regiomontana, SA de CV,* 347 F.3d

589, 594-96 (5th Cir. 2003) (refusing to enforce Mexican judgment because relief was afforded

on an ex parte basis); *In re Remington Rand Corp. v. Bus. Sys. Inc.*, 830 F.2d 1260, 1266 (3d Cir.

1987) (refusing to extend comity to Dutch court's sale order because the U.S. company did not

have notice or an opportunity to be heard), *aff'd, sub nom., Kilbarr Corp. v. Bus. Sys. Inc., B.V.,*

869 F.2d 589 (3d Cir. 1989).

78.    "'The fundamental requisite of due process of law is the *opportunity to be*

*heard*.'"  *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) (emphasis added)

(quoting *Grannis v. Ordean*, 234 U.S. 385, 394 (1914)); *see also In re Board of Directors of*

*Telecom Argentina, S.A.*, 528 F.3d 162, 170 (2d Cir. 2008) (quoting the holding of *In re*

*Hourani*, 180 B.R. 58, 67 (Bankr. S.D.N.Y. 1995) that "access to information and an opportunity

to be heard in a meaningful manner," are "fundamental requisites of due process.").  The

"hearing must be at a meaningful time and in a meaningful manner," and in circumstances where

important rights may be terminated due process requires "an effective opportunity to defend by

confronting any adverse witnesses and by presenting… arguments and evidence orally."

*Goldberg v. Kelly*, 397 U.S. 254, 267-68 (1970) (internal quotations omitted).  Foreign

proceedings do not comport with due process where there is "no systematic framework by which

information may be obtained, used, or considered in any meaningful way during the proceeding."
*In re Hourani*, 180 B.R. at 67.

79.     Under Brazilian law, avoidance actions cannot be brought in reorganization

proceedings and must be brought by civil revocation actions in separate proceedings.  Brazilian

law provides for no discovery in connection with such actions, nor any opportunity to present

any evidence to the court.  Further, because debtors are required to file a reorganization plan

within 60 days of the publication of notice of court acceptance of the proceedings, parties in

interest are rarely able to obtain an order on avoidance actions prior to the confirmation of a

reorganization plan which extinguishes those actions.  Moreover, insolvency proceedings in

Brazil ordinarily involve no scheduled public hearings, and all interactions with the judges are *ex

parte*.

80.     The lack of discovery and presentation of evidence procedures (which are

fundamental to the U.S. bankruptcy regime) from the Brazilian bankruptcy process is

inconsistent with both procedural and substantive fairness for U.S. parties, including holders of

Notes.  Thus, the Court should deny recognition, as manifestly contrary to U.S. public policy.

*See In re Hourani,* 180 B.R. at 66, 70 (denying section 304 petition where Jordanian law lacked

fundamental procedural and substantive safeguards for creditors); *see also Int'l Transactions,*

347 F.3d at 594-96  (refusing to enforce Mexican judgment because relief was afforded on an ex

parte basis); *In re Remington Rand Corp. v. Bus. Sys. Inc.*, 830 F.2d 1260, 1266 (3d Cir. 1987)

(refusing to extend comity to Dutch court's sale order because the U.S. company did not have

notice or an opportunity to be heard).

81.     On top of the lack of due process protections in Brazilian law and procedure, the

particular facts surrounding the OAS Group and its stature in Brazil make it highly questionable

43

that the Noteholders can receive a fair hearing in Brazil.  Upon information (including news

reports) and belief, certain current and former managers of the OAS Group have deep

connections with high-ranking members of the Brazilian federal government and judiciary, and

there is a likelihood that that certain of those members of government have a personal stake in

seeing the OAS Group cleared of participating in fraudulent activities.    Accordingly, it would

come as no surprise if the Brazilian courts followed suit without fairly considering Noteholder

arguments, especially given that there is no documentation of any *ex parte* meetings with judges

in Brazil.

### III.    OAS Investments and OAS Finance BVI Have No COMI or Establishment in Brazil.

82.    The Court should not grant recognition under section 1517 of the Bankruptcy

Code because the Petitioner has not demonstrated the existence of a foreign main proceeding

with respect to OAS Investments and OAS Finance BVI.  Section 1517(b)(1) provides that a

foreign proceeding will be recognized "as a foreign main proceeding if it is pending in the

country where the debtor has the center of its main interests."  The burden is on the foreign

debtor to prove in which jurisdiction lies its center of main interests.  *In re Tri-Continental

Exch., Ltd.*, 349 B.R. 627, 635 (Bankr. E.D. Cal. 2006); *see also In re Bear Stearns High-Grade

Structured Credit Strategies Master Fund, Ltd*., 374 B.R. 122, 126 (Bankr. S.D.N.Y. 2007)

(court "must make an independent determination as to whether the foreign proceeding meets the

definitional requirements of section 1502 and 1517 of the Bankruptcy Code"); *Basis Yield*, 381

B.R. at 51 (same).

83.    Section 1516(c) of the Bankruptcy Code provides that in the "absence of evidence

to the contrary, the debtor's registered office . . . is presumed to be the center of the debtor's

main interests."  Accordingly, the presumptive COMI of OAS Finance BVI and OAS

Investments are the locations of their incorporation: the British Virgin Islands and Austria, respectively.  Although the Debtors may rebut this presumption by submitting evidence to the contrary, they have not done so here.

84.     The Second Circuit, in *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 137 (2d Cir. 2013), emphasized that a debtor's COMI should be "ascertainable by third parties." *Id*. at 138.  Further, the Second Circuit endorsed several factors as relevant to a COMI analysis, including "the location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes." *Id*. at 137.  The Second Circuit expressly rejected the idea that the Debtor's "nerve center," *i.e.* "where a corporation's officers direct, control, and coordinate the corporation's activities" is controlling on the COMI analysis, but rather found that the "nerve center" is just another factor to be considered. *Id*. at 138 n.10. According to the Second Circuit, "COMI should be determined … at or around the time the Chapter 15 petition is filed." *Id.* at 137.

85.     The COMIs of the Non-Brazilian Debtors ascertainable to third parties are in Austria and BVI.  As special purpose entities whose only function was to act as a vehicle for the issuance and payment of the Notes, the Non-Brazilian Debtors held themselves out to investors as remote from the Brazilian entities, and their incorporation in other countries was intended to assure investors of this remoteness.

86.     With respect to OAS Investments:

- It was incorporated in Austria, and its only office is in Austria, and it never had an address in Brazil;

45

- 

- Austrian law contemplates that at least one director must reside in Austria, and if that ceases to be the case, parties in interest are entitled to demand the appointment of a temporary director from an Austrian court. *See* Austria's Limited Liability Company Act at §§ 5, 15a (attached to Rose Decl. as **Exhibit 21**).

- ████████████████████████████████████████████████

- Its only known asset other than cash in the United States is a US$909,448,958.33 intercompany receivable from OAS Investments BVI, a BVI company. It has no assets in Brazil (*see* RJ Creditor List at last page);

- ██████████████████████████████ Austrian public records show that he is still a director, and thus third parties would ascertain that decisions are made, at least in part, in Austria, *see* Rose Decl. at **Exhibit 6**;

- Its principal creditors are holders of Notes issued pursuant to New York law in part by U.S. underwriters to creditors around the world;

- It has vendors in Austria, and not in Brazil (*see* Tavares Declaration at ¶ 10);

- New York law, not Brazil law, would apply to most of its disputes, because the Notes are governed by New York law and most of its creditors are Noteholders;[13] and

- ████████████████████████████████████████
████████████████████████████████████████
█████████████████████████████

---

[13]   The offering memoranda for the Notes contain sections entitled "Enforcement of Civil Liabilities" which contain disclaimers relating to disputes with the Non-Brazilian Debtors, explaining that Austrian courts may apply Austrian law, and that Austrian and BVI courts may not enforce U.S. judgments. *See 8.00% Senior Notes Offering Memorandum* at vi-viii; *8.25% Senior Notes Offering Memorandum* at v-vii; *8.875% Perpetual Notes Offering Memorandum* at vi-viii. With respect to the Non-Brazilian Debtors (as opposed to the Brazilian Guarantors), however there is no mention of Brazilian law potentially applying to disputes with the Non-Brazilian Debtors.

With respect to OAS Finance BVI:

- It was incorporated in BVI, and its only office is in BVI, and it never had an address in Brazil;

- 

- 

- Is only known asset other than cash in the United States is a US$943,089,583.33 intercompany receivable from OAS Investments BVI, a BVI company.  It has no assets in Brazil (*see* RJ Creditor List at last page);

- 

- Its principal creditors are holders of Notes issued pursuant to New York law in part by U.S. and European underwriters, which creditors are mostly outside of Brazil (*i.e.* in the U.S. and Europe);

- It has vendors in Austria, and not in Brazil (*see* Tavares Declaration at ¶ 10);

- New York law, not Brazil law, would apply to most of its disputes, because the Notes are governed by New York law and most of its creditors are Noteholders; and

- 

87.   Where the decisions for the Non-Brazilian Debtors were made does not control the analysis, as the other factors considered relevant by the Second Circuit weigh in favor of a finding that the COMI of the Non-Brazilian Debtors is outside of Brazil.[14]  This is especially true

---

[14]   The Debtors' citation of the District Court decision in *In re Bear Stearns High Grade Structured Credit Strategies Master Fund, Ltd*., 389 B.R. 325, 336 (S.D.N.Y. 2008) is inapposite.  *See* Verified Petition at ¶ 58.  There, the purported debtors were master funds registered in the Cayman Islands as "exempted" LLCs, which allowed them to trade in the Cayman Islands provided that they seek to further business outside of the Cayman Islands and do not compete with local businesses.  *See id*. at 328.  Consistent with their registration, the funds conducted all of their business and held all of their assets in New York, *see id.* at

here, where based on the Offering Memoranda and other public records, the only ascertainable

COMI for those entities is Austrian and BVI, respectively.

88. The fact that the directors of the Non-Brazilian Debtors reside in Brazil should

not tip the scales in favor of Brazilian COMI, especially given that the other factors weigh so

heavily against COMI in Brazil, and the Non-Brazilian Debtors are not part of an integrated

business operation with the other members of the OAS Group.

89. Finally, the order of the Eastern Caribbean Supreme Court issued on the day after

the Purported Foreign Representative filed the Recognition Petition (the "Petition Date") vested

all control of OAS Finance BVI with the JPLs. Thus, to the extent the "nerve center" of OAS

Finance BVI was in Brazil as of the Petition Date (which it was not), that "nerve center" changed

through a lawful process just one day later. *See In re Suntech Power Holdings Co.*, 520 B.R.

399, 417-420 (Bankr. S.D.N.Y. 2014) (finding COMI shifted based on lawful commencement of

liquidation proceeding and appointment of joint provisional liquidators in Cayman Islands).

Because this occurred prior to the hearing on recognition, and the Court may assess COMI "at *or*

*around* the time the Chapter 15 petition is filed," the Court should find that the COMI of OAS

Finance BVI is in BVI.

90. Moreover, the Non-Brazilian Debtors do not have "establishments" in Brazil

within the meaning of section 1502, and thus their Brazilian Bankruptcy Proceedings cannot be

recognized as foreign nonmain proceedings. 11 U.S.C. § 1517(b)(2). Section 1502(2) defines an

"establishment" as "any place of operations where the debtor carries out a nontransitory

---

337, which is unlike the Non-Brazilian Debtors' connection to Brazil. Critically, the District Court found that "no evidence has been offered to suggest that any creditor or investor (aside from the other Bear Stearns entities) of the funds knew or had reason to know of their Cayman Islands incorporation or any location of the funds other than the New York offices of Bear Stearns Asset Management." *Id*. at 338. Here, the Non-Brazilian Debtors' creditors are the Noteholders, and their Offering Memoranda clearly highlight those debtors' place of incorporation. Thus, investors clearly had reason to know and rely on Austria and BVI as the places of incorporation.

economic activity." 11 U.S.C. § 1502(2). Courts considering whether a debtor has an

"establishment" should consider "the economic impact of the debtor's operations on the market,

the maintenance of a 'minimum level of organization' for a period of time, and the objective

appearance to creditors whether the debtor has a local presence." *In re Millennium Global*

*Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 85 (Bankr. S.D.N.Y. 2011) (quoting Miguel

Virgos & Etienne Schmit, *Report on the Convention on Insolvency Proceedings* ¶ 71).

91.    Here, the Non-Brazilian Debtors have no local place of business in Brazil, have

no economic impact on the market in Brazil, and have no ascertainable local operational

presence in Brazil. They have no offices, ████████, or vendors in Brazil. ████████████

████████████████████████████████████████████████ As

discussed above, based on offering memoranda and other public records, the appearance to

creditors is that the Non-Brazilian Debtors have no ties to Brazil other than the fact that two of

their directors live there. The simple fact that the directors are located in Brazil, however, is not

enough for a finding of an "establishment." *Cf. In re Kemsley*, 489 B.R. 346, 362 (Bankr.

S.D.N.Y. 2013) (debtor's employment arrangement in the United Kingdom did not give him an

establishment there); *Lavie v. Ran (In re Ran)*, 607 F.3d 1017, 1028 (5th Cir. 2010) (debtor's

bankruptcy proceeding and corresponding debts in Israel could not be equated with nontransitory

economic activity in the country).

92.    Accordingly, the Court should deny recognition of the Brazilian Bankruptcy

Proceedings of the Non-Brazilian Entities as failing to meet the definitions of both foreign main

and foreign nonmain proceedings.

**IV.    The Court Should Deny Discretionary Relief and Condition Any Recognition Order on Creditor Protections.**

93.    The Debtors, to avoid discovery, have agreed not to pursue the discretionary relief requested under section 1521(a)(4) and (5) and under 1520(a)(3) requested in the Verified Petition, but may continue to request discretionary relief.  For example, as set forth above, the Debtors cannot show that Brazilian Bankruptcy Proceedings for OAS Finance BVI (for which the JPLs have sole authority to act) or OAS Investments are "foreign main proceedings," and thus those proceedings may, at most, be recognized as "foreign nonmain proceedings," for which there is no automatic relief.  Thus, the Debtors included in the Verified Petition an alternative request for the discretionary imposition of the automatic stay pursuant to sections 1521(a)(1) and (2) upon recognition of those proceeding as "nonmain."  *See* Verified Petition at 33 n.18. Moreover, pursuant to section 1520(a)(3), upon recognition, "*unless the court orders otherwise, the foreign representative may operate the debtor's business and may exercise the rights and powers of a trustee under and to the extent provided by sections 363 and 552.*"  11 U.S.C. § 1520(a)(3).  Thus, unlike the other powers automatically granted under section 1520(a) upon recognition of a foreign main proceeding, the Court has discretion to condition or deny 1520(a)(3) relief.

94.    As discussed above, the Debtors have engaged in a pattern of fraudulent activity leading to the filing of these Chapter 15 Cases.  The Purported Foreign Representative is an appointee of the Debtors and, as general counsel of Investimentos and OAS Infraestrutura, was involved in, or at least aware of, the covert, fraudulent Christmas Transfers.  In light of this, to the extent the Court decided to grant recognition of the Brazilian Bankruptcy Proceedings for some or all of the Debtors (which it should not), the Court should exercise its discretion to deny section 1521 relief upon the recognition of any of the Debtors' proceedings as nonmain, and

section 1520(a)(3) relief upon the recognition of any of the Debtors' proceedings as main.  Also,

pursuant to section 1522(b) of the Bankruptcy Code, the Court should condition any section

1520(a)(3) relief on the giving of security or the filing of an large bond.

       95.     At the very least, any order granting recognition should contain provisions

expressly tolling any applicable deadlines pursuant to section 108(c) of the Bankruptcy Code,

and assure that assets, books, records, and other documents remain in the U.S. under this Court's

jurisdiction, and prevent the Debtors from wasting assets or destroying documents.

## CONCLUSION

For the reasons set forth above, Alden and Aurelius respectfully request that the Court deny the order for recognition and grant the Motion and such other and further relief as is just and appropriate.

Dated: May 15, 2015
       New York, New York

                          _____/s/ Allan S. Brilliant_____
                          Allan S. Brilliant
                          Robert J. Jossen
                          Gary J. Mennitt
                          Craig P. Druehl
                          Stephen M. Wolpert
                          DECHERT LLP
                          1095 Avenue of the Americas
                          New York, New York  10036
                          Telephone: (212) 698-3500
                          Facsimile: (212) 698-3599

                          *Attorneys for Aurelius Capital Management, LP on
                          behalf of entities it manages, including Aurelius
                          Investment, LLC and Huxley Capital Corporation
                          and Alden Global Capital LLC on behalf of entities
                          it manages, including Alden Global Adfero BPI
                          Fund, Ltd., Alden Global Opportunities Master
                          Fund, L.P., Alden Global Value Recovery Master
                          Fund, L.P., and Turnpike Limited*