UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 15-10937 (SMB) |
| OAS S.A., *et al.*,[1] | ) | (Jointly Administered) |
| | ) | |
| Debtors in Foreign Proceedings. | ) | Chapter 15 |
| | ) | |

## MEMORANDUM DECISION RECOGNIZING
## DEBTORS' BRAZILIAN BANKRUPTCY PROCEEDINGS
## AS FOREIGN MAIN PROCEEDINGS

**A P P E A R A N C E S :**

WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036

> John K. Cunningham, Esq.
> Gregory M. Starner, Esq.
> Kimberly A. Haviv, Esq.
> Richard S. Kebrdle, Esq.
> Of Counsel

QUINN EMANUEL URQUHART & SULLIVAN LLP
51 Madison Ave., 22nd Floor
New York, NY 10010

> Susheel Kirpalani, Esq.
> Michael Carlinsky, Esq.
> Benjamin Finestone, Esq.
> Of Counsel

*Attorneys for Renato Fermiano Tavares as*
*Petitioner and Foreign Representative*

---

[1] The Debtors in these chapter 15 cases, along with the last four digits of each debtor's tax identification or corporate registry number, are: OAS S.A. (01-05), Construtora OAS S.A. (01-08), OAS Investments GmbH (4557), and OAS Finance Limited (6299).

DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036

>   Allan S. Brilliant, Esq.
>   Robert J. Jossen, Esq.
>   Gary J. Mennitt, Esq.
>   Craig P. Druehl, Esq.
>   Stephen M. Wolpert, Esq.
>       Of Counsel

*Attorneys for Aurelius Capital Management, LP,
  and Alden Global Capital LLC*

CHADBOURNE & PARKE LLP
1301 Avenue of the Americas
New York, NY 10019

>   Howard Seife, Esq.
>   Andrew Rosenblatt, Esq.
>   Eric Daucher, Esq.
>       Of Counsel

*Attorneys for the Joint Provisional Liquidators of
  OAS Finance Limited*

ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, NY 10020

>   Ken Coleman, Esq.
>   Laura R. Hall, Esq.
>       Of Counsel

*Attorneys for HSBC Bank USA, National Association*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

Renato Fermiano Tavares, as proposed foreign representative, requests recognition of

three foreign proceedings pending in Brazil as foreign main proceedings pursuant to chapter 15

of the United States Bankruptcy Code.  (*See Verified Petition for Recognition of Brazilian*

*Bankruptcy Proceedings and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§*

*1515, 1517, 1520 and 1521*, dated Apr. 15, 2015 (ECF Doc. # 3) (together with the *Voluntary*

*Petitions for each debtor*, dated Apr. 15, 2015, filed in Adv. Pro. Nos. 15-10937 through 15-

2

10940).)  The foreign debtors – OAS S.A. ("OAS"), Construtora OAS S.A. ("Construtora") and

OAS Investments GmbH ("OAS Investments," and together with OAS and Construtora,

collectively, the "OAS Debtors")[2] – are currently debtors in judicial reorganization proceedings

(the "Brazilian Bankruptcy Proceedings") pending in the First Specialized Bankruptcy Court of

São Paulo (the "Brazilian Court") pursuant to Federal Law No. 11.101 of February 9, 2005 of the

laws of the Federative Republic of Brazil (the "Brazilian Bankruptcy Law").  The Court

conducted an evidentiary hearing on May 19, 2015 (the "Recognition Hearing")[3] and concludes

based upon the factual findings and legal conclusions that follow that the OAS Debtors' petitions

for recognition as foreign main proceedings are granted.

## BACKGROUND

### A.     The OAS Debtors

The OAS Debtors are part of the OAS Group.  The OAS Group consists of infrastructure

companies that focus on heavy engineering and equity investments in infrastructure projects

located in and outside Brazil, and provides a range of services that includes public concessions,

construction, engineering, planning, execution and works management for the transportation,

power, sanitation, infrastructure and real estate industries, providing services in twenty-two

countries in Latin America, the Caribbean and Africa.  (*Declaration of Renato Fermiano*

*Tavares Pursuant to 28 U.S.C. § 1746 in Support of Verified Petition for Recognition of*

*Brazilian Bankruptcy Proceedings and Motion for Order Granting Related Relief Pursuant to 11*

*U.S.C. §§ 1515, 1517, 1520 and 1521*, dated Apr. 15, 2015 ("*Tavares Declaration*") at ¶ 9 (ECF

---

[2]     Tavares filed a fourth petition seeking recognition for the Brazilian debtor OAS Finance Limited ("OAS
Finance").  For reasons discussed later in this opinion, Tavares did not go forward on that recognition petition, and
hence, these findings of fact and conclusions of law do not address the recognition of OAS Finance.

[3]     References to the Recognition Hearing transcript are cited as "Tr. at __:__."

Doc. # 4).)[4]  Its principal operating activities are organized into two major divisions: engineering, which engages in heavy civil engineering and construction projects, and investments, which is focused on private investments in infrastructure and public and private services concessions.  (*Id.*)

Most of the OAS Group's foreign construction contracts are with the national governments of countries in Latin America and Africa and relate to the construction of, among other things, highways, hospitals, water and sewage systems and affordable housing.  (*Id.* at ¶ 10.)  The OAS Group's domestic construction contracts are with private companies holding concessions, other private companies and the federal and local Brazilian governments.  (*Id.*)  The OAS Group employs, directly or indirectly, approximately 110,000 people.  (*Id.*)

OAS, as the holding company, sits at the apex of the OAS Group.  (*Id.* at ¶ 12.)  It directly or indirectly owns 100% of the share capital of Construtora, the holding company atop the engineering division.  (*Id.* at ¶¶ 12-13.)  Construtora, through its subsidiaries and branches, conducts business in Brazil, Peru, Trinidad and Tobago, Ghana, Uruguay, Chile, Honduras, Argentina, Bolivia, Colombia, Mozambique, Guinea, Ecuador, Equatorial Guinea, Haiti, Costa Rica, Panama, Angola, and Guatemala. (*Id.* at ¶ 13.)  Its operations in Brazil consist of more than eighty construction projects that generate more revenue for Construtora than its operations in any other country.  (*Id.*)

OAS Investments maintains its registered office in Vienna, Austria, and is directly and wholly-owned by OAS.  (*Id.* at ¶ 15.)  Pursuant to its articles of association, its principal

---

[4]  The *Tavares Declaration* was received as his direct testimony at the Recognition Hearing.  He was present and cross-examined.

corporate purpose is the financing of the operations of the OAS Group.  (OASX 27, at 113; OASX 28, at 118.)[5]  In or around October 2012, OAS Investments issued $500 million of 8.25% senior notes due 2019 (the "2019-1 Notes").  The 2019-1 Notes were guaranteed by OAS, Construtora, and OAS Investimentos, S.A. ("Investimentos").  (OASX 27, at 122, 123.) Investimentos, a Brazilian company, is not one of the OAS Debtors seeking recognition and should not be confused with OAS Investments, the note issuer.  The OAS Group intended to use the proceeds to refinance a substantial portion of its existing debt, fund certain capital expenditures, and use the remainder for general corporate purposes.  (OASX 27, at 45.)   The 2019-1 Notes were governed by New York law.  (*See* OASX 27, at v.)

In or around October 2013, OAS Investments issued an additional $375 million of 8.25% senior notes due 2019 (the "2019-2 Notes" and together with the 2019-1 Notes, the "2019 Notes"; holders of the 2019 Notes are referred to herein as the "2019 Noteholders").  The 2019-2 Notes were guaranteed, again by OAS, Construtora, and Investimentos.  (OASX 28, at 128.) The OAS Group intended to use the proceeds to refinance a substantial portion of its existing debt.  (OASX 28, at 48.)   The 2019-2 Notes were also governed by New York law.  (*See* OASX 28, at vi.)

## B.    Events Leading Up to the Brazilian Bankruptcy Proceedings

The OAS Group's immediate financial problems can be traced to its dealings with Petrobras.  The Brazilian oil company Petrobras had been the target of an anti-corruption investigation by the Brazilian federal government since March 2014.  The investigation also

---

[5]    "OASX" refers to Tavares' exhibits received in evidence at the Recognition Hearing.  "AAX" refers to Recognition Hearing exhibits proffered by Aurelius Capital Management, LP (together with its affiliates, "Aurelius") and Alden Global Capital LLC (together with its affiliates, "Alden").

involved Brazil's largest construction companies and several suppliers. (*Tavares Declaration* at ¶ 24.) On November 21, 2014, Petrobras released a list of twenty-three firms – including OAS – that were temporarily blocked from competing for new contracts with Petrobras, leading Standard & Poor's to downgrade OAS to 'B+' from 'BB-'. (*Id.*) These events, together with the general slowdown in the Brazilian economy, resulting cash flow problems and the lower credit ratings made it difficult and expensive for the OAS Group to obtain credit to finance its projects. (*Id.* at ¶ 25.) In addition, the decline in value of the Brazilian *real* relative to other currencies (including the U.S. dollar) added to the OAS Group's inability to service its existing total debt. (*Id.*) As a result, in January of 2015, the OAS Group announced that it would cease making payments to its financial creditors while it worked to propose a global restructuring plan to its creditors. (*Id.* at ¶ 26.)

### 1.    The December 2014 Transactions

Prior to the default, in December 2014, the OAS Group engaged in three transactions that are, to a large extent, driving the opposition to recognition by Aurelius and Alden, holders of the 2019 Notes. First, on December 1, 2014, Construtora, a guarantor of the 2019 Notes, transferred assets valued at R$301 million to OAS Engenharia e Construção S.A. ("Engenharia"), another subsidiary of OAS that did not guarantee the 2019 Notes. (*See* AAX 32.)

Second, on December 26, 2014, Investimentos, a guarantor, was merged into OAS, also a guarantor (the "Merger"). (AAX 12, at OAS-00001984-1997; AAX 13, at OAS-8773.) The merger agreement provided that Investimentos would be dissolved following the Merger. (AAX 12, at OAS-00001995.) Tavares signed the merger agreement in his capacity as Investimentos' Head of Legal Affairs. (AAX 12, at OAS-00001997.) According to Aurelius and Alden, the Merger eliminated their structural seniority in the separate assets of Investimentos that were now

6

part of the OAS asset pool.  OAS justified the Merger explaining that it was intended to simplify

the OAS Group's corporate structure and reduce administrative and operational costs.  (AAX 13,

at OAS-8773.)

Third, also on December 26, 2014, Investimentos transferred its ownership stake in

Investimentos e Participações em Infraestrutura S.A. − INVEPAR ("Invepar") to its subsidiary

OAS Infraestrutura, a non-guarantor.  (AAX19; AAX13 at OAS-8773.)  The Notice to the

Market issued by OAS was signed on behalf of both parties by Fabio Hori Yonamine as CEO

and Tavares as Legal Officer.  (AAX 19, at 2.)  According to OAS, the purpose of the transfer

was to restructure the OAS Group's shareholding interests in Invepar, (AAX 19, at 1), and

segregate the shares for a potential sale to raise new financing.  (AAX 13, at OAS-8773.)

The three transactions will be referred to collectively as the December Transactions.

### 2.      The New York Litigations

Litigation in New York followed on the heels of the December Transactions and the

default under the 2019 Notes.[6]  Aurelius filed an action on February 4, 2015 and Alden filed its

own action on February 18, 2015, both in New York state court, against OAS, OAS Finance,

Construtora, and Investimentos.  (*See* OASX 34, 35.)  The plaintiffs sought to recover the

amounts due on the 2019 Notes they held.  Their claims aggregate over $140 million.  Aurelius

sought and obtained an *ex parte* order of attachment, and Alden moved for the same relief.  In

addition, Huxley Capital Corporation, an Aurelius affiliate, sued OAS, Construtora,

Investimentos, OAS Infraestrutura S.A. and Engenharia in the United States District Court for

---

[6]      OAS Finance and the same guarantors also defaulted under other notes that are not the subject of these
proceedings.

the Southern District of New York.  *See Huxley Capital Corp. v. OAS S.A., et al.*, No. 15-cv-01637 (S.D.N.Y. filed Mar. 5, 2015).  That action seeks to avoid the three December Transactions as fraudulent transfers under New York law.[7]

### 3.    The Brazilian Bankruptcy Proceedings

On March 31, 2015, the OAS Debtors together with other OAS affiliates (collectively, the "Brazilian Debtors") commenced the Brazilian Bankruptcy Proceedings under Brazilian Bankruptcy Law.  (*See* AAX 27.)  On April 1, 2015, the Brazilian Court issued a decision and order approving the continuation of the joint reorganization proceedings.   (*See* Decision, Proceeding No. 1030812-77.2015.8.26.0100, 1st District Bankruptcy and Judicial Reorganization Court, São Paulo, Brazil, Apr. 1, 2015 (OASX 1, OASX 2 (English Translation).))  The Brazilian Court observed that although Brazil had not yet adopted the UNCITRAL Model Code, the center of main interests of OAS was Brazil, and the Brazilian Debtors, including those incorporated abroad, were part of the same economic group controlled from Brazil.

Aurelius, Alden and another entity (Turnpike Limited) sought reconsideration complaining about the prejudicial effect of the Merger on the 2019 Noteholders.  They argued

---

[7]    Additional litigation ensued.  On April 27, 2015, HSBC sued Aurelius in New York State Court seeking a declaration that any assets attached by Aurelius must be shared ratably with the other creditors.  (*See HSBC Bank USA, N.A. v. Aurelius Inv. LLC*, No. 15-cv-651399 (N.Y. Sup. Ct. filed Apr. 27, 2015) (OASX 16).)  On May 12, 2015, Aurelius filed an action against Citibank, N.A. and certain of its affiliates seeking the turnover of $276,000 in an account belonging to Construtora on deposit in a New York Citibank branch.  (*Aurelius Inv. LLC v. Citibank Global Mkts., Inc., et al.*, No. 15-cv-651633 (N.Y. Sup. Ct. filed May 12, 2015) (OASX 43).)  On the same day, Aurelius filed a turnover action against OAS Finance, OAS, Construtora and Investimentos seeking the same relief.  (*Aurelius Inv., LLC v. OAS Fin. Ltd., et al.*, No. 15-cv-651632 (N.Y. Sup. Ct. filed May 12, 2015) (OASX 17).)

that Investimentos had the financial ability to honor its guarantee to the 2019 Noteholders before

the Merger, (OASX 18, at ¶ 19), but OAS, on the other hand, did not, (*id.* at ¶¶ 21-22), and the

Merger therefore caused tremendous losses to the 2019 Noteholders.  (*Id.* at ¶ 22.)  The

applicants noted that another Brazilian court had already preliminarily enjoined (suspended) the

effects of the Merger.  (*Id.* at ¶ 23.)  In conclusion, they asked the Brazilian Court to process the

reorganizations of each Brazilian Debtor separately, require each Brazilian Debtor to file a

separate plan to be voted on by the creditors of that debtor, and preclude one Brazilian Debtor

from using the assets of another Brazilian Debtor to pay its debts absent a binding legal

relationship that justified doing so.  (*Id.* at ¶¶ 55-56.)  On April 6, 2015, the Brazilian Court

issued a decision affirming its earlier ruling to supervise the reorganization on a consolidated

basis.  (*See* OASX 19.)

The applicants appealed.  In addition to the relief sought in the Brazilian Court, they

asked the appellate court to exclude the three foreign Brazilian Debtors (OAS Investments, OAS

Finance and OAS Investments Limited ("OAS Investments (BVI)") from the Brazilian

proceedings.  (OASX 20, at ¶ 108.)  The appellate court affirmed the Brazilian Court, noting that

the challenge was premature.  No plan had been submitted, no creditors meeting had been held,

the order was subject to modification, and with additional information, "it will certainly be

possible to become better acquainted with the facts and the relationship between the companies

and their creditors in order to reach a sound decision with regard to what must be ordered."  (*Id.*

at pp. 2439-40.)

The Brazilian Court also appointed Alvarez & Marsal Consultoria Empresarial do Brasil

("A&M") as judicial administrator.  (OASX 2.)  The role is statutory under Brazilian Bankruptcy

Law.  (*See* AAX 20.)  The duties of a judicial administrator include providing information requested by creditors, (*id.* at Art. 22-I (b)), demanding information from creditors, the debtor or their officers, (*id.* at Art. 22-I (d)), publishing notice of the creditor list, (*id.* at Art. 7 § 2, Art. 18), sending certain specific information about the case to creditors, (*id.* at Art. 22-I (a)), applying to the judge to convene a creditors' meetings (*id.* at Art. 22-I (g)) and chairing those meetings.  (*Id.* at Art. 37.)  In addition, the judicial administrator reconciles claims, (*id.* at Art. 7), has standing to object to claims, (*id.* at Art. 19), oversees the debtor's activities and its compliance with the restructuring plan, (*id.* at Art. 22-II (a)), hires professionals, (*id.* at Art. 22-I (h)), files for bankruptcy (*i.e.*, liquidation) if the debtor breaches the obligations under the plan, (*id.* at Art. 22-II (b)), and submits monthly reports to the judge on the debtor's activities.  (*Id.* at Art. 22-II (c).)  Finally, the order appointing A&M directed it to report the company's situation, bear responsibility for supervising the process and for seeing that the debtors meet all deadlines, and submit a proposal of fees.  (OASX 2.)

## C.     The Chapter 15 Cases

On April 2, 2015, the Board of Directors of OAS, Construtora, OAS Finance and OAS Investments resolved to grant Tavares a power of attorney for one year to represent the entities with respect to their judicial reorganization proceedings before the Brazilian Court and administer the reorganization of the debtors' assets and affairs in the Brazilian Bankruptcy Proceedings.  In addition, the Boards of Directors specifically appointed Tavares as the OAS Debtors' agent and attorney-in-fact for the purpose of seeking relief available to a "foreign representative" under chapter 15 of the United States Bankruptcy Code.  The resolutions were accompanied by powers of attorney evidencing his authority.  (OASX 3, 4.)

10

On April 15, 2015, Tavares commenced the chapter 15 cases and sought immediate relief in the form of an injunction against continued litigation and collection efforts. (*Motion for Provisional Relief Pursuant to Section 1519 of the Bankruptcy Code*, dated Apr. 15, 2015 (ECF Doc. # 7).) Aurelius and Alden objected to the provisional relief. (*See Noteholders' Objection to Motion for Provisional Relief Pursuant to Section 1519 of the Bankruptcy Code*, dated Apr. 17, 2015 (ECF Doc. # 17).) At the hearing, the Court granted the relief but only in part.

On May 15, 2015, Aurelius and Alden filed their *Objection to Petition for Recognition*, dated May 15, 2015 (ECF Doc. # 60). The objection and the ensuing Recognition Hearing identified four areas of dispute. First, Tavares was not qualified to file the petitions or serve as foreign representative because he had not been authorized by the Brazilian Court to exercise those powers. Second, even if court authorization was not required, Tavares was not qualified to serve as the foreign representative because the OAS Debtors lacked the authority to appoint Tavares, and Tavares was personally disqualified or unable to perform the functions of a foreign representative. Third, OAS Investments' center of main interests was in Vienna, and its Brazilian reorganization could not be recognized as a foreign main or non-main proceeding. Fourth, certain rules and procedures of the Brazilian judicial and/or bankruptcy system were manifestly contrary to the public policy of the United States.

### D.    The British Virgin Islands Proceeding

On or about April 16, 2015, Aurelius, Alden and others (the "BVI Petitioners") filed a petition in the Eastern Caribbean Supreme Court, High Court of Justice, British Virgin Islands (the "BVI Court") to appoint liquidators for OAS Finance. (*See* OASX 10.) The BVI Court granted the petition and appointed Marcus Allender Wide and Mark T. McDonald as joint

11

provisional liquidators (the "JPLs").  The JPLs directed Tavares to withdraw the chapter 15

petition for recognition filed on behalf of OAS Finance, and advised him that he had no further

authority to direct the affairs of that company.  Although Tavares has not withdrawn the petition,

he did not go forward with his own petition to grant recognition to OAS Finance.  The JPLs

subsequently filed their own petition for recognition under chapter 15, and that petition is the

subject of a separate proceeding.

## DISCUSSION

### A.    Introduction

Congress adopted chapter 15 as part of the Bankruptcy Abuse Prevention and Consumer

Protection Act of 2005.  Chapter 15 incorporates the Model Law on Cross-Border Insolvency

(the "Model Law") promulgated by the United Nations Commission on International Trade Law

("UNCITRAL").  11 U.S.C. § 1501(a); *see Morning Mist Holdings Ltd. v. Krys* (*In re Fairfield

Sentry Ltd.*), 714 F.3d 127,132 (2d Cir. 2013) ("*Fairfield Sentry*"); *Ad Hoc Grp. of Vitro

Noteholders v. Vitro S.A.B. de C.V.* (*In re Vitro S.A.B. de C.V.*), 701 F.3d 1031, 1043 (5th Cir.

2012) ("*Vitro*"), *cert. dismissed*, 133 S. Ct. 1862 (2013).  Chapter 15 is intended to promote

"cooperation between United States courts, trustees, examiners, debtors and debtors in

possession and the courts and other competent authorities of foreign countries; greater legal

certainty for trade and investment; fair and efficient administration of cross-border insolvencies

that protects the interests of all creditors and other interested entities, including the debtor; the

protection and maximization of the debtor's assets; and the facilitation of the rescue of

financially troubled businesses."  *In re Bear Stearns High-Grade Structured Credit Strategies

Master Fund, Ltd.*, 374 B.R. 122, 126 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y.

2008); *accord* 11 U.S.C. § 1501(a).

"In interpreting this chapter, the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions."  11 U.S.C. § 1508.  "As each section of Chapter 15 is based on a corresponding article in the Model Law, if a textual provision of Chapter 15 is unclear or ambiguous, the Court may then consider the Model Law and foreign interpretations of it as part of its 'interpretive task.'"  *O'Sullivan v. Loy* (*In re Loy*), 432 B.R. 551, 560 (E.D. Va. 2010) (footnote omitted) (citing 11 U.S.C. § 1508); *accord Fairfield Sentry*, 714 F.3d at 136; *Fogerty v. Petroquest Res., Inc.* (*In re Condor Ins. Ltd.*), 601 F.3d 319, 321 (5th Cir. 2010).  When interpreting Chapter 15, the Court should also consult the GUIDE TO ENACTMENT OF THE UNCITRAL MODEL LAW ON CROSS-BORDER INSOLVENCY (the "GUIDE") promulgated by UNCITRAL.  *See* H.R. REP. NO. 109-31, at 105 (2005); LEIF M. CLARK, ANCILLARY & OTHER CROSS-BORDER INSOLVENCY CASES UNDER CHAPTER 15 OF THE BANKRUPTCY CODE § 3[1][a][i], at 17 (2008).

Bankruptcy Code § 1517 states the grounds for granting recognition:

(a) Subject to section 1506, after notice and a hearing, an order recognizing a foreign proceeding shall be entered if--

(1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;

(2) the foreign representative applying for recognition is a person or body; and

(3) the petition meets the requirements of section 1515.

Section 1517(b) clarifies the distinction between foreign main and nonmain proceedings referred to in § 1517(a)(1):

(b) Such foreign proceeding shall be recognized--

(1) as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests; or

(2) as a foreign nonmain proceeding if the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending.

The parties agree that OAS and Construtora maintain their center of main interests ("COMI") in Brazil.[8]  They are registered in Brazil where they maintain their main offices, and their registration creates a rebuttable presumption that Brazil is their COMI.  11 U.S.C. § 1516(c).  Furthermore, the earlier description of their activities, which are predominantly in Brazil, confirms that their COMI is in Brazil.  Aurelius and Alden do, however, dispute that OAS Investments' COMI is in Brazil, and that issue is addressed later.  And although Tavares is clearly a person within the meaning of 11 U.S.C. § 1517(a)(2), Aurelius and Alden maintain that he does not satisfy the definition of "foreign representative" under 11 U.S.C. § 101(24).  That issue is discussed next.

## B.    Tavares as the Foreign Representative

### 1.    The Requirement for Judicial Authorization

The definition of "foreign representative" includes a requirement, *inter alia*, that he must be "authorized in a foreign proceeding" to administer the reorganization of the debtor's assets or affairs:

> The term "foreign representative" means a person or body, including a person or body *appointed* on an interim basis, *authorized in a foreign proceeding* to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

---

[8]    The Brazilian Court concluded that the COMI of all of the Brazilian Debtors, including the OAS Debtors, was in Brazil.  This Court has considered the COMI issue for each OAS Debtor *de novo* in light of the evidence adduced in connection with the Recognition Hearing.

11 U.S.C. § 101(24) (emphasis added).  In addition Bankruptcy Code § 1515, which states the

requirements for a petition for recognition, includes several references to proof of the

"appointment" of the foreign representative:

> **(a)** A foreign representative applies to the court for recognition of a foreign
> proceeding in which the foreign representative has been *appointed* by filing a
> petition for recognition.
>
> **(b)** A petition for recognition shall be accompanied by--
>
>> **(1)** a certified copy of the decision commencing such foreign proceeding and
>> *appointing* the foreign representative;
>>
>> **(2)** a certificate from the foreign court affirming the existence of such foreign
>> proceeding and of the *appointment* of the foreign representative; or
>>
>> **(3)** in the absence of evidence referred to in paragraphs (1) and (2), any other
>> evidence acceptable to the court of the existence of such foreign proceeding
>> and of the *appointment* of the foreign representative.

(Emphasis added).  Aurelius and Alden argue, in the main, that Tavares had to be authorized or

appointed by the Brazilian Court to act as the "foreign representative," but he was not..

  In *Vitro*, the Fifth Circuit Court of Appeals addressed this very argument at length and

rejected it.  There, a large Mexico-based glass manufacturer initiated a *concurso* proceeding

(analogous to a chapter 11 reorganization) under the Mexican Reorganization Act.  *Vitro*, 701

F.3d at 1038.  Vitro's board of directors appointed two individuals to serve as co-foreign

representatives, and they commenced chapter 15 proceedings seeking recognition.  *Id*. at 1040-

41.  Like Aurelius and Alden here, the *Vitro* noteholders objected arguing that the foreign

representatives failed to meet the definition of "foreign representative" because, among other

reasons, they were not appointed by a foreign court or administrative tribunal.[9]  *Id*. at 1046.

---

[9] The objecting *Vitro* noteholders were represented by the same counsel that represents Aurelius and Alden
in these proceedings.

The District Court specifically addressed the argument, rejected it and affirmed the Bankruptcy Court order granting recognition. Initially, the District Court concluded that the phrase "authorized in a foreign proceeding" was ambiguous, and could be interpreted broadly to mean "authorized *in the context of* a foreign bankruptcy proceeding." *Ad Hoc Grp. of Vitro Noteholders v. Vitro, S.A.B. de C.V.* (*In re Vitro, S.A.B. de C.V.*), 470 B.R. 408, 411-12 (N.D. Tex. 2012) ("*Vitro District Court Opinion*") (emphasis in original). In addition, although the case law on the issue was sparse, the New York Bankruptcy Court had addressed the issue in *In re Compania Mexicana de Aviacion, S.A. de C.V.,* No. 10-14182 (MG) (Bankr. S.D.N.Y. Nov. 8, 2010). *Vitro District Court Opinion*, 470 B.R. at 411-12. In *Compania Mexicana de Aviacion,* the Bankruptcy Court had ruled from the bench that a Mexican corporation could authorize a person to act as a foreign representative in a chapter 15 case because under Mexican law, the debtor essentially acted as a debtor in possession and managed its own affairs. *Vitro District Court Opinion*, 470 B.R. at 412.

The District Court agreed that the conclusion of the New York Bankruptcy Court in *Compania Mexicana de Aviacion* was consistent with the definition of "foreign representative" under Bankruptcy Code § 101(24). Under the first prong of the statute, those authorized to administer the reorganization or liquidation of the debtor's assets and affairs are also authorized to be the foreign representative, and Mexican law allowed the debtor to manage its business enterprise during the *concurso* proceeding. *Id.* at 412. Finally, while there were differences between the concepts of "debtor-in-possession" under U.S. and Mexican law, the District Court was not persuaded that they were of sufficient magnitude to warrant the conclusion that Vitro could not appoint its own foreign representative. *Id.*

16

The Fifth Circuit affirmed the District Court.  Construing the phrase "authorized in a foreign proceeding," the Court stated that while that statement is "compatible with appointment by a foreign court … it is hardly necessary."  *Vitro*, 701 F.3d at 1047.  Agreeing with the District Court, the Fifth Circuit explained that "it would be equally compatible with a requirement that an individual be appointed 'in the context of' … or in the course of, a foreign proceeding."  *Id*. (quoting *Vitro District Court Opinion*, 470 B.R. at 411).  The Court added that the references to "appointment" (quoted above) in Bankruptcy Code § 1515 suffered from the same defect, and at best, required that the foreign representative must be appointed but did not say by whom.  *Id*.

Case law also supported the interpretation.  The District Court had identified examples of bankruptcy courts routinely granting recognition to foreign representatives appointed by Mexican debtors.  *Id*. at 1047-48.  Although those decisions did not entail challenges to the foreign representative's appointment, they were nevertheless persuasive because even in the absence of an objection, "the [bankruptcy] court would still need to determine whether the appointment was correct as a threshold matter prior to granting recognition."  *Id*. at 1048 n. 15.

The Court found additional support for its interpretation in the Model Law and the reports of the Working Group on Insolvency Law (the "Working Group").  The definition of foreign representatives in § 101(24) is essentially identical to the corresponding definition in Model Law Article 2(d).[10]  "In drafting this definition, the Working Group expressly rejected the requirement that a foreign representative be specifically authorized by statute or other order of court (administrative body) to act in connection with a foreign proceeding."  *Id*. at 1048 (quoting UNCITRAL Rep. of the Working Group on Insolvency Law on the Work of the Eighteenth

---

[10]     The only change in 11 U.S.C. § 101(24) is the addition of the words "including a person or body appointed," in lieu of the original "including one appointed."

Session, ¶ 111, U.N. Doc. A/CN.9/419 (Dec. 1, 1995) ("*Eighteenth Session*"), *available at* http://

www. uncitral. org/ uncitral/ en/ commission/ working_ groups/ 5 Insolvency. html (Dec. 1995

Rep.) (internal quotation marks omitted)).   According to the Circuit Court, the Working Group

rejected the requirement for which the *Vitro* noteholders argued because of concerns that "the

expressions [of various specific terms and titles] would be unfamiliar and might have the

unintended effect of being unduly restrictive, since the list would inevitably be incomplete." *Id.*

at 1048 (quoting *Eighteenth Session* at ¶ 112) (internal quotation marks omitted).  Finally, "the

Working Group also declined to include the word 'specifically' because 'it would be unusual for

a State to appoint an insolvency representative specifically to act abroad.'  This supports our

conclusion that the [n]oteholders' proposed interpretation—which would require exactly such an

appointment—is wrong." *Vitro*, 701 F.3d at 1048-49 (quoting *Eighteenth Session* at ¶ 113)

(footnote omitted).

Aurelius and Alden are correct that the facts of *Vitro* differed from those presented in the

OAS Debtors' cases in one respect.  The *Vitro* foreign court had denied a motion to enjoin the

foreign representatives and refused to declare the *conciliador*[11] to be the only person authorized

to act as foreign representative.  The Fifth Circuit viewed the Mexican court's ruling as "tacit

approval" of the representatives appointed by the *Vitro* board.  *Vitro*, 701 F.3d 1048.  That

statement, however, played no part in the Fifth Circuit's interpretation of chapter 15 and its

conclusion that the Bankruptcy Code did not require the foreign representative to be authorized

by the foreign bankruptcy court.

---

[11]      "A *conciliador* is an individual appointed by the *Instituto Federal de Especialistas de Concursos Mercantiles*—the Federal Institute of Specialists of Insolvency Procedures—to serve as a quasi-judicial officer with certain responsibilities in a *concurso* proceeding, including filing an initial list of recognized claims, mediating a plan, and, if necessary to protect the debtor's estate, managing the debtor's business."  *Vitro*, 701 F.3d at 1038 n. 2.

Based on the foregoing, the Court concludes that the Bankruptcy Code does not require the judicial authorization or appointment of the foreign representative.

### 2.    The Authority of the OAS Debtors' Boards of Directors

Aurelius and Alden next contend that even if judicial authorization is not required as a matter of law, the OAS Debtors' could not appoint Tavares as foreign representative because they are not debtors-in-possession.  The Model Law does not define the characteristics of a debtor-in-possession, but the GUIDE suggests that it includes a debtor that retains "some measure of control over its assets" although under court supervision.  GUIDE ¶¶ 71, 74.  The UNCITRAL Practice Guide on Cross-Border Insolvency Cooperation (2009) ("PRACTICE GUIDE"), published after Congress adopted chapter 15, defines a "debtor in possession" as a debtor that "retains full control over the business, with the consequence that the court does not appoint an insolvency representative."  PRACTICE GUIDE, at ¶ 13(j).

The OAS Debtors are debtors-in-possession within the meaning of the Model Law as amplified by the GUIDE and the PRACTICE GUIDE.  Article 64 of the Brazilian Bankruptcy Law provides, with certain exceptions that do not apply, that "[d]uring the in-court restructuring procedure, the debtor and his officers shall be kept in the management of the business activity, overseen by the Committee, if any, and by the judicial administrator."  (AAX 20, at Art. 64.)  The debtor's management retains full control over the debtor's business and assets, subject to the type of oversight that ordinarily characterizes a judicially-supervised reorganization.  (*See Declaration of Eduardo Secchi Munhoz Pursuant to 28 U.S.C. § 1746 in Support of Petition for Recognition of Brazilian Bankruptcy Proceedings and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§ 1515, 1517, 1520 and 1521*, dated Apr. 15, 2015 ("*Munhoz Declaration*") (ECF Doc.

# 5).)[12]  In contrast, the judicial administrator represents the estate in a *liquidation*, and has the authority to seize the debtor's assets, sell perishable assets with the court's approval, collect its receivables and preserve the debtor's assets.  (AAX 20, at ¶ 22-III (c), (f), (j), (i), (n), (q).)

Furthermore, Aurelius and Alden are precluded from making the contrary argument because it is inconsistent with the position they successfully took before the BVI Court.  *See Adrogue Chico S.A. v. FleetBoston Fin. Corp.*, 427 F. App'x. 43, 45 (2d Cir. 2011) (judicial estoppel precluded a plaintiff from asserting a claim – its largest asset – that it failed to disclose in its Argentine bankruptcy); *Rapture Shipping, Ltd. v. Allround Fuel Trading, B.V.,* 350 F. Supp. 2d 369, 373-75 (S.D.N.Y. 2004) (party who successfully argued in Rotterdam court that a contractual relationship existed with the defendant was precluded under the doctrines of judicial estoppel and comity from arguing that no contract existed in a subsequent federal court action). The BVI Petitioners, including Aurelius and Alden, petitioned the BVI Court to place OAS Finance into liquidation and immediately appoint a provisional liquidator.  Under BVI law, and absent the consent of the debtor, the BVI Court may appoint a provisional liquidator if it finds that the appointment "is necessary for the purpose of maintaining the value of assets owned or managed by the company, or . . . is in the public interest."  Insolvency Act, 2003 § 170(4)(b).

Their *ex parte* submissions to the BVI Court warned that OAS's existing management was still in control of the Brazilian Debtors and the Brazilian reorganization process, and that control warranted the appointment of a provisional liquidator.  In their *Written Submissions of Applicants Ex Parte Hearing on 16 April 2015 for Appointment of Provisional Liquidators*, dated Apr. 16, 2015 (OASX 9), the BVI Petitioners argued:

---

[12]    Munhoz testified as Tavares' expert on Brazilian insolvency law.  The Court received the *Munhoz Declaration* as his direct testimony at the Recognition Hearing.  He was present and was cross-examined.

Notwithstanding the corruption charges against senior OAS Group management and the OAS Group itself, *the Brazilian proceedings leave the directors in control of the Respondent and OAS Investments.* Alvarez and Marsal have been appointed as trustee in the Brazilian proceedings, but as the affidavit of the Applicants' Brazilian lawyer Marcelo Carpenter explains, *this role is largely administrative. The substantive proposals for restructuring the OAS Group are in the hands of those who have overseen its involvement in the corruption scandal and its subsequent economic collapse.*

(OASX 9, at ¶16) (emphasis added).

Furthermore, the judicial administrator had little power to interfere with the management of the Brazilian Debtors. In the expert affidavit referred to in the preceding quote, their Brazilian law expert detailed the limited authority of the judicial administrator:

> *The judicial administrator in Brazilian recovery proceedings has very limited powers and acts more as an inspector than an administrator, since he has no administrative powers. It is important to understand that, during the recovery process, management of the company remains in the hands of its duly appointed directors. Neither the creditors nor the judicial administrator can replace them.* The debtor is, however, prevented from selling or encumbering its permanent assets without the prior consent of the court in consultation with the creditors' committee.

(OASX 11, at ¶ 12) (emphasis added).

The BVI Court accepted the argument and appointed the JPLs. This implies that the BVI Court found that a provisional liquidator was needed to maintain the value of OAS Finance's assets or was in the public interest, or both, based on the BVI Petitioners' arguments that the existing OAS management remained in control of the Brazilian Debtors and the Brazilian reorganization proceedings, and the limited powers of the judicial administrator did not permit interference with that control. Having successfully made the latter argument to the BVI Court, principles of judicial estoppel and comity preclude Aurelius and Alden from arguing to this Court that the powers of the OAS management are so minimal or those of the judicial

21

administrator so robust that OAS does not operate as a debtor-in-possession because it lacks
control of its business and assets or has been supplanted by the judicial administrator.

Finally, Aurelius and Alden argue that the OAS Debtors are not debtors-in-possession
because they do not have the same duties and responsibilities of a debtor-in-possession under the
United States Bankruptcy Code.  For example, they cite to Bankruptcy Code §§ 1107 and 1108[13]  in
an attempt to draw a distinction between the authority to manage the debtor's business and assets and
"the authority to administer the reorganization or liquidation of its assets and affairs for the
benefit of creditors and other stakeholders."  (*Alden and Aurelius' Proposed Findings of Fact
and Conclusions of Law on Chapter 15 Petitions*, dated June 4, 2015 ("*AA Proposed Findings &
Conclusions*") at ¶ 163 (ECF Doc. # 73).)

The law they cite does not support a distinction they attempt to draw.  Section 1107
grants the debtor in possession the rights and powers of a trustee serving under chapter 11.  A
trustee appointed under Bankruptcy Code § 1106(a) is vested with most of the powers and duties
conferred on a chapter 7 trustee other than the mandate to liquidate the debtor's assets pursuant
to Bankruptcy Code § 704(a)(1).  *See* 11 U.S.C. § 1106(a)(1).  A chapter 7 trustee does not have
the authority to operate a debtor's business unless expressly authorized to do so by the
bankruptcy court.  *See* 11 U.S.C. §§ 704(8), 721.  Section 1108 grants the trustee, and hence, the
debtor-in-possession, the authority to operate the debtor's business without the need to procure a
separate order.  H.R. REP. NO. 95-595, at 404 (1977); S. REP. NO. 95-989, at 116 (1978).
Bankruptcy Code §§ 1107 and 1108 reflect the distinction between a trustee's authority to

---

[13]      Bankruptcy Code § 1107 provides in pertinent part that "a debtor in possession shall have all the rights . . .
and powers, and shall perform all the functions and duties, . . . of a trustee serving in a case under this chapter."
Bankruptcy Code § 1108 states in pertinent part that "[u]nless the court . . .  orders otherwise, the trustee may
operate the debtor's business."

operate the debtor's business under chapter 7 and chapter 11 and not between the debtor's power to control its business and administer its reorganization.

Aurelius and Alden also argue that the OAS Debtors do not have the same duties and responsibilities as an American bankruptcy trustee, they are not fiduciaries and they lack the power to avoid preferential and fraudulent transfers. (*AA Proposed Findings & Conclusions* at ¶ 165.) In addition, the Brazilian Bankruptcy Law does not confer the administrative powers and duties of an American trustee or debtor-in-possession on the OAS Debtors other than the right to propose a plan, and Brazilian Bankruptcy Law does not create an estate. (*Id.* at ¶ 166.) Instead, these administrative duties are conferred on the judicial administrator. (*Id.* at ¶ 167.)

The *Vitro* Court rejected a similar argument. It proceeds from the incorrect assumption that only those who meet the criteria of a debtor-in-possession under U.S. law can be deemed a debtor-in-possession in a foreign proceeding with the power to appoint a foreign representative. The drafters of the Model Law did not base their concept of "debtor-in-possession" on how United States law defined the term, and "under Chapter 15 the correct analogy is not to whether a debtor meets Chapter 11's definition of a 'debtor in possession,' but whether it meets that definition originally envisioned by the drafters of the Model Law and incorporated into § 101(24)." *Vitro*, 701 F.3d at 1050. As stated earlier, the OAS Debtors retain control of their assets and business affairs, and are debtors-in-possession within the meaning of the Model Law.

### 3.    Tavares as Foreign Representative

Aurelius' and Alden's final challenge focuses on Tavares. They contend that under Bankruptcy Code § 101(24) the foreign representative must be the one who administers the assets and affairs in the foreign proceeding, and Tavares has not assumed and does not intend to

assume those duties.  (*AA Proposed Findings & Conclusions* at ¶ 174.)  In addition, the foreign

representative must be neutral and accountable, (*id.* at ¶¶ 174-75), and must be a representative

of the Brazilian Court, not the Brazilian Debtors.  (*See id.* at ¶ 177.)  Having constructed this test,

Aurelius and Alden maintain that Tavares cannot meet the neutrality and accountability criteria

because he represents the interests of the OAS Debtors, not the Brazilian Court or the Brazilian

Bankruptcy Proceedings, he was involved in the December Transactions, he owes his allegiance

to OAS Group's shareholders and he has a conflict inherent in his representation of OAS

Investments.  (*Id.* at ¶ 178.)

Neither the Bankruptcy Code nor the Model Law explains what it means to administer

the reorganization of the debtor's assets and affairs.  The GUIDE states, however, that "the

foreign representative may be a person authorized in the foreign proceeding to *administer those

proceedings, which would include seeking recognition, relief and cooperation in another

jurisdiction*…."  GUIDE at ¶ 86 (emphasis added).  Tavares was expressly authorized by the OAS

Debtors' Boards of Directors to represent the OAS Debtors and act as their agent in

administering the reorganization of their assets and affairs in the Brazilian Bankruptcy

Proceedings and to exercise the authority available to a foreign representative as defined in the

Bankruptcy Code to seek relief under chapter 15.  The powers granted to him authorized Tavares

to administer the OAS Debtors' assets and affairs, and the filing of the chapter 15 cases

themselves constituted the administration of their assets and affairs.  Whether he performs those

duties satisfactorily is a question different from whether he is authorized to perform those duties.

Here, Tavares was plainly authorized to administer the OAS Debtors' reorganization, and

accordingly, he has the powers necessary to qualify as the OAS Debtors' foreign representative.

24

In addition, Aurelius' and Alden's neutrality and accountability is not supported by the law they cite.  For example, they rely on Bankruptcy Code § 1509(b)(3) to argue that the foreign representative represents the foreign court, not the foreign debtor.  Section 1509(b)(3) states that if the court grants recognition "a court of the United States shall grant comity or cooperation to the foreign representative."  Aurelius and Alden reason that a court can only grant comity to another court, and the foreign representative must, therefore, represent the court to receive comity.  (*See AA Proposed Findings & Conclusions* at ¶ 177.)

Section 1509 is derived from Model Law § 9.  Its purpose is to ensure that once recognition is granted, the foreign representative will have full access to state and federal courts within the United States.  H.R. REP. NO. 109-31, at 110 (2005).  It also limits that access by implementing the "single point of entry" concept, 8 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 1509.02, at 1509-4 (16th ed. 2015) ("COLLIER"), and providing the "exclusive door to ancillary assistance for the foreign proceedings."  H.R. REP. NO. 109-31, at 110 (2005).  In other words, it is the one key that unlocks the foreign representative's access to courts in the United States, but once the door is unlocked, the access is complete.

The reference to comity does not equate the foreign representative with the foreign court or the foreign proceeding.  "Although use of the word 'comity' connotes recognition of another judicial proceeding, the word 'cooperation' suggests a much broader meaning." *Vitro*, 701 F.3d at 1047.  Section 1509 addresses the rights and privileges of the foreign representative and means that the foreign proceeding must receive courtesy and cooperation when the foreign representative proceeds in another court.  8 COLLIER ¶ 1509.02, at 1509-5 to 1509-6.  It does not, however, mandate comity with respect to all acts in the foreign proceeding without regard to the

satisfaction of the other provisions of chapter 15 that pertain to comity.  *Id.* at ¶ 1509.02, at 1509-6.

In addition, Aurelius' and Alden's interpretation ignores the definition of "foreign representative."  Under Bankruptcy Code § 101(24), a foreign representative is one authorized in the foreign proceeding to (1) administer the reorganization or the liquidation of the debtor's assets or affairs *or* (2) act as a representative of such foreign proceeding.  If the foreign representative had to demonstrate that he acted as the representative of the foreign proceeding, the first prong of the disjunctive test would be superfluous.

Aurelius and Alden also rely on Bankruptcy Code § 1505 to support their contention that the foreign representative must satisfy a neutrality and accountability test.  Section 1505 states:

> A trustee or another entity (including an examiner) may be authorized by the court to act in a foreign country on behalf of an estate created under section 541.  An entity authorized to act under this section may act in any way permitted by the applicable foreign law.

According to the legislative history, section 1505's "main purpose is to ensure that the court has knowledge and control of possibly expensive activities [and] have the collateral benefit of providing further assurance to foreign courts that the United States debtor or representative is under judicial authority and supervision."  H.R. REP. NO. 109-31, at 108 (2005).  Section 1505 focuses on the authorization of United States trustees and similar entities to appear in foreign courts, not the other way around.  In fact, Congress recognized that it changed the language of the Model Law and was purely internal to United States law.  H.R. REP. NO. 109-31, at 108

(2005).[14]  It does not modify or otherwise impose unstated requirements on the definition of

"foreign representative" in Bankruptcy Code § 101(24) which tracks the Model Law.

One last observation concerns Tavares' relationship to the OAS Group shareholders and

his participation in the December Transactions.  Those involved in the Petrobras scandal have

been arrested and removed from their management of the OAS Debtors.  Tavares was not

charged.  (*See* AAX 7.)  There is no suggestion much less evidence presented to this Court that

Tavares had a role in any wrongdoing; rather, the allegation of his unfitness is based on his

association with those charged with wrongdoing by the Brazilian authorities relating to the

business activities of the OAS Group.  Furthermore, while his name appears on certain

documents associated with the December Transactions, including the execution of the merger

agreement and the Notice to the Market published in connection with the Invepar transfer, no

court has judged the transactions to be wrongful or, apparently, raised the issue of Tavares'

qualifications with the Brazilian Court.

Accordingly, the Court concludes that Tavares was duly appointed and qualified to act as

the "foreign representative" in these chapter 15 proceedings.

## C.    The COMI of OAS Investments

Tavares seeks recognition of the OAS Investments' Brazilian Bankruptcy Proceeding as a

foreign main proceeding.[15]  A "'foreign main proceeding' means a foreign proceeding pending in

the country where the debtor has the center of its main interests," 11 U.S.C. § 1502(4), or COMI.

---

[14]    Section 1505 is derived from Article 5 of the Model Law.  The latter automatically authorizes the person administering the foreign reorganization or liquidation – here, Tavares – to act on behalf of the foreign proceeding as permitted by applicable foreign law.

[15]    In the alternative, Tavares seeks recognition of the Brazilian proceeding as a foreign nonmain proceeding. In light of the disposition of Tavares' principal request, it is unnecessary to reach the alternative request.

"In the absence of evidence to the contrary, the debtor's registered office . . . is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c). "[A] debtor's COMI is determined as of the time of the filing of the Chapter 15 petition," but, "[t]o offset a debtor's ability to manipulate its COMI, a court may also look at the time period between the initiation of the foreign liquidation proceeding and the filing of the Chapter 15 petition." *Fairfield Sentry*, 714 F.3d at 133.

The COMI analysis permits consideration of any relevant activities, including liquidation activities and administrative functions. *Id.* at 137. The following non-exclusive group of factors guides the analysis, "but consideration of these specific factors is neither required nor dispositive," *id.*:

> Various factors, singly or combined, could be relevant to such a determination: the location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.

*Id.* (quoting *In re SPhinX, Ltd.,* 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006), *aff'd,* 371 B.R. 10 (S.D.N.Y. 2007)). In addition, the court may consider the location of the debtor's "nerve center," "including from where the debtor's activities are directed and controlled, in determining a debtor's COMI." *Fairfield Sentry*, 714 F.3d at 138 n. 10. Finally, international sources of law that the court may consider "underscore[] the importance of factors that indicate regularity and ascertainability." *Id.* at 138. The party seeking recognition as a foreign main proceeding has the burden of proving that the debtor's COMI is in the jurisdiction where the foreign main proceeding is pending. *SPhinX*, 351 B.R. at 117.

28

As this case shows, the COMI analysis when applied to a special purpose financing

vehicle proves less straightforward than the typical case.  OAS Investments is incorporated in

Austria, and in the absence of contrary evidence, Austria is its presumed COMI.  The evidence,

however, indicates that it was not.  OAS Investments is a subsidiary of OAS that was formed to

serve as a special purpose vehicle.  It issued the 2019 Notes, and then loaned the proceeds to

OAS Investments (BVI), a direct OAS subsidiary, (*see* AAX 4, at 7518), which apparently

loaned the proceeds to the members of the OAS Group in accordance with the uses stated in the

offering memoranda.  Although OAS Investments' registered office is located in Vienna,

Austria, it only maintains a post office box there.  (Tr. at 85:12-19.)  Furthermore, it does not

conduct business, own assets, have a physical location, or employ anyone in Austria. (*Tavares*

*Declaration* at ¶ 18.)  It has just a handful of trade creditors located in Austria, (AAX 4, at 7451),

who provide services relating to the establishment and maintenance of OAS Investments'

registered office in Austria and services required under Austrian law.  (*Tavares Declaration* ¶

18.)  The predominant creditors are the beneficial holders of the 2019 Notes located worldwide.[16]

Having issued the 2019 Notes, OAS Investments had no other business except to pay

them off.  This was the very business it and the other Brazilian Debtors were engaged in through

the Brazilian Bankruptcy Proceedings when Tavares filed the chapter 15 case on April 15, 2015.

Moreover, the Brazilian Bankruptcy Proceedings provide the only realistic chance to repay the

2019 Notes.  OAS Investments principal asset is a receivable owed by OAS Investments (BVI).

The latter appears to be a conduit for the distribution of financing proceeds to the ultimate

---

[16]    If OAS, Construtora or Investimentos honor their guarantees and pay the 2019 Noteholders, they will be
entitled to indemnity from the principal obligor, OAS Investments, under New York law.  *Varsames v. Palazzolo*, 96
F. Supp. 2d 361, 368 (S.D.N.Y. 2000); *Fredericks v. Shapiro*, 160 F.R.D. 26, 28 (S.D.N.Y. 1995) ("If a guarantee is
enforced, the original obligor is liable to the guarantor for the amounts required to be paid.").  As discussed in the
succeeding text, this seems more likely than payment coming from OAS Investments.  In the end, it may be more
accurate to say that the Brazilian guarantors, contingent creditors of OAS Investments, are the principal creditors.

beneficiaries of the financing; it was not mentioned in the offering memoranda and does not

appear to have any other purpose.  In addition, it is currently the subject of a provisional

liquidation proceeding (along with OAS Finance) in the BVI, and lacks the means to repay OAS

Investments unless its own OAS Group borrowers repay that debt.  In truth, the only source of

repayment that will ultimately discharge the obligations to the 2019 Noteholders must come

from the OAS Group pursuant to the reorganization of their financial affairs.

Brazil, in this regard, is OAS Investments' nerve center and headquarters.  OAS, a

Brazilian entity and its sole shareholder, has the power to elect OAS Investments' executive

officers and "determine the outcome of any action requiring shareholder approval, including

transactions with related parties, acquisitions and dispositions of assets and the timing and

payment of any future dividends, according to the Brazilian Corporation Law."  (OASX 27, at

42; OASX 28, at 44.)  The offering memoranda explained that although OAS Investments was

organized under the laws of Austria, "[a]ll of its directors and [OAS Group's] officers and

certain advisors named herein reside in Brazil."  (OASX 27, at 42; OASX 28, at 44.)  There is no

evidence that its Board of Directors ever convened a meeting except to pass the resolution

appointing Tavares as its foreign representative, and that resolution was executed by its Brazilian

directors in Brazil.[17]

The conclusion that Brazil is the nerve center and headquarters of OAS Investments is

consistent with the expectation of the creditors, especially the 2019 Noteholders.  The first page

of each offering memoranda stated that the 2019 Notes were "unconditionally and irrevocably

guaranteed by OAS S.A., Construtora OAS Ltda. and OAS Investimentos S.A. (*each organized*

---

[17]    Dr. Klaus Hafner, a former OAS Investments director residing in Austria, resigned on February 28, 2015.
(AAX 21.)

*under the laws of Brazil)*."  (Emphasis in original.)  The offering memoranda described OAS

Investments as "a special purpose finance company and [the OAS Group's] wholly owned

subsidiary," (OASX 27, at 15; OASX 28, at 17), and "[p]ursuant to section three of [OAS

Investments'] articles of association, [OAS Investments'] principal purpose is the financing of

the operations of the OAS group, its affiliates and direct and indirect subsidiaries."  (OASX 27,

at 113; OASX 28, at 118.)  The offering memoranda discussed the businesses of the OAS Group,

(OASX 27, at 80-112; OASX 28, at 82-117), supplied the condensed financial statements of

OAS, (OASX 27, at F-1 to F-301; OASX 28, at F-1 to F-299), and the three Brazilian guarantors,

(OASX 27, at A-1 to A-11; OASX 28, at A-1 to A-10), and identified the management of OAS,

Construtora and Investimentos.  (OASX 27, at 114-19; OASX 28, at 119-24.)  Notably, the

offering memoranda did not include any financial information regarding OAS Investments, (*see*

OASX 27, at 113; OASX 28, at 118), or identify its management.  It is also noteworthy that any

notices under the Indentures that needed to be directed to OAS Investments had to be sent to

Construtora in Brazil, with copies to Investimentos, also in Brazil.  (*See* OASX 31, at § 13.01.)[18]

The Indentures did not require any notices to be sent to OAS Investments in Austria or anywhere

else in its own name.

Most importantly, the "Risk Factors" that all note purchasers were warned to "carefully

consider" before deciding to purchase the notes described the risks associated with the

businesses of the OAS Group, not OAS Investments, (OASX 27, at 25-44; OASX 28, at 26-47),

and included a separate discussion focusing on the special risks relating to investments that could

---

[18]      The parties provided the Indenture for the first tranche of 2019 Notes, (OASX 31), but not the second.
Nevertheless, the Court infers that the notice provisions for the second tranche were the same.  In this regard, the
Court also received the Indentures relating to two tranches of other notes issued by OAS Finance, and each required
that any notices directed to OAS Finance should be sent to OAS with copies to Construtora and Investimentos.
(OASX 29, at §13.01; OASX 30, at § 12.01.)

be affected by the Brazilian economy and Brazilian government actions.  (OASX 27, at 39-42;

OASX 28, at 41-44.)  Potential purchasers were also warned that if OAS and its subsidiaries

could not pay their indebtedness, including the obligations under the guarantees, they might

become subject to bankruptcy proceedings in Brazil, and Brazilian laws might be less favorable

to creditors compared to the laws of the United States or other jurisdictions.  (OASX 27, at 43;

OASX 28, at 45.)  In contrast, the offering memoranda do not discuss the risks of operating in

Austria.  The only risk factor that mentioned Austria stated that Austria would not enforce U.S.

judgments, the U.S. securities laws or awards of punitive damages.  (OASX 27, at v; OASX 28,

at vi.)

In conclusion, purchasers of the 2019 Notes understood that they were investing in

Brazilian-based businesses, and OAS Investments' place of incorporation, or for that matter its

very existence, was immaterial to their decision to purchase their notes.  While their rights were

governed by New York law, (OASX 31, at § 13.08), and OAS Investments consented to the

jurisdiction and service of process in New York, (*id.* at § 13.12), the purchasers expected to

receive repayment from the cash generated by the operations of the OAS Group, and in the event

of a default, might ultimately have to enforce their rights in a Brazilian bankruptcy proceeding.

OAS Investments had no separate, ascertainable presence in Austria; it was part of, and

inseparable from, the OAS Group located in Brazil.  Finally, the 2019 Noteholders had no

legitimate expectation that the Austrian courts would play any role in the determination or

payment of their claims.  For the reasons stated, the Court concludes that OAS Investments'

COMI was also located in Brazil when Tavares filed its chapter 15 case.

D.    **Public Policy**

Bankruptcy Code § 1506 states:

Nothing in this chapter prevents the court from refusing to take an action
governed by this chapter if the action would be manifestly contrary to the public
policy of the United States.

The public policy exception "requires a narrow reading." *Fairfield Sentry*, 714 F.3d at 139;

*accord* H.R.REP. NO. 109-31, pt. 1, at 109 (2005) ("[Section 1506] follows the Model Law

article 5[sic] exactly, is standard in UNCITRAL texts, and has been narrowly interpreted on a

consistent basis in courts around the world. The word "manifestly" in international usage

restricts the public policy exception to the most fundamental policies of the United States.");

GUIDE at ¶ 104 ("The purpose of the expression 'manifestly' … is to emphasize that public

policy exceptions should be interpreted restrictively and that article 6 is only intended to be

invoked under exceptional circumstances concerning matters of fundamental importance for the

enacting State."). As the Second Circuit observed, federal courts in the United States have

uniformly adopted the narrow application of the public policy exception. *Fairfield Sentry*, 714

F.3d at 139 (listing cases).

Aurelius and Alden have not mounted a serious challenge to the fairness of the Brazilian

Bankruptcy Proceedings on a "macro system" level, and this Court recently held that "Brazilian

bankruptcy law meets our fundamental standards of fairness and accords with the course of

civilized jurisprudence." *In re Rede Energia S.A.*, 515 B.R. 69, 98 (Bankr. S.D.N.Y. 2014). As

explained by the OAS Debtors' Brazilian insolvency law expert, Brazil has a comprehensive

bankruptcy law that in many ways mirrors our own. The debtor must file a petition which

requires judicial approval before it can proceed. (*Munhoz Declaration* at ¶ 11.) If approved, the

debtor operates as a debtor-in-possession subject to varying levels of oversight by the court, the

33

creditors committee and the judicial administrator.  (*See id.* at ¶¶ 12, 14-15.)  The debtor submits

a reorganization plan which, with limited exceptions, deals with all pre-petition debt.  (*Id.* at ¶

17.)  The plan must demonstrate feasibility, and separate the creditors into four classes – labor-

related, secured, general unsecured and "small business companies" unsecured claims.  (*Id.* at ¶¶

20, 21.)  The plan must be approved by the requisite majority of creditors in each class, (*id.* at ¶

22), but may be crammed down over the vote of a rejecting class under certain circumstances.

(*Id.* at ¶ 23.)  The Brazilian bankruptcy court must then approve the plan for it to become

effective.  (*Id.* at ¶ 24.)  Finally, as noted above, Brazilian Bankruptcy Law provides for a claims

allowance process, and the Brazilian Bankruptcy Law includes detailed provisions relating to a

creditor's challenge to the proposed disallowance of his claim. (AAX 20, at Art. 11-18.)

Instead, Aurelius and Alden focus on certain aspects of Brazilian Bankruptcy Law or the

Brazilian Bankruptcy Proceedings that they argue are or were manifestly contrary to public

policy and preclude recognition.  First, the Brazilian Bankruptcy Court entered a "substantive

consolidation" order *ex parte* without procedural and substantive fairness to the 2019

Noteholders or due process of law.  (*AA Proposed Findings & Conclusions* at ¶ 189 & nn. 18,

19.)  Second, the Brazilian Debtors are unable to avoid and recover the fraudulent transfers made

in connection with the December Transactions.  (*Id.* at ¶ 190.)  Although creditors may still bring

fraudulent transfer actions, "the Brazilian plan will likely be based on substantive consolidation,

which would wipe out any creditor ability to avoid inter-debtor fraudulent transfers," and "[e]ven

if . . . separate plans are confirmed, the evidence shows that any pending fraudulent transfer

actions will be superseded by the Brazilian plan."  (*Id.*)  Third, "given that there likely will be no

redress for the [December] Transactions and no benefit to holders of claims against guarantors in

Brazil, any distribution to Noteholders under a plan confirmed in the Brazilian Bankruptcy

Proceedings will necessarily deviate materially from distributions that would occur under a United States plan." (*Id.* at ¶ 191.)  In addition, Aurelius and Alden contend that Tavares has refused to cooperate in discovery, has evidenced a disregard for United States process, and intends to withhold relevant information from the JPLs until substantive consolidation is "definitively granted in Brazil." (*Id.* at ¶ 193.)

Objections based on the speculation that the Brazilian Court will approve a plan or plans that permit substantive consolidation, unfair distributions or the elimination of creditor fraudulent transfer claims are premature.  They depend on the contents and effect of one or more plans that the Brazilian Court has not yet approved and may never approve.

Moreover, as is evident from the record, Aurelius and Alden have received due process in Brazil.  A Brazilian court preliminarily enjoined the consummation of the Merger upon application by Aurelius and Alden.  Aurelius and Alden also challenged the consolidation order through their motion for reconsideration and their subsequent appeal of the Brazilian Court's consolidation order.  Aurelius and Alden concede that substantive consolidation has not been "definitively granted," and Brazilian appellate court affirmed the Brazilian Bankruptcy Court's consolidation order observing that it was subject to modification and "it will certainly be possible to become better acquainted with the facts and the relationship between the companies and their creditors in order to reach a sound decision." (OASX 21, at 2439-40.)  In addition, Aurelius and Alden will have the chance to object to any plans in Brazil and challenge any motion in this Court seeking recognition and enforcement of any plans approved by the Brazilian Court.

Furthermore, "even the absence of certain procedural or constitutional rights will not itself be a bar under § 1506." *Vitro*, 701 F.3d at 1069.  In particular, the practice in Brazil of the

35

different sides meeting *ex parte* with the Brazilian judge, (*see* Tr. at 103:16-104:6), is not

manifestly contrary to United States public policy.  *See Vitro District Court Decision,* 473 B.R.

at 130-31 ("A number of the objections raised by the Objecting Parties fall under the category of

general unfairness.  For example, they emphasize that Vitro SAB had many *ex parte* meetings

with the presiding judges.  *Ex parte* contact with judges is apparently common in Mexico; in

fact, the Objecting Parties' counsel had *ex parte* meetings of their own.").  Even United States

recognizes exceptions to the general rule forbidding *ex parte* communications and procedures.

Requests for examination pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure

are "filed and usually granted *ex parte*",  9 COLLIER ¶ 2004.01[2] at 2004-4, temporary

restraining orders may be issued under certain circumstances without notice, FED. R. CIV. P.

65(b), and settlement conferences often involve *ex parte* communications with judges and/or

mediators.  And Aurelius and Alden overlook that Aurelius obtained an *ex parte* order of

attachment from the New York state court and attached some of the defendants' bank accounts,

they filed an *ex parte* application with the BVI Court to place OAS Finance in liquidation, and as

part of that same application, obtained *ex parte* the appointment of the JPLs.  Due process is

satisfied because these *ex parte* proceedings and orders are subject to *ex post* review, just as the

consolidation order has been subject to *ex post* review in Brazil.

Furthermore, even a "definitive" substantive consolidation order is not manifestly

contrary to United States law.  The Bankruptcy Code expressly authorizes substantive

consolidation, *see* 11 U.S.C. § 1123(a)(5) (a plan must provide an adequate means for its

implementation, including "the merger or consolidation of the debtor with one or more

persons"); *see also In re Stone & Webster, Inc.*, 286 B.R. 532, 546 (Bankr. D. Del. 2002) ("I find

that § 1123(a)(5)(C) clearly authorizes a bankruptcy court to confirm a Chapter 11 plan

36

containing a provision which substantively consolidates the estates of the two or more debtors."),

and substantive consolidation is often ordered by United States bankruptcy courts.  *E.g., Union*

*Sav. Bank v. Augie/Restivo Baking Co., Ltd.* (*In re Augie/Restivo Baking Co., Ltd.*), 860 F.2d

515, 518-20 (2d Cir. 1988) (discussing factors to consider when determining substantive

consolidation); *see e. g.*, *In re H.H. Distributions, L.P.*, 400 B.R. 44, 53-55 (Bankr. E.D. Pa.

2009) (approving substantive consolidation); *In re Am. Homepatient, Inc.*, 298 B.R. 152, 165-66

(Bankr. M.D. Tenn. 2003) (same), *aff'd on other grounds,* 420 F.3d 559 (6th Cir. 2005), *cert.*

*denied*, 459 U.S. 942 (2006).  Although Brazilian law may impose different requirements for

substantive consolidation, the different standards, standing alone, do not signify that Brazilian

Bankruptcy Law is manifestly contrary to our own public policy.  *See In re Compania de*

*Alimentos Fargo, S.A.*, 376 B.R. 427, 437 (Bankr. S.D.N.Y. 2007) ("A foreign bankruptcy

system need not . . .  "mirror" United States law for comity to be granted, so long as foreign law

is substantially similar and not repugnant to United States law."); GUIDE ¶ 30 ("Differences in

insolvency schemes do not themselves justify a finding that enforcing one State's laws would

violate the public policy of another State.").

Finally, the record does not support the finding that the OAS Debtors have abused the

discovery process in this Court or the District Court, that Tavares has refused to cooperate with

"legitimate" discovery requests, that Tavares has evidenced his "disregard for United States

process" or that the OAS Debtors "intend to withhold relevant information from the JPLs until

substantive consolidation is definitively granted in Brazil."  (*AA Proposed Findings &*

*Conclusions* at ¶ 193.)  Here, Aurelius and Alden made discovery demands, and the OAS

Debtors objected to certain requests and asked for a discovery conference.  (*See Letter from*

*Susheel Kirpalani, Esq. to the Court,* dated May 4, 2015 (ECF Doc. # 39).) The Court conducted

a conference and sustained the majority of the objections.

Accordingly, the Court concludes that recognition of the OAS Debtors' Brazilian

Bankruptcy Proceedings is not manifestly contrary to the public policy of the United States, and

recognition is granted.  This conclusion is without prejudice to Aurelius' and Alden's right to

challenge any action that Tavares seeks to take in this Court, including, in particular, a request to

recognize and enforce a plan or plans approved by the Brazilian Court.  Settle order on notice.

Dated: New York, New York
       July 13, 2015

                                           /s/ *Stuart M. Bernstein*
                                           STUART M. BERNSTEIN
                                           United States Bankruptcy Judge